## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NUIQSUT TRILATERAL, INC.,
    3315 3rd Avenue
    Nuiqsut, AK 99789,

        *Plaintiff*,

    v.

DOUG BURGUM, in his official capacity as
Secretary of the Interior,
    1849 C Street, NW
    Washington, DC 20240,

KATHARINE MACGREGOR, in her official
capacity as Deputy Secretary of the Interior,
    1849 C Street, NW
    Washington, DC 20240,

UNITED STATES DEPARTMENT OF THE
INTERIOR,
    1849 C Street, NW
    Washington, DC 20240,

BILL GROFFY, in his official capacity as Acting
Director of the Bureau of Land Management,
    1849 C Street, NW
    Washington, DC 20240,

KEVIN PENDERGAST, in his official capacity as
Alaska State Director of the United States Bureau of
Land Management,
    222 W 7th Avenue #13
    Anchorage, AK 99513,

UNITED STATES BUREAU OF LAND
MANAGEMENT,
    1849 C Street, NW
    Washington, DC 20240,

        *Defendants*.

Civil Action No. 26-cv-239

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1. This lawsuit seeks to enjoin the unlawful and unconstitutional cancellation of a mitigation right-of-way granted by the United States Bureau of Land Management ("BLM") to Plaintiff Nuiqsut Trilateral Inc. ("NTI") pursuant to the Secretary of the Interior's powers under the Naval Petroleum Reserves Production Act ("NPRPA"). That statute designates the National Petroleum Reserve in Alaska ("NPR-A" or "Reserve"), a 23-million-acre tract of land extending across Alaska's North Slope, and it directs the Secretary of the Interior to conduct competitive leasing of oil and gas in the Reserve.

2. The "Act also recognize[s] the subsistence interests of Native American tribes in the area and the need to protect the environment." *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 973 (9th Cir. 2006). For thousands of years, communities across Alaska's North Slope have engaged in subsistence hunting and fishing as a way of life, nurturing and sustaining Iñupiat culture and traditions that date back millennia. *See* 1(b) Iñupiat Cmty. of the Arctic Slope, The Inupiat View 16 (1979).[1] The Iñupiat people's "physical and cultural survival depends on the continued harvest of natural resources," which provide communities across Alaska's North Slope with food, clothing, and societal cohesion. *Id.*

3. The surpassing importance of subsistence uses to Alaska Natives led Congress to declare in the Alaska National Interest Lands Conservation Act ("ANILCA")—just days before it opened the Reserve to oil and gas leases—that "the continuation of the opportunity for subsistence uses by rural residents of Alaska . . . is essential to Native physical, economic, traditional, and cultural existence and to non-Native physical, economic, traditional, and social existence."

---

[1] https://www.blm.gov/sites/blm.gov/files/Planning_Alaska_The_Inupiat_View_NPRA_105C_V olume1b.pdf.

16 U.S.C. § 3111(1); *see also* ANILCA, Pub. L. No. 96-487, §§ 801-816, 94 Stat. 2371 (1980). "[T]he situation in Alaska is unique in that, in most cases, no practical alternative means are available to replace the food supplies and other items gathered from fish and wildlife which supply rural residents dependent on subsistence uses[.]" 16 U.S.C. § 3111(2).

4.     Central to the Iñupiat way of life are caribou, which are among the most dependable and versatile resources on the North Slope. The Teshekpuk Caribou Herd is particularly important. That herd relies on calving grounds within the Western Arctic, primarily near the herd's eponymous lake: the largest lake in Alaska, the largest thermokarst lake in the world, and a vital habitat for the caribou, shorebirds, waterfowl, and fish.

5.     The herd suffered a roughly 50% decline between 2008 and 2016 due to poor calf survival and high adult mortality. *See* BLM, Federal Subsistence Board Adopts New Regulations for the Western Arctic and Teshekpuk Caribou Herds (Apr. 28, 2016).[2] The herd remains fragile, and development near the caribou calving grounds can harm caribou populations by displacing young caribou to territory with relatively poor access to food and greater threat of predation. Threats to the Teshekpuk Caribou Herd imperil not only the herd itself, but also the rural communities that rely on it for their existence and way of life.

6.     Congress understood the vital importance of Alaska Natives' subsistence rights when it created the NPR-A, and it therefore directed the Secretary of the Interior to strike a balance: facilitate hydrocarbon extraction while "protecti[ng] environmental, fish and wildlife, and historical or scenic values," § 42 U.S.C. § 6503(b), mitigating "adverse effects on the surface resources," *id.* § 6506a(b), and providing "maximum protection" for areas with subsistence value, *id.* § 6504(a). Under the NPRPA, therefore, "the federal government cannot greenlight private

---

[2] https://edit.doi.gov/sites/doi.gov/files/uploads/nr_wp16_37_fact_sheet.pdf.

development without considering 'the subsistence interests of Native American tribes in the area and the need to protect the environment.'" *Ctr. for Biological Diversity v. BLM*, 141 F.4th 976, 989 (9th Cir. 2025) (quoting *Kempthorne*, 457 F.3d at 973).

7.　　Congress paid special attention to the area around Teshekpuk Lake in view of the Lake's fragile ecosystem and local communities' dependence on the area for its subsistence use: Congress instructed that activities within "the Teshekpuk Lake area[] . . . shall be conducted in a manner which will assure the *maximum protection* of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve." 42 U.S.C. § 6504(a) (emphasis added).

8.　　To give effect to these goals, Congress empowered the Secretary of the Interior, acting through BLM, to "grant such rights-of-way, licenses, and permits as may be necessary to carry out his responsibilities under this Act." *Id.* § 6502. In the decades since, communities that rely on subsistence uses have routinely participated in BLM decisionmaking related to management of the Reserve and Teshekpuk Lake, facilitating local participation and consideration of the effects of oil and gas projects on residents within and adjacent to the Reserve.

9.　　In 2018, ConocoPhillips Alaska, Inc. sought regulatory approval to develop certain oil and gas leases it held in the Reserve. This proposal—called the "Willow Project"—would be the largest oil and gas project on the North Slope in decades. The Willow Project comprised several oil drilling sites, an operations center, a permanent camp for 500 employees, a gravel mine, hundreds of miles of roads and pipelines, and other infrastructure within and just south of the Teshekpuk Lake area. And in a first for the Reserve, ConocoPhillips would also construct a central processing facility to separate raw well fluids into multiple constituent products.

10.     After completing an Environmental Impact Statement ("EIS") pursuant to the National Environmental Policy Act ("NEPA"), BLM published its first Willow Master Development Plan and Record of Decision in October 2020 ("2020 Willow ROD"),[3] approving ConocoPhillips's plan.

11.     According to BLM, the scope and duration of the Project threatened to impact nearby caribou populations by disturbing and displacing calving caribou and impacting caribou movements during other times of the year.  The Project also risked "significantly restrict[ing] subsistence uses for the community of Nuiqsut due to a reduction in the availability of resources caused by the alteration of their distribution and the limitation on subsistence user access to the area."  2020 Willow ROD at 11.

12.     In August 2021, the United States District Court for the District of Alaska vacated the 2020 Willow ROD in part because it failed to give due consideration to the NPRPA's requirement to afford maximum protection to significant surface values in the Teshekpuk Lake area.  *See Sovereign Iñupiat for a Living Arctic v. BLM*, 555 F. Supp. 3d 739, 770, 805 (D. Alaska 2021).

13.     On remand, BLM engaged with local Native and non-Native communities to identify mitigation measures that might offset the Willow Project's impact on subsistence uses. The agency released the supplemental Willow Master Development Plan Record of Decision in March 2023 ("2023 Willow ROD") to "give[] effect to the Court's direction."  2023 Willow ROD at 11.[4]  The 2023 Willow ROD permitted several drill sites to move forward on the condition of

---

[3] https://eplanning.blm.gov/public_projects/109410/200258032/20029172/250035373/2020-10-27_ROD_508.pdf.

[4] https://eplanning.blm.gov/public_projects/109410/200258032/20075029/250081211/2023%20Willow%20MDP%20Record%20of%20Decision.pdf.

(among others) Mitigation Measure 27, which required the agency to undertake mitigation to protect the Teshekpuk Caribou Herd.

14.     Through Mitigation Measure 27, BLM decided to protect the lake, a buffer along its shores, and caribou movement corridors "with a focus on restricting future leasing or surface development in those areas." 2023 Willow ROD at 30. Courts later reviewing BLM's decision to approve Willow cited Mitigation Measure 27 in concluding that the agency complied with its obligation to provide maximum protection to the Teshekpuk Lake area. *See Sovereign Iñupiat for a Living Arctic v. BLM*, 701 F. Supp. 3d 862, 896 (D. Alaska 2023); *Ctr. for Biological Diversity*, 141 F.4th at 1002, 1015.

15.     On December 17, 2024, the BLM State Director for Alaska fulfilled the agency's obligations under Mitigation Measure 27 by granting the Teshekpuk Lake Conservation Right-of-Way ("Mitigation Right-of-Way") to NTI, relying on the Secretary of the Interior's explicit power to grant rights-of-way to carry out his responsibilities under the NPRPA. *See* Ex. A at 2-3 (citing 42 U.S.C. § 6502).

16.     NTI is a nonprofit organization formed by community members to protect the Teshekpuk Caribou Herd and the critical role it plays in the Iñupiat way of life. Its board comprises members from the Native Village of Nuiqsut (a federally-recognized Alaska Native Tribe), Kuukpik Corporation (an Alaska Native Corporation),[5] and the City of Nuiqsut, all of which have vital interests in the preservation of the Teshekpuk Lake area and its herd.

---

[5] In the Alaska Native Claims Settlement Act, or "ANCSA," "Congress authorized the transfer of $962.5 million in state and federal funds and approximately 44 million acres of Alaska land to state-chartered private business corporations that were to be formed pursuant to [the Act]," known as Alaska Native Corporations. *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 343 (2021) (quotation omitted).

17. The Mitigation Right-of-Way covers approximately one million acres in the Teshekpuk Lake area, or approximately four percent of the National Petroleum Reserve. Through the Mitigation Right-of-Way, the United States presumptively precluded new oil and gas leasing, surface and subsurface exploration and development, and the construction of oil and gas facilities and related utilities within the area of the Mitigation Right-of-Way. The Right-of-Way provides NTI with the right to enforce the United States's prohibition, but NTI may waive that right if it determines "in writing" that "the benefits associated with the proposal outweigh any impacts to the Herd and that it is in the best interest of the community . . . ." Ex. A at 4. And any new oil and gas leasing and development within the Mitigation Right-of-Way would remain subject to BLM oversight and approval.

18. The Mitigation Right-of-Way cured many of the deficiencies in BLM's 2020 ROD for the Willow Project and complied with the Secretary of the Interior's statutory obligations to protect surface resources and subsistence uses. Local institutions like Kuukpik Corporation did not previously support the project, but that changed after BLM began considering mitigation measures. Kuukpik Corporation even intervened in a challenge to the 2023 Willow ROD in order to *defend* the Willow Project, and, indeed, multiple courts upheld BLM's approval after favorably citing to Mitigation Measure 27.

19. On December 19, 2025, Deputy Secretary of the Interior Katharine MacGregor sent NTI a letter purporting to "cancel" the Mitigation Right-of-Way (the "Cancellation Decision"). *See* Ex. B. The Department did not consult NTI or its board members regarding the Cancellation Decision.

20. The Cancellation Decision announced that the Department of the Interior was opening the Teshekpuk Lake area for oil and gas leases and exploration. In a mere six pages of

reasoning, the Department rejected the proposition that protection of subsistence resources constituted a "responsibility" of the Secretary under the NPRPA, clearcutting the agency's statutory mandate and 50 years of considered management decisions. In so doing, the Department unwound the fulfillment of a mitigation measure necessary for the agency's lawful approval of the Willow Project.

21. Although it had only recently relied on the NPRPA's statutory authority to grant the Mitigation Right-of-Way, the Department's Cancellation Decision asserted that the Department lacked authority to issue the Right-of-Way in the first place. To reach this conclusion, the Department first characterized the Mitigation Right-of-Way as one for a "non-use," a determination in tension with Congress's recognition that "subsistence uses" are, as the name implies, "uses" of land and resources.

22. From this premise, the Department concluded that the NPRPA—which allows the Secretary to grant rights-of-way that may be necessary to carry out his "responsibilities" under the Act—does not allow instruments "intended to . . . hinder oil and gas activities." *Id.* at 4. The decision did not explain why the Secretary's various and mandatory duties to conserve and protect the Reserve, including for subsistence uses, are not his "responsibilities." Nor did it explain why a Right-of-Way designed to *facilitate* the Willow Project was one that "hindered" oil and gas activities.

23. The Cancellation Decision conceded that "[t]he NPRPA does not address cancellation of authorizations." *Id.* at 4. To cancel the Mitigation Right-of-Way, the Department therefore relied on what it described as an "inherent" authority described in a Supreme Court opinion, *id.*, even though that decision "h[e]ld *only* that the Secretary has the power to correct *administrative* errors . . . by cancellation of leases in *proceedings* timely instituted by *competing*

*applicants* for the same land." *Boesche v. Udall*, 373 U.S. 472, 485 (1963) (emphasis added). The Cancellation Decision did not explain how this narrow holding authorized the Department to cancel the Mitigation Right-of-Way.

24. The Cancellation Decision jeopardizes decades of collaboration with local communities and is unlawful several times over. The Department's conclusions are contrary to law, in violation of the Administrative Procedure Act ("APA"). The NPRPA explicitly provides the Secretary the authority, without further limitation, to grant rights of way that "may be necessary to carry out [the Secretary's] responsibilities under this Act," 42 U.S.C. § 6502, and those responsibilities unambiguously encompass conservation of surface resources in general and the subsistence resources and users in and around Teshekpuk Lake in particular. *See, e.g.*, *id.* §§ 6503(b), 6504(a), 6506a(b).

25. The Cancellation Decision also exceeds the Department's statutory authority. The agency admits that no statute grants it the power to revoke a right-of-way, and instead relies on a case addressing only administrative errors resulting in competing claims to leases. The Secretary has no "inherent authority" to cancel a right-of-way without notice and based on his vacillating interpretations of the NPRPA—and certainly not when those readings run directly counter to the statute's plain text.

26. If those errors were not enough, the agency committed a litany of basic administrative law errors. Durable protections for the Teshekpuk Caribou Herd's habitat, for example, were an indispensable component of the 2023 Willow ROD, but the agency has now rescinded those protections and provided no "day after" plan for fulfilling Mitigation Measure 27. The Department simply insisted that it lacked the legal authority to include that key mitigation measure in the ROD in the first place, then declined to consider alternative measures to comply

with its own ROD or the text of the NPRPA.  The agency also proceeded from an incorrect factual basis that the Mitigation Right-of-Way represented "non-use" of the protected area despite ongoing subsistence uses.  And the Department failed to consider local populations' reliance interests.

27.    Furthermore, the Cancellation Decision violates Plaintiff's rights under the Fifth Amendment Due Process Clause.  The Mitigation Right-of-Way may not be terminated during the life of the Willow Project without the consent of both Plaintiff and BLM.  NTI has a property right in the Mitigation Right-of-Way and may not be deprived of that right without due process. Whatever process is due, the Cancellation Decision is plainly insufficient.

28.    The Cancellation Decision also violates NEPA, which requires that agencies prepare a "detailed statement" on the effects of "major Federal actions significantly affecting the quality of the human environment."   42 U.S.C. § 4332(C).   On information and belief, the Department's NEPA analysis for the Cancellation Decision (if any) did not consider the effects of the Willow Project on caribou and other resources in the total absence of agency action to satisfy Mitigation Measure 27, including by analyzing relevant new information on caribou populations.

## JURISDICTION AND VENUE

29.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under federal law, including the U.S. Constitution and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 704-06.

30. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this action seeks relief against federal agencies and officials acting in their official capacities; at least one defendant is located in this district; and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

31. Plaintiff Nuiqsut Trilateral, Inc., is a private, not-for-profit corporation incorporated in Alaska, with tax-exempt status under Section 501(c)(3) of the Internal Revenue Code. NTI's board comprises representatives from Nuiqsut's municipal government, the Native Village of Nuiqsut, and Kuukpik Corporation, which is an Alaska Native Corporation. NTI promotes the lasting protection, survival, and enhancement of the Teshekpuk Caribou Herd and its most important habitat, including the areas near and around Teshekpuk Lake. To accomplish this goal, NTI protects the natural environment and wild resources near Teshekpuk Lake from adverse effects of industrial activities. NTI also works to perpetuate the Iñupiat culture and traditions associated with the herd, with the goal of passing this knowledge to future generations. The Cancellation Decision deprives NTI of its rights under the NPRPA and other federal statutes, the Mitigation Right-of-Way, and the Constitution.

32. The Cancellation Decision also impairs NTI's ability to carry out its core activities: protecting the Teshekpuk Caribou Herd and perpetuating Iñupiat culture and subsistence traditions within the Nuiqsut community through the holding of conservation instruments and exercising rights thereunder. NTI cannot carry out these activities when the United States unlawfully revokes those instruments or unlawfully withholds the issuance of those instruments, thus depriving NTI of an opportunity to enter into a conservation instrument for the benefit of the Teshekpuk Caribou Herd.

10

33.     Defendant Doug Burgum is the Secretary of the United States Department of the Interior.  He is sued in his official capacity only.

34.     Defendant Katharine MacGregor is the Deputy Secretary of the United States Department of the Interior and signatory of the Cancellation Decision.  She is sued in her official capacity only.

35.     Defendant United States Department of the Interior is an executive department of the United States government with overall responsibility for administering the NPRPA.

36.     Defendant Kevin Pendergast is the Alaska State Director of the United States Bureau of Land Management.  He is sued in his official capacity only.

37.     Defendant Bill Groffy is the Acting Director of the United States Bureau of Land Management.  He is sued in his official capacity only.

38.     Defendant United States Bureau of Land Management is the agency within the United States Department of the Interior with primary responsibility for administering the NPRPA.

## FACTUAL ALLEGATIONS

### *Local Communities' Reliance on Caribou Since Time Immemorial*

39.     Native communities in northern Alaska have relied on subsistence uses of natural resources since their ancestors crossed the Bering Strait thousands of years ago.  Hunting and fishing, as well as communal sharing of resources, are key components of the Iñupiat culture and way of life: the Iñupiat people's "physical and cultural survival depends on the continued harvest of natural resources." *The Inupiat View* at 16.  Activities associated with subsistence—processing, sharing, redistribution networks, cooperative and individual hunting, fishing, whaling, gathering, and ceremonial activities—strengthen community and family social ties, reinforce community and individual cultural identity, and provide a link between contemporary Alaska Natives and their

ancestors. These activities are guided by traditional knowledge based on a long-standing relationship with the environment. Traditional feasts such as Nalukataq (the spring Whale Festival) and Kivgiq (the Messenger Feast) revolve around the bringing together of communities and the distribution of subsistence foods throughout the community and region. Extensive sharing networks exist between North Slope communities, and between the North Slope and other regions in Alaska.

40. Alaska Natives residing in Nuiqsut feel a deep connection to the land around Teshekpuk Lake and the Colville River. Many families have cabins and camps near the lake that support their use of the land and its resources. Community members describe themselves as "subsistence hunters" who hunt and fish to feed themselves, their parents, and their children. These practices are even more vital given difficulties importing food to the region and the potential for food insecurity.

41. The Teshekpuk Caribou Herd is of particular importance to Iñupiat cultural heritage. Communities surrounding Teshekpuk Lake, including Nuiqsut, depend on the herd for subsistence uses, including food, clothing, and other commodities. Caribou herds are closely attached to calving grounds, and the Teshekpuk Caribou Herd most often returns to an area southeast of the lake to raise their young. The herd has experienced a dramatic decline since the 1970s, including steep population dips during the 2000s and 2010s. Though it has since marginally recovered, the herd remains fragile and vulnerable to developments affecting its core calving grounds. The future of Nuiqsut, its people, and their way of life depends on the health of the Teshekpuk Caribou Herd. NTI exercises its rights under the Right-of-Way to protect its subsistence way of life.

42.     Recognizing the overwhelming importance of subsistence uses to Native communities in Alaska, Congress included strong protections for those activities in ANILCA. *See* Pub. L. No. 96-487, §§ 801-816, 94 Stat. 2371 (1980); *see also* 16 U.S.C. § 3113 (defining "subsistence uses"). Congress enacted these protections on December 2, 1980, just ten days before it passed a separate measure permitting oil and gas leases in the NPR-A.

43.     In ANILCA, Congress "f[ou]nd and declare[d]" that "the continuation of the opportunity for subsistence uses by rural residents of Alaska, including both Natives and non-Natives, on the public lands and by Alaska Natives on Native lands is essential to Native physical, economic, traditional, and cultural existence and to non-Native physical, economic, traditional, and social existence." 16 U.S.C. § 3111(1). "[T]he situation in Alaska is unique in that, in most cases, no practical alternative means are available to replace the food supplies and other items gathered from fish and wildlife which supply rural residents dependent on subsistence uses." *Id.* § 3111(2). Congress observed that opportunity for subsistence uses was under threat from "increasing population" accompanied "by sudden decline in the populations of some wildlife species which are crucial subsistence resources." *Id.* § 3111(3). Congress thus relied on its authority over Native affairs and the Property Clause to "protect and provide the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents," *id.* § 3111(4), and establish protections for "the continuation of the opportunity for a subsistence way of life by residents of rural Alaska," *id.* § 3111(5).

44.     For these reasons, Congress required priority for uses of federal land reflecting "customary and direct dependence upon [fish and wildlife] populations as the mainstay of livelihood." *Id.* § 3114(1). Congress also directed that whenever a "Federal agency" makes a decision "to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of

public lands," the agency must evaluate the effect of that action on subsistence uses and needs, as well as consider alternatives that would reduce impact on subsistence. *Id.* § 3120(a). Whenever that action "would significantly restrict subsistence uses," the agency must provide notice to various entities, hold a hearing near the affected area, and make several determinations. *Id.*

45.     ANILCA thus reflects a definitive federal policy recognizing threats to traditional subsistence uses and protecting those activities.

### *The National Petroleum Reserve in Alaska*

46.     The National Petroleum Reserve in Alaska is a vast federal land unit located on Alaska's North Slope, encompassing approximately 23 million acres. President Harding originally designated the area in 1923 as the Naval Petroleum Reserve No. 4. *See* Exec. Order No. 3797-A (Feb. 27, 1923). Administration of the Reserve remained under the purview of the Secretary of the Navy until 1976, when Congress transferred management authority over the area to the Department of the Interior and redesignated it as the National Petroleum Reserve-Alaska. *See* NPRPA, Pub. L. No. 94-258, §§102-103(a), 90 Stat. 303 (1976) (codified at 42 U.S.C. §§ 6502-6503). At that time, Congress prohibited oil development while permitting ongoing exploration. *See id.* § 104(a).

14



47. Even before permitting petroleum extraction, Congress commanded that subsistence surface values must be protected: "Any exploration within the Utukok River, the Teshekpuk Lake areas, and other areas designated by the Secretary of the Interior containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value, shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve." *Id.* § 104(b) (presently codified at 42 U.S.C. § 6504(a)). From the outset, Congress thus identified Teshekpuk Lake area as one containing "significant subsistence" value requiring "maximum protection." *Id.* Congress included this provision in specific response to threats to the Arctic caribou population,

which had decreased by 58 percent between 1971 and 1976 and drawn the attention of Alaska state officials.

48.     Congress also provided for special consideration of Alaska Natives.  Congress directed the Secretary to establish a task force "to conduct a study to determine the values of, and best uses for, the lands contained in the reserve." *Id.* § 105(c).  That study was to consider "the natives who live or depend on" the Reserve and include representatives from "the Arctic slope native community." *Id.*

49.     Congress also instructed that "the Secretary of the Interior shall assume all responsibilities" previously carried out by the Secretary of the Navy "[w]ith respect to any activities related to the protection of environmental, fish and wildlife, and historical or scenic values" in the Reserve. *Id.* § 103(b) (codified at 42 U.S.C. § 6503(b)).  Congress further instructed the Secretary to, "[a]s soon as possible . . . promulgate such rules and regulations as he deems necessary and appropriate for the protection of such values within the reserve." *Id.*

50.     Legislative history reflects Congress's intention that extraction of oil and gas be balanced against harms to surface resources.  The conference report explained, for instance, that Section 103 of the NPRPA vests powers in the Secretary "immediately upon enactment of this Act so that any activities which are or might be detrimental to such values will be carefully controlled." H.R. Conf. Rep. 94-942, at 20, *as reprinted in* 1976 U.S.C.C.A.N. 516, 523.  The report also explained that "the Secretary is expected to take into consideration the needs of resident and migratory wildlife" in the Teshekpuk Lake area, including avoiding activities "during times of the year when the caribou calving season and the nesting and molting seasons of the birds can be avoided." *Id.* at 21.  "[T]he Secretary will take every precaution to avoid unnecessary surface damage and to minimize ecological disturbances throughout the reserve." *Id.*

51.     Just ten days after Congress passed ANILCA, the same Congress permitted and funded an "expeditious program of competitive leasing of oil and gas in the National Petroleum Reserve in Alaska." Department of the Interior Appropriations Act, Pub. L. No. 96-514, 94 Stat. 2957 (Dec. 12, 1980) (presently codified at 42 U.S.C. § 6506a). Yet Congress established as the very first out of nine separate conditions on that funding that "activities undertaken pursuant to this Act shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources" of the Reserve. *Id.* In providing for oil and gas leases less than two weeks after passing ANILCA, Congress plainly intended that hydrocarbon extraction would be balanced with subsistence uses within the NPR-A.

52.     On July 4, 2025, Congress passed the One Big Beautiful Bill Act, instructing the Secretary to "conduct not fewer than 5 lease sales under the Program by not later than 10 years after the date of enactment of this Act," each of which "shall offer not fewer than 4,000,000 acres." Pub. L. No. 119-21, § 50105(c), 139 Stat. 72, 143. The Act made no changes whatsoever to Congress's statutory directions to protect environmental, fish and wildlife, and historical or scenic values, provide "maximum protection" to subsistence values in the Teshekpuk Lake area, and mitigate effects on surface resources.

### BLM's Management of the Reserve

53.     BLM is the bureau within the Department of the Interior with primary responsibility for management of the NPR-A. To implement the requirements of the NPRPA, BLM has historically relied on integrated activity plans ("IAPs"), informed by environmental impact statements ("EISs") prepared under NEPA, to analyze and govern leasing, exploration, and development across the Reserve. These planning documents establish land-use allocations, identify areas subject to heightened protections, and define some of the mitigation measures

intended to safeguard subsistence uses, wildlife habitat, and other surface values required by the NPRPA.

54.     IAPs have consistently recognized that the Secretary's "responsibilities" under the NPRPA include "the protection of environmental, fish and wildlife, and historical or scenic values," and the protection of special subsistence areas like the Teshekpuk Lake area.  BLM, NPR-A IAP ROD at 9 (December 2025) ("2025 IAP");[6] *see also* BLM, NPR-A IAP ROD at 8 ("2020 IAP")[7] ("The plan adopted in this ROD balances BLM's legislatively mandated goals of providing for the exploration and development of oil and gas in NPR-A while protecting surface values, taking into consideration public and agency comments and Native consultation.").

55.     BLM has recognized its obligation to protect subsistence uses and the environment in every IAP.  In recent iterations, BLM has excluded at least 4.1 million acres of land within the NPR-A from oil and gas leasing—roughly four times as much of land as the Mitigation Right-of-Way—"in order to protect and conserve important surface resources and uses in these areas."  2025 IAP at 4; *see also* 2020 IAP at 3.

56.     Agency actions authorizing oil and gas development in the NPR-A are subject to the procedural requirements of NEPA, and many such authorizations constitute "major Federal actions" necessitating preparation of an EIS.  *See* 42 U.S.C. §§ 4332(C), 6504(a).

### The Willow Project and Mitigation Measure 27

57.     In 2018, ConocoPhillips Alaska, Inc. requested that BLM prepare an EIS for the Willow Project, the proposed development of certain oil and gas leases in the Reserve.  The

---

[6] https://eplanning.blm.gov/public_projects/117408/200284263/20148807/251048787/20251222_2025%20NPRA_ROD_508.pdf.

[7] https://eplanning.blm.gov/public_projects/117408/200284263/20032151/250038350/NPR-A%20IAP%20Record%20of%20Decision.pdf.

company proposed to develop up to five drill sites to access subsurface hydrocarbons, a central processing facility, an operations center pad, up to 37 miles of gravel roads and seven bridges, up to 575.4 total miles of ice roads during construction, an airstrip, up to 315.9 miles of pipelines, a gravel mine site, sealift barge transport of construction materials and prefabricated modules to the North Slope, a constructed freshwater reservoir sized to provide 55 million gallons of water for winter withdrawal, up to three boat ramps for subsistence users, and a permanent camp to house 500 employees.   In total, the Willow Project was estimated to produce approximately 586 million barrels of oil over its 30-year life, amounting to 160,000 barrels of oil per day.  *See* 2020 Willow ROD at 1.

58.     The project was the largest oil and gas proposal anywhere in the country on public lands, as well as the largest project proposed in northern Alaska in decades.  Inclusion of a central processing facility expanded the project's scope significantly beyond those of prior projects and dramatically increased potential impacts on the environment and the Teshekpuk Caribou Herd.

59.     In preparing its EIS on the proposed plan for the Willow Project, BLM engaged in "an open, collaborative, and robust process among scientists, resource specialists, and regulatory staff of BLM, the cooperating agencies, and the participating public," including the Native Village of Nuiqsut, the City of Nuiqsut, the Iñupiat Community of the Arctic Slope, and the North Slope Borough.  2020 Willow ROD at 2.  BLM sought input from a broad range of federal agencies, including the Environmental Protection Agency, the Army Corps of Engineers, the Fish and Wildlife Service, the National Marine Fisheries Service, Coast Guard, and the Bureau of Ocean Energy Management.  *See* Willow EIS BLM Administrative Record Index, *Sovereign Iñupiat for a Living Arctic v. BLM*, No. 20-cv-290 (D. Alaska Jan. 15, 2021).  BLM also received scores of comments from businesses, consultancies, environmental groups, and the general public.  *See id.*

60.    In total, the administrative record informing BLM's original decision spanned at least 234,000 pages and 3,200 documents.  *See id.*

61.    In October 2020, BLM issued a Willow Master Development Plan Record of Decision, approving ConocoPhillips's plan to drill for oil at three sites.  ConocoPhillips requested that BLM defer approval for two additional drill sites to allow it to consult with Nuiqsut community members regarding impacts to caribou migration and subsistence hunting.

62.    On August 18, 2021, the United States District Court for the District of Alaska vacated and remanded the 2020 Willow ROD because, *inter alia*, "BLM acted contrary to law in its alternative analysis for the Teshekpuk Lake Special Area insofar as it failed to consider the statutory directive that it give 'maximum protection' to surface values in that area."  *Sovereign Iñupiat for a Living Arctic v. BLM*, 555 F. Supp. 3d 739, 805 (D. Alaska 2021).  The court rejected BLM's qualified and circumspect conclusion that impacts from the Willow Project "may not 'necessarily be greater within the [Teshekpuk Lake area] than they would outside the [area]," explaining that the agency's analysis "entirely distort[ed]" Congress's mandate in the NPRPA.  *Id.* at 769.

63.    BLM then developed a Supplemental EIS "to address the U.S. District Court for Alaska's . . . decision" that, among other faults, the prior EIS underlying the 2020 Willow ROD "failed to give due consideration to the requirement in the [NPRPA] to afford 'maximum protection' to surface values in" the Teshekpuk Lake area. BLM, Willow Master Development Plan Supplemental EIS ("Supplemental EIS") ES-1, 1 (Jan. 2023).[8]  The Supplemental EIS was intended to permit "construct[ion of] the infrastructure necessary to allow the production and

---

[8] https://eplanning.blm.gov/public_projects/109410/200258032/20073121/250079303/Willow%20FSEIS_Vol%201_Ch%201-Ch%205.pdf.

transportation to market of federal oil and gas resources . . . while providing maximum protection to significant surface resources within the NPR-A, consistent with BLM's statutory directives." *Id.* at 2-3. "A key revision of the Supplemental EIS was the addition of a fourth action alternative (Alternative E), which reduce[d] infrastructure within the Teshekpuk Lake Special Area (TLSA) relative to the previously analyzed action alternatives." BLM, Appendix G to Willow Master Development Plan Supplemental EIS at 1 (Jan. 2023).[9]

64.    The Supplemental EIS focused on subsistence uses, noting that "[t]he Iñupiat of the North Slope traditionally lived a seminomadic, subsistence-based lifestyle," and that those "communities continue to actively engage in traditional subsistence activities, with substantial sharing of traditional foods across the region." Supplemental EIS at 301. "[A]t least 94% of Iñupiat households in all communities reported using subsistence foods, and a majority of households reported at least half of their household diet came from subsistence foods." *Id.* "[T]o the Iñupiat, protection of traditional lands, waters, and the wild resources that inhabit them is essential to maintaining cultural traditions, traditional knowledge, and identity." *Id.* at 303.

65.    BLM also recognized the ongoing impacts of oil and gas development on subsistence uses. The agency observed that "[s]ince 2000, oil and gas development has expanded into highly used Nuiqsut subsistence use areas." *Id.* at 420. Development has impacted Nuiqsut residents' subsistence harvests due to disruption of animal activity, air and ground traffic, decreased access, and increased oil and gas infrastructure. *See id.* at 305. Continued expansion toward the Teshekpuk Caribou Herd's core calving grounds could result in "overall decline in productivity and abundance," which "would likely extend to subsistence users of the herd

---

[9] https://eplanning.blm.gov/public_projects/109410/200258032/20073070/250079252/Willow%20FSEIS_Vol%2016_App%20I%20to%20J.pdf.

including Nuiqsut." *Id.* at 419. "[M]any" people within the community also "view the increasing expansion of development infrastructure as a loss of traditional lands" that were "[o]nce considered part of the community's traditional subsistence use." *Id.* at 420.

66.     The Supplemental EIS thus proposed options to protect the Teshekpuk Caribou Herd, including measures to minimize disturbance to the herd and limit oil and gas facilities in caribou movement corridors and calving areas. *Id.* at 319. The agency also considered solutions gathered through public comment, including buffer zones around the caribou habitat and a plan to "develop compensatory mitigation that provides durable, long-term protection for the Teshekpuk Caribou Herd to fully offset impacts of the Project on that Herd." *Id.* at 323, 325.

67.     In total, BLM's renewed evaluation of the environmental impacts associated with the Willow Project—including its effects on the Teshekpuk Caribou Herd—spanned approximately 450,000 additional pages across hundreds of documents. *See* BLM Administrative Record Index, *Sovereign Inupiat for a Living Arctic v. Bureau of Land Management*, No. 23-cv-58 (D. Alaska, June 28, 2023). BLM received 125,146 public comments during scoping of substantive issues, *see* Supplemental EIS at ES-2, an additional 218,931 public comments on the draft EIS, *id.* at ES-3, and an unspecified number of comments following the final Supplemental EIS, *see* 2023 Willow ROD at 15.

68.     In March 2023, BLM issued its supplemental Willow Master Development Plan Record of Decision. Choosing among five alternatives, BLM permitted ConocoPhillips to proceed with three drill sites southeast of the Teshekpuk Lake area that would facilitate extraction of 94 percent of the subsurface oil resources ConocoPhillips initially sought. *See id.* at 12. BLM asserted that its "decision strikes a balance, allowing for development to occur in the NPR-A

consistent with the terms of existing leases while at the same time requiring the implementation of robust protections for surface resources." *Id.* at 11.

69.     In reaching its decision, the agency "g[a]ve effect to the Court's direction," *id.*, and the need for less surface infrastructure within the Teshekpuk Lake area. BLM reasoned that "[t]he Project's impacts to caribou and subsistence harvesting of caribou, particularly associated with roads and pipelines, has been consistently identified as a key concern by the community of Nuiqsut, which relies heavily on caribou for their sustenance and is located closest to the Project." *Id.* at 11. The approved plan would limit proposed development in the Teshekpuk Lake area, "thereby reducing impacts on caribou and the community's subsistence harvest of caribou." *Id.* at 23.

70.     Key to this limitation and compliance with the NPRPA was Mitigation Measure 27. That measure would "protect the most important habitat areas for the maternal and migrating caribou of the Teshekpuk Caribou Herd, including Teshekpuk Lake, a buffer around the lake, and the migration corridors to the east and northwest." *Id.* at 30. In its 2023 Willow ROD, BLM stated that it "will develop compensatory mitigation that provides durable, long-term protection for the Teshekpuk Caribou Herd to fully offset impacts of the project on that Herd." *Id.* This "include[d] protecting the surface area of Teshekpuk Lake, a buffer along all shores of the lake, and the K-10 Caribou Movement Corridors/K-16 Deferral Areas . . . using existing statutory, management or administrative authorities, with a focus on restricting future leasing or surface development in those areas." *Id.* The ROD required BLM to "explore creating a bi-lateral or multi-lateral conservation instrument to provide protections for the Herd and its key habitat for the duration of the Project's impacts." *Id.* at 31. This instrument, BLM explained, would provide local

community entities greater say over future activities impacting "an important subsistence resource." *Id.*

71.     After BLM issued the 2023 Willow ROD, it set about fulfilling its obligations under Mitigation Measure 27.  BLM met with various stakeholders and, in July of 2023, issued the Teshekpuk Lake Special Area Protection Options Report.[10]  The Report carefully considered prior existing rights near Teshekpuk Lake, co-stewardship opportunities, and community outreach.  *See id.* at 6-8.  And while the Report evaluated several legal instruments that could in theory satisfy Mitigation Measure 27—such as a memorandum of understanding or an easement—BLM ultimately recommended a mitigation right-of-way for several reasons, including the clear authority for such agency actions in the NPRPA.  *Id.* at 4.  Other options were dismissed because, for example, they expired too quickly (and were thus not "durable") or were disproportionate to Willow's effects (e.g., a perpetual easement).  *Id.*  Ultimately, the Right-of-Way was the only method of complying with the NPRPA and Mitigation Measure 27.

72.     Three-quarters of the area of the Right-of-Way would be within the core calving grounds of the Teshekpuk Caribou Herd, and the entire area would be vital to the herd through their critical life phases.

---

[10] https://eplanning.blm.gov/public_projects/?doc=2034692%2F200633090%2F20125418%2F251025398%2FTeshekpuk%20Lake%20Conservation%20Area%20Protection%20Options%20Report.pdf.



***Defendants Issue the Mitigation Right-of-Way to Comply with***
***the ROD and Statutory Obligations***

73.    On December 17, 2024, BLM issued the Mitigation Right-of-Way to NTI.  The
instrument's preamble documents the agency's reasoning.  Ex. A at 1-2.

74.    The preamble cites the 2023 Willow ROD for the Willow Project, noting that
project development was approved subject to the ROD's "Mitigation Measures," including
Mitigation Measure 27.  *Id.* at 1.  BLM again observed that "the Willow Project is expected to
impact the Herd and associated subsistence uses that cannot be fully mitigated by avoidance and
minimization, and protections are desired to offset these impacts on the Herd for the life of the
Willow Project."  *Id.*  These protections include "protecting the area comprising Teshekpuk Lake,

a buffer along all shores of the lake, and the K-10 Caribou Movement Corridors and K-16 Deferral Areas." *Id.*

75.     BLM also summarized its view of the importance of these protections.  "[T]he Protected Property and the resources it supports," the agency explained, "are used by local residents and caribou and are a very important subsistence resource for communities within the [Reserve]." *Id.*  The Teshekpuk Lake Special Area "and its subset, the Teshekpuk Lake Caribou Habitat Area, are critical to calving and insect relief for the Herd." *Id.* at 2.  The area also "contains natural, scenic, and other similar resources and values, including fish and wildlife and their habitats, as well as cultural attributes and amenities that are important and valuable to local communities." *Id.* at 1.  The agency's "objective" in issuing the Mitigation Right-of-Way was to "achieve durable, long-term protection for the Herd and for the communities who depend on it for subsistence use in order to offset the impacts on the Herd from the Willow Project." *Id.*

76.     BLM recognized that the NPRPA granted it authority to issue the Mitigation Right-of-Way, observing that "the Secretary is authorized to . . . grant such rights-of-way, licenses, and permits as may be necessary to carry out his responsibilities under this Act . . . ." *Id.* at 2 (quoting 42 U.S.C. § 6502).  BLM identified three statutory responsibilities carried out by the Mitigation Right-of-Way.  First, the Secretary is responsible for "protection of environmental, fish and wildlife, and historical or scenic values" within the Reserve.  *Id.* (quoting 42 U.S.C. § 6503(b)).  Second, the NPRPA requires the Secretary to ensure that "any exploration within the . . . Teshekpuk Lake area[] . . . containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value, shall be conducted in a manner which will assure the maximum protection of such surface values." *Id.* at 2-3 (quoting 42 U.S.C. § 6504(a)).  Third, the Secretary must "include or provide for such conditions, restrictions, and prohibitions as the Secretary deems

necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the National Petroleum Reserve in Alaska." *Id.* at 3 (quoting 42 U.S.C. § 6506a(b)).

77.     BLM then applied these responsibilities to the Willow Project, closely tailoring the Mitigation Right-of-Way to the Project itself.  Thus, the Mitigation Right-of-Way "shall continue and remain in effect throughout the life of construction and operation of the Willow Project" and through "completion of post-operation reclamation activities until the date BLM determines, in accordance with a BLM-approved reclamation plan, that reclamation has been completed and is deemed substantially effective in restoring the caribou habitat and the population and health of the Herd adversely impacted by the Willow Project." *Id.*

78.     The Mitigation Right-of-Way encompasses a "Protected Property" of approximately 1,012,040 acres surrounding Teshekpuk Lake, which constitutes approximately 4.3 percent of the Reserve.  *Id.* at 3.  In these areas, BLM chose to mitigate effects from the Willow Project by presumptively—but not absolutely—prohibiting "[i]ssuance of new oil and gas leases for lands" as well as exploration, development and extraction of oil, gas, and mineral resources. *Id.* at 6.  BLM also chose to presumptively prohibit construction of new facilities and installation or relocation of utilities.  *See id.*



Ex. A at 14.



Teshekpuk Lake Conservation Area Options Report at 14.

79.     The Mitigation Right-of-Way grants NTI the limited power to monitor and assess uses of the Protected Property, to enter and survey the area, and to "take legal and any other lawful action" to enforce the United States's prohibitions in the area of the Right-of-Way. Ex. A at 4. The Right-of-Way does not grant NTI any right to define prohibited activities within the Protected Property. Nor does it give NTI any right to minerals or other monetizable interests in the Property. NTI may agree to waive its right to enforce the prohibition for specific "projects, activities, uses, or facilities," but only if NTI determines "in writing" that "the benefits associated with the proposal outweigh any impacts to the Herd and that it is in the best interest of the community[.]" *Id.* The

Mitigation Right-of-Way provides NTI no right to approve or oversee any oil or gas project—that authority remains in BLM's hands.

### Defendants Cancel the Mitigation Right-of-Way to Open the Protected Teshekpuk Lake Area to Oil and Gas Leases

80. On December 19, 2025, without any advance notice or opportunity to be heard, the Department of the Interior sent NTI a short letter captioned "Right of Way Cancellation." Ex. B at 1. The agency declared the Mitigation Right-of-Way "void *ab initio*," *id.* at 8, stating that the Department "has determined that the [Mitigation Right-of-Way] was improperly issued" and that "cancellation is appropriate" because of "serious and fundamental legal deficiencies in the [Mitigation Right-of-Way]," *id.* at 1. The agency also adopted a striking, novel view of the NPRPA, claiming that because Congress's "primary direction to the Secretary [is] to undertake 'an expeditious program of competitive leasing of oil and gas' in the NPR-A," the statute provides the Secretary only limited authority to protect surface resources and subsistence uses. *Id.* at 2-3 (quoting 42 U.S.C. § 6506a(a)).

81. Although its prior consideration of Willow—the largest oil and gas project in the NPR-A in decades—previously encompassed at least 700,000 pages and hundreds of thousands of public comments, the Department upended its prior determination in six pages of reasoning and without public input.

### The Department's Purported Non-Statutory Authority

82. The Department recognized that the NPRPA does not provide statutory authority for "cancellation of authorizations." *Id.* at 4. BLM's regulations governing the Reserve also do not address cancellations. *See id.* The agency instead relied on the Secretary's purported "inherent authority, under his general managerial power over public lands, to cancel authorizations issued in violation of law." *Id.* (citing *Boesche v. Udall*, 373 U.S. 472, 476-77 (1963)). The agency did not

further explain this authority, including, for example, whether it was limited by time or reliance interests, what constituted a "violation of law" requisite for cancellation, or which bodies were empowered to determine such a violation for purposes of the authority.

83.     For its part, *Boesche* was careful to note that it held "only that the Secretary has the power to correct administrative errors of the sort involved here"—*i.e.*, the invalidity of a lease for failure to comply with the Department's regulatory requirements for total acreage—"by cancellation of leases in proceedings timely instituted by competing applicants for the same land." 373 U.S. at 485. If that limitation were not clear enough, the decision "sanction[ed] no broader rule that is called for by the exigencies of the general situation and the circumstances of [its] particular case[,]" and warned against the Department relying on even the limited authority described in the opinion as a "door to administrative abuses." *Id.* at 485-86.

*The Department's "Dominant Purpose" Rationale*

84.     In the Cancellation Decision, the Department identified three "legal deficiencies regarding the [Mitigation Right-of-Way] that warrant cancellation" under its "inherent authority." Ex. B at 4.

85.     "First," according to the Department, "the plain language of the NPRPA does not authorize the [Mitigation Right-of-Way]." *Id.* Notwithstanding this appeal to "plain language," the Department justified its initial rationale on the grounds that the "primary *purpose* of the Act," is "to support oil and gas exploration . . . while also recognizing existing Native claims to surface areas." *Id.* (emphasis added); *see id.* at 5 (describing "oil and gas leasing" as the NPRPA's "dominant purpose" and "primary statutory direction"). From this characterization of the Act's purpose, the Department inferred that "the Secretary's authority to 'grant such rights-of-way … as may be necessary to carry out his responsibilities under this Act' must be understood to authorize rights-of-way related to oil and gas activities under the Act." *Id.* at 4-5. By the same token, the

31

Department concluded, the NPRPA "does not authorize a right-of-way that is specifically intended to prohibit or otherwise hinder oil and gas activities in the NPR-A." *Id.* at 5.

86.     The Department reasoned that the Mitigation Right-of-Way was intended to hinder oil and gas activities because it prohibited new leases absent NTI's waiver of its capacity to enforce that bar. But the 2023 Willow ROD reflects just the opposite: BLM included Mitigation Measure 27 and granted the Mitigation Right-of-Way to comply with its statutory obligations under the NPRPA and correct judicially-identified deficiencies in the 2020 Willow ROD. The Right-of-Way thus facilitated the Willow Project and *furthered* oil and gas development in the Reserve.

87.     The Cancellation Decision also wrongly concluded that such mitigation was beyond the purview of the Secretary because conservation and stewardship of natural resources, including subsistence resources, were not among the Secretary's "responsibilities" for purposes of his right-of-way authority. That conclusion flatly ignores the NPRPA's many statutory references to those responsibilities and BLM's long, unbroken history of recognizing them as such.

88.     The Cancellation Decision characterizes subsistence *uses*—the fulcrum of the Right-of-Way's mitigation—as somehow a "non-use" that supplies an extra-textual limit to Secretary's right-of-way authority. That characterization fundamentally misapprehends the most basic concepts of "subsistence" on Alaska's North Slope and is incompatible with the NPRPA's plain text. Even if Congress had not spoken so clearly, the statute's mandate to protect subsistence uses must be "construed liberally" in favor of the Alaska Natives it is intended to benefit. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *see also People of Vill. of Gambell v. Clark*, 746 F.2d 572, 581 (9th Cir. 1984) (applying the canon to adopt a broad interpretation of ANILCA).

*The Department's Post-Hoc Rationale*

89.     Although the Department justified cancellation of the Mitigation Right-of-Way by asserting that it was unlawful at the time it was issued, the agency supported that conclusion by looking to developments that post-date its decision to issue the Mitigation Right-of-Way.  The Department reasoned that "in PL 119-21 [*i.e.*, the One Big Beautiful Bill Act] Congress has now explicitly directed the Department to make available for leasing the approximately 1,012,040 acres that are currently subject to the ROW." Ex. B at 7.  The Department also cited Congress's separate disapproval of the 2022 NPR-A Integrated Activity Plan—which had governed planning for oil and gas leases in the Reserve—noting that "[t]he [preceding] 2020 IAP made most of the Teshekpuk Lake area available for oil and gas leasing."  *Id.* at 6.

90.     The Department included this reasoning even though its purported authority to cancel the Mitigation Right-of-Way depends on its unlawfulness *at the time of issuance*. Furthermore, the One Big Beautiful Bill Act made no mention of the Teshekpuk Lake area, much less any "explicit[]" direction regarding the Mitigation Right-of-Way.  The law provided the Secretary no authority to cancel rights-of-way, did not explicitly or impliedly revoke any such agency actions, and did not purport to have any retroactive effect.

*The Department's Sub-Delegation Rationale*

91.     The Department purported to identify a third flaw in the decision to issue the Mitigation Right-of-Way: that "the sub-delegation doctrine bars the [Mitigation Right-of-Way]'s sharing of the BLM's land management duties with the NTI."  *Id.* at 7.  The Department asserted that "[t]he doctrine bars a Federal agency from sub-delegating its authority wholesale to an entity outside the agency without congressional authorization," and that neither the NPRPA nor BLM's implementing regulations authorize sub-delegation.  *Id.*

33

92.     The Department provided this justification even though *BLM* decided precisely which activities to prohibit within the Mitigation Right-of-Way and simply provided NTI the right to enforce certain rights related to those prohibitions.  The Mitigation Right-of-Way granted NTI no authority whatsoever over approval and oversight of oil and gas activities, nor the authority to amend or countermand the land management decisions made *by BLM* in the Right-of-Way.  BLM even restricted NTI's ability to waive its rights, providing that waiver is only appropriate when "the benefits associated with the proposal outweigh any impacts to the Herd and that it is in the best interest of the community for the project, activity, use, or facility to go forward." Ex. A at 4.

### *The Department's Disregard of Reliance Interests*

93.     BLM had spent years working with local communities to develop mitigation measures that would minimize impacts on subsistence uses.  The Department batted these interests away in two short paragraphs.  First, the agency asserted that it "has considered the disruptive consequences of cancellation and finds those consequences to be minimal." Ex. B at 9.  Because the Mitigation Right-of-Way was recently issued and NTI did not pay for it, the Department reasoned, "NTI has limited reliance interests that could possibly be affected by cancellation." *Id.*

94.     The Department made no effort to address the concerns of communities that rely on the Teshekpuk Caribou Herd—and, in turn, the Teshekpuk Lake area—for their lives and livelihoods.  Those communities spent years pressing their interests before BLM, attending meetings, sending letters, and submitting scores of comments emphasizing the importance of the Teshekpuk Caribou Herd and mitigation measures to their way of life.  Instead, the agency commented that "not cancelling the [Mitigation Right-of-Way] could frustrate various planned and anticipated oil and gas development activities in the area" and that "[e]xpeditious cancellation is

necessary to ensure these activities can proceed without delay." *Id.* The Department did not identify or further explain these activities.

95. The Department failed to consider—in either the Cancellation Decision or the process of creating the broader, post-cancellation 2025 IAP—new data measuring the effects of oil and gas development on subsistence uses. *See, e.g.*, Nuiqsut Caribou Subsistence Monitoring Project: 2023 (Year 16) Report (Aug. 15, 2025).[11] In the IAP process, BLM instead relied on stale data from 2022.

96. The Department also ignored parties' reliance on the finality of the 2023 Willow ROD and its mitigation measures when approving Willow. BLM committed in that decision—after years of input from the community, notice-and-comment, and litigation—to protecting the most important habitat for the Teshekpuk Caribou Herd. *See Sovereign Iñupiat for a Living Arctic*, 701 F. Supp. 3d at 896; *Ctr. for Biological Diversity*, 141 F.4th at 1002. The Department made no attempt to grapple with the implications of its retreat from Mitigation Measure 27, which reflected those extensive efforts. Instead, the Department punted on the issue in its entirety, claiming with no support or elaboration that "BLM will ensure that the issues addressed in MM27 are appropriately addressed going forward." Ex. B at 9.

97. The Department concluded by stating that the Cancellation Decision represented the "final decision of the Department" and that it "is not subject to appeal." *Id.*

---

[11] https://catalog.northslopescience.org/id/dataset/2397/resource/262d5afe-b8ac-4401-85b5-fc8755b4a3b7.

# CLAIMS FOR RELIEF

## *FIRST CLAIM FOR RELIEF*

### Violation of the Administrative Procedure Act—Contrary to Law
### (All Defendants)

98.     Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

99.     A reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law."  5 U.S.C. § 706(2)(A).

100.     In managing the NPR-A, the Secretary must mitigate adverse effects on surface resources, *see* 42 U.S.C. § 6506a(b), "protect[] environmental, fish and wildlife, and historical or scenic values," *id.* § 6503(b), and provide "maximum protection" to subsistence resources in the Teshekpuk Lake area, *id.* § 6504.   Those mitigation and protection efforts fall within the Secretary's "responsibilities," and the Secretary may issue a right-of-way that "may" be necessary to carry them out.

101.     BLM's conclusion that the Secretary lacks the statutory authority to issue a right-of-way to carry out his duties is not in accordance with law.

102.     BLM's conclusion that Congress directed the Department of the Interior to make the Protected Property available for lease is not in accordance with law.

103.     BLM's conclusion that the Mitigation Right-of-Way represents a sub-delegation of the Secretary's authority is not in accordance with law.

104.     BLM's conclusion that it is "obligated to include the area covered by the Mitigation Right-of-Way within those areas available for potential leasing" is not in accordance with law.

105.     The cancellation is final agency action reviewable under 5 U.S.C. §§ 702 and 706.

106.    Defendants' actions, findings, and conclusions are contrary to law, and the Court must hold their actions unlawful and set them aside.

### *SECOND CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act—In Excess of Statutory Authority**
**(All Defendants)**

107.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

108.    A reviewing court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

109.    Defendants lack authority to cancel the Mitigation Right-of-Way through administrative action.

110.    Absent statutory authority, the Secretary may not unilaterally cancel a right-of-way.

111.    Defendants' actions are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and this Court must hold their actions unlawful and set them aside.

### *THIRD CLAIM FOR RELIEF*

**Violation of the Administrative Procedure Act—Arbitrary and Capricious**
**(All Defendants)**

112.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

113.    A court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious."  5 U.S.C. § 706(2)(A).

114.    After years of study and public comment, BLM committed itself to "develop compensatory mitigation that provides durable, long-term protection for the Teshekpuk Caribou

Herd to fully offset impacts of [the Willow Project] on that Herd, to include protecting the surface area of Teshekpuk Lake, a buffer along all shores of the lake, and the K-10 Caribou Movement Corridors/K-16 Deferral Areas . . . with a focus on restricting future leasing or surface development in those areas." 2023 Willow ROD at 30.

115. The Cancellation Decision's sudden rejection of those commitments is fundamentally arbitrary and capricious.

116. Defendants have also failed to adequately justify their actions; have premised their decision on a misreading of their statutory authority; have failed to consider key aspects of the problem, reasonable alternatives, and the substantial reliance interests at stake; have relied on factors Congress did not authorize them to consider; and have failed to acknowledge or justify their change of position, among other errors.

117. Defendants' actions are arbitrary and capricious, and this Court must hold their actions unlawful and set them aside.

### FOURTH CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act—Without Observance of Procedure Required by Law**
**(All Defendants)**

118. Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

119. A court must "set aside agency action, findings, and conclusions" that are "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

120. "NEPA imposes 'a set of action-forcing procedures' requiring federal agencies to take a 'hard look' at any potential environmental consequences associated with their 'proposals and actions' and to broadly disseminate relevant environmental information." *Gov't of Province*

*of Manitoba v. Zinke*, 849 F.3d 1111, 1115 (D.C. Cir. 2017). NEPA requires a federal agency to conduct an environmental analysis for "actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

121.    The Cancellation Decision neither includes nor relies upon any analysis that might comply with the requirements of NEPA as codified at 42 U.S.C. § 4332(C). NEPA analysis prepared in advance of the 2023 Willow ROD does not consider the effects of the ROD or subsequent actions in the absence of Mitigation Measure 27.

122.    Defendants failed to observe procedure required by law, including NEPA and ANILCA, among other procedures, and the Court must hold their actions unlawful and set them aside.

### FIFTH CLAIM FOR RELIEF

**Procedural Due Process (Fifth Amendment)**
**(All Defendants)**

123.    Plaintiff realleges and incorporates by reference all prior and subsequent paragraphs.

124.    "There are three basic elements to a procedural due process claim: there must be (1) a deprivation; (2) of life, liberty, or property; (3) without due process of law." *Lightfoot v. District of Columbia*, 273 F.R.D. 314, 319-20 (D.D.C. 2011). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* (internal quotation marks omitted) (quoting *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976)).

125.    By its own terms, the Mitigation Right-of-Way does not expire until "reclamation of the Willow Project has been completed and is deemed substantially effective in restoring the caribou habitat and the population and health of the Herd adversely affected by the Willow

Project." Ex. A at 10. The Mitigation Right-of-Way may also "be terminated upon mutual written agreement of both Parties." *Id.*

126.    NTI has a property interest in the Mitigation Right-of-Way.

127.    BLM deprived NTI of the Mitigation Right-of-Way without due process. Plaintiff is entitled to injunctive and declaratory relief to remedy this unconstitutional deprivation.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiff requests judgment in its favor against Defendants as follows:

1.    Declare that the Department of the Interior's December 19, 2025, letter captioned "Right of Way Cancellation" is unconstitutional and unlawful;

2.    Vacate and set aside the Department of the Interior's December 19, 2025, letter captioned "Right of Way Cancellation";

3.    Award Plaintiff reasonable attorneys' fees and costs; and

4.    Grant such other and further relief as the Court may deem just and proper.

Dated: January 28, 2026                              Respectfully submitted,

                                                     */s/ Travis Annatoyn*

Patrick W. Munson (*pro hac vice pending*)           Travis Annatoyn (D.C. Bar 7137597)
Kody P. George (*pro hac vice pending*)              Allison Rumsey (D.C. Bar 450475)
MUNSON, CACCIOLA & SEVERIN, LLP                      Sonia Tabriz (D.C. Bar 1025020)
1029 West Third Avenue Suite 402                     John V. Hoover (D.C. Bar 90006181)
Anchorage, AK 99501                                  ARNOLD & PORTER KAYE SCHOLER LLP
Tel: (907) 272-8401                                  601 Massachusetts Ave., NW
pmunson@mcsalaska.com                                Washington, DC 20001-3743
                                                     Tel: (202) 942-5000
                                                     travis.annatoyn@arnoldporter.com

*Counsel for Plaintiff Nuiqsut Trilateral, Inc.*