Travis Annatoyn (*pro hac vice*)
Allison Rumsey (*pro hac vice*)
Sonia Tabriz (*pro hac vice*)
John V. Hoover (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
travis.annatoyn@arnoldporter.com

Patrick W. Munson (Alaska Bar 1205019)
Kody P. George (Alaska Bar 2211100)
MUNSON, CACCIOLA & SEVERIN, LLP
1029 West Third Avenue Suite 402
Anchorage, AK 99501
Tel: (907) 272-8401
pmunson@mcsalaska.com

*Counsel for Plaintiff Nuiqsut Trilateral, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NUIQSUT TRILATERAL, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> DOUG BURGUM, in his official capacity as Secretary of the Interior, *et al.*, <br><br> *Defendants*, <br><br> and <br><br> STATE OF ALASKA, <br><br> *Intervenor-Defendant*. | Civil Action No. 3:26-cv-00098-SLG |

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Nuiqsut Trilateral, Inc. respectfully moves for summary judgment against all

Defendants. Plaintiff supports its motion with the following memorandum.

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 3

    A.    Caribou and the National Petroleum Reserve in Alaska ...................................... 3

    B.    BLM's Management of the NPR-A ....................................................................... 5

    C.    The Willow Project and Mitigation Measure 27 .................................................. 6

    D.    BLM Issues the Mitigation Right-of-Way ........................................................... 9

    E.    The Department of the Interior Cancels the Mitigation Right-of-Way ........... 11

LEGAL STANDARD ................................................................................................... 14

ARGUMENT ................................................................................................................ 14

I.    Defendants' Actions Are in Excess of Statutory Authority ................................... 14

II.    Defendants' Actions Are Contrary to Law .......................................................... 18

    A.    The NPRPA Authorized the Secretary to Issue the Right-of-Way .................. 18

        1.    The Plain Text of the NPRPA Authorizes the Right-of-Way .................... 18

        2.    The NPRPA's "Purpose" Does Not Preclude the Right-of-Way ................ 20

    B.    The Right-of-Way is Not a Sub-delegation ...................................................... 23

    C.    The Department Cannot Rely on Post-Hoc Events ........................................... 26

III.    Defendants' Actions Are Arbitrary and Capricious ............................................. 27

    A.    Failure to Recognize or Justify Change in Position .......................................... 27

    B.    Failure to Consider Alternatives ....................................................................... 28

    C.    Failure to Consider Important Aspects of the Problem ..................................... 29

    D.    Failure to Consider Reliance Interests .............................................................. 30

IV.    Defendants' Actions Are Without Observance of Procedure Required by Law ......... 30

V.    Defendants' Actions Violate the Fifth Amendment Due Process Clause ............ 31

CONCLUSION ............................................................................................................. 32

*Nuiqsut Trilateral, Inc. v. Burgum*                Case No. 3:26-cv-00098-SLG

## INTRODUCTION

As a subsistence community, Native Alaskans in Nuiqsut rely heavily on the Teshekpuk Caribou Herd for their existence and fundamental way of life. The herd's most critical habitat is located around Teshekpuk Lake, which sits in the northeast corner of the National Petroleum Reserve in Alaska ("NPR-A" or "Reserve"), a 23-million acre area managed by the Bureau of Land Management ("BLM"). Oil and gas development in the Reserve threatens the herd's core habitat and, by extension, the subsistence uses on which Nuiqsut residents rely for their culture and physical well-being.

In 2021, this Court struck down BLM's approval of the Willow Project, a large oil and gas project near Teshekpuk Lake, in part because the agency had failed to consider Congress's mandate to protect surface resources like the Teshekpuk Caribou Herd. BLM went back to the drawing board, seeking public comment, engaging with local communities, and considering hundreds of thousands of pages of analysis. BLM ultimately decided to fulfill its statutory mandate in part by issuing a right-of-way to Plaintiff Nuiqsut Trilateral, Inc. ("Nuiqsut Trilateral"), a non-profit corporation representing the major community stakeholders near Teshekpuk Lake. The Mitigation Right-of-Way would protect the area around Teshekpuk Lake from further development for the limited duration of the Willow Project, balancing BLM's statutory obligations to develop subsurface resources while protecting subsistence values on the surface. *See* ROW_02264-77 ("Mitigation Right-of-Way"). Federal courts—including this Court and the Ninth Circuit—subsequently upheld the revised Willow Project plan after citing the mitigation measures underlying the Right-of-Way. *See, e.g.*, *Ctr. for Biological Diversity v. BLM*, 141 F.4th 976 (9th Cir. 2025).

One year later, after the dust from litigation had settled, the Department of the Interior issued a letter suddenly cancelling the Mitigation Right-of-Way without notice to Nuiqsut Trilateral. *See* ROW_02699-707 ("Cancellation Decision"). Although BLM had previously concluded that it had the legal authority to create durable conservation instruments like the Right-of-Way (and defended Willow in federal court on that premise), the Department now decided that the Right-of-Way was unlawful when issued. The Department also asserted the power to cancel Nuiqsut Trilateral's property right without a hearing. The Department said that it needed to open the Teshekpuk Lake area for development because "[c]ompanies are looking to conduct exploration activities in the area covered by the [Right-of-Way] this winter," and "[e]xpeditious cancellation is necessary to ensure these activities can proceed without delay." ROW_02707.

The Department's cancellation of the Mitigation Right-of-Way was unlawful. The Department admits it lacks the statutory authority to cancel the Right-of-Way, and instead hopes to stretch a purported "inherent authority" to cancel well beyond its breaking point. The Department's original analysis of its authority to issue the Right-of-Way was correct, and the Mitigation Right-of-Way therefore would not warrant cancellation even if the agency had the requisite power. The Cancellation Decision is arbitrary and capricious, particularly given its unexplained about-face on the necessity of the Right-of-Way and failure to consider alternatives to cancellation: the record shows that Interior simply rubber-stamped a bare-bones proposal to rescind the Right-of-Way from the State of Alaska, which had been disappointed when the instrument was awarded to Nuiqsut Trilateral and not to the State. ROW_02292-97. Finally, the Department was required to grant Nuiqsut Trilateral a hearing before depriving it of its property interest. Each of these errors is sufficient to warrant vacatur.

**STATEMENT OF FACTS**

**A.    Caribou and the National Petroleum Reserve in Alaska**

For thousands of years, communities across Alaska's North Slope have engaged in subsistence hunting and fishing as a way of life, nurturing and sustaining Iñupiat culture and traditions that date back millennia.  *See* Iñupiat Cmty. of the Arctic Slope, The Inupiat View 16 (1979).[1]  These practices are critical for the survival of North Slope communities.  Congress has recognized that "the situation in Alaska is unique in that, in most cases, no practical alternative means are available to replace the food supplies and other items gathered from fish and wildlife which supply rural residents dependent on subsistence uses."  16 U.S.C. § 3111(2).  Given the difficulties of importing food to the region, subsistence uses are oftentimes the only thing standing between North Slope communities and food insecurity.

There is no dispute that caribou "play a central role in the subsistence lifestyle of Iñupiat culture."  Defs.' Answer ¶ 4, ECF No. 44; *see also* Ex. A, Eunice Brower Decl. ¶¶ 2, 3, 7, 10. They are a versatile and ideally reliable source of food, clothing, and other commodities.  *See* The Inupiat View at 16.  The Teshekpuk Caribou Herd is particularly important to the people of Nuiqsut.  That herd relies on calving grounds near Teshekpuk Lake, the largest thermokarst lake in the world and a vital habitat for shorebirds, waterfowl, and fish.  *See* Defs.' Answer ¶ 4 (admitting "that the Herd utilizes calving grounds" in the NPR-A and "that Teshekpuk Lake, along with its surrounding area, provides habitat for caribou, shorebirds, waterfowl, and fish").  Many Nuiqsut families have camps near the lake that support their use of the land and its resources.  *See* Eunice Brower Decl. ¶ 14.

---

[1] https://perma.cc/4XLV-8FW7.

As explained by George Sielak, a Nuiqsut Trilateral Board member who lives in the community:

> Subsistence is vital, important. It's a connection for our people to each other and the land. The young people who are strong hunt and share, especially with the elders. The food and traditions keep us strong. Everybody I know I think in Nuiqsut eats a lot of caribou. So we need a lot of caribou to make sure everybody has some. It brings everybody together, like a big family. If there isn't enough to share, everybody feels it. That is our way.

Ex. B, Sielak Decl. ¶ 8.

The Teshekpuk Caribou Herd often returns to an area near the lake to raise its young. *See* Sielak Decl. ¶ 9. That area is adjacent to the Willow Project's oil and gas development. The herd suffered a roughly 50% decline between 2008 and 2013 due to poor calf survival and high adult mortality, although it is presently experiencing a gradual recovery. *See* ROW_01109 (Willow Master Development Plan Supplemental Environmental Impact Statement ("Supplemental EIS")). Further development near these caribou calving grounds could harm caribou populations by displacing young caribou to territory with relatively poor access to food and greater threat of predation. *See, e.g.*, ROW_01123; ROW_01300.

The Teshekpuk Lake area lies within the National Petroleum Reserve in Alaska, a 23-million acre tract first designated by President Harding in 1923 and overseen by the Navy. *See* Exec. Order No. 3797-A (Feb. 27, 1923). Congress passed the Naval Petroleum Reserves Production Act ("NPRPA") in 1976, transferring responsibility over the area to the Secretary of the Interior and providing initial instructions for managing the Reserve. NPRPA, Pub. L. No. 94-258, §§ 102-103(a), 90 Stat. 303 (1976) (codified at 42 U.S.C. §§ 6502-6503). Recognizing the importance of the area to Native communities and the subsistence way of life, Congress embedded protections for Teshekpuk Lake into the NPRPA: "Any exploration within . . . the Teshekpuk

Lake area[] . . . shall be conducted in a manner which will assure the *maximum protection* of such surface values[.]" 42 U.S.C. § 6504(a) (emphasis added).

The NPRPA also provides that the Secretary of the Interior's responsibilities include "the protection of environmental, fish and wildlife, and historical or scenic values" in the Reserve generally. 42 U.S.C. § 6503(b). To carry out these responsibilities, Congress empowered the Secretary, acting through BLM, to "grant such rights-of-way, licenses, and permits as may be necessary[.]" *Id.* § 6502.

These legislated subsistence protections remain a core piece of the laws enabling oil and gas resource development in Alaska's North Slope. On July 4, 2025, Congress passed the One Big Beautiful Bill Act ("OBBBA"), instructing the Secretary to "conduct not fewer than 5 lease sales under the Program by not later than 10 years after the date of enactment of this Act," each of which "shall offer not fewer than 4,000,000 acres." ROW_02434-35 (Pub. L. No. 119-21, § 50105(c)(1), 139 Stat. 72, 144). That command made no changes whatsoever to Congress's statutory directions to protect environmental, fish and wildlife, and historical or scenic values, provide "maximum protection" to subsistence values in the Teshekpuk Lake area, and mitigate effects on surface resources. *See id.* The OBBBA also did not modify or mention the Mitigation Right-of-Way, or any other existing rights in the Reserve. *See id.*

## B. BLM's Management of the NPR-A

BLM manages the NPR-A under authority delegated from the Secretary of the Interior. *See* 43 C.F.R. § 2361.4 ("[BLM] . . . is responsible for the management of the Reserve [and] the protection of surface values from environmental degradation[.]"). To implement the NPRPA's requirements and Interior's regulations, BLM has historically relied on integrated activity plans ("IAPs")—informed by environmental impact statements ("EISs") prepared under the National

Environmental Policy Act ("NEPA")—to analyze and govern leasing, exploration, and development across the Reserve.  *See, e.g.*, Notice of Availability of 1998 NPR-A IAP, 63 Fed. Reg. 42431 (Aug. 7, 1998).  These planning documents establish land-use allocations, identify areas subject to heightened protections, and define some of the mitigation measures intended to safeguard subsistence uses, wildlife habitat, and other surface values required by the NPRPA.

IAPs have consistently recognized that the Secretary's "responsibilities" under the NPRPA include "the protection of environmental, fish and wildlife, and historical or scenic values," and the protection of special subsistence areas like the Teshekpuk Lake area.  ROW_02723 (December 2025 NPR-A IAP Record of Decision ("2025 IAP")); *see also* ROW_00228 (2020 NPR-A IAP Record of Decision ("2020 IAP")) ("The plan adopted in this [Record of Decision ("ROD")] balances BLM's legislatively mandated goals of providing for the exploration and development of oil and gas in NPR-A while protecting surface values, taking into consideration public and agency comments and Native consultation.").  BLM has recognized its obligation to protect subsistence uses and the environment in every IAP.  In recent iterations, BLM has excluded at least 4.1 million acres of land within the NPR-A from oil and gas leasing "in order to protect and conserve important surface resources and uses in these areas."  ROW_02718 (2025 IAP); *see also* ROW_00223 (2020 IAP).

### C.      The Willow Project and Mitigation Measure 27

In 2018, ConocoPhillips Alaska, Inc. sought regulatory approval for the "Willow Project," which would develop oil and gas leases ConocoPhillips held in the Reserve.  The Willow Project would be the largest oil and gas project on the North Slope in decades, comprising several drilling sites, an operations center, a permanent camp of 500 employees, a gravel mine, hundreds of miles of roads and pipelines, and a processing facility to separate raw well fluids.  *See* ROW_00135

*Nuiqsut Trilateral, Inc. v. Burgum*                    Case No. 3:26-cv-00098-SLG

6

(Willow Master Development Plan and ROD ("2020 Willow ROD")).  All of this infrastructure would be in or just south of the Teshekpuk Lake area.  *See* ROW_00139.

BLM determined in 2020 that the scope and duration of the Willow Project threatened to impact nearby caribou populations by disturbing and displacing calving caribou and impacting caribou movements during other times of the year.  The Willow Project, BLM concluded, risked "significantly restrict[ing] subsistence uses for the community of Nuiqsut due to a reduction in the availability of resources caused by the alteration of their distribution and the limitation on subsistence user access to the area."  ROW_00145.

In preparing its EIS for the Willow Project, BLM sought input from a wide range of sources, including scientists, BLM staff, other agencies, and the public, including the Native Village of Nuiqsut, the City of Nuiqsut, the Iñupiat Community of the Arctic Slope, and the North Slope Borough.  *See* ROW_00136.  In total, the administrative record informing BLM's original decision spanned at least 234,000 pages and 3,200 documents.  *See* Willow EIS BLM Administrative Record Index, *Sovereign Iñupiat for a Living Arctic v. BLM*, No. 20-cv-290 (D. Alaska Jan. 15, 2021).

BLM issued its record of decision in October 2020, permitting the Willow Project to move forward.  *See* ROW_00136-37.  In August 2021, this Court vacated the 2020 Willow ROD in part because it failed to give due consideration to the NPRPA's requirement to afford maximum protection to significant surface values in the Teshekpuk Lake area.  *See Sovereign Iñupiat for a Living Arctic v. BLM*, 555 F. Supp. 3d 739, 770, 805 (D. Alaska 2021).

On remand, BLM engaged with local Native and non-Native communities to identify mitigation measures that might offset the Willow Project's impact on subsistence uses and "address the U.S. District Court for Alaska's . . . decision."  ROW_00860.  The agency considered

the Iñupiat "seminomadic, subsistence-based lifestyle" and the community's reliance on subsistence foods. ROW_01186. BLM also recognized that "[s]ince 2000, oil and gas development has expanded into highly used Nuiqsut subsistence use areas." ROW_01305. BLM thus proposed options to protect the Teshekpuk Caribou Herd, including measures to minimize disturbance to the herd and limit oil and gas facilities in caribou movement corridors and calving areas. In total, BLM's renewed evaluation of the environmental impacts associated with the Willow Project—including its effects on the Teshekpuk Caribou Herd—spanned approximately 450,000 additional pages across hundreds of documents. *See* BLM Administrative Record Index, *Sovereign Iñupiat for a Living Arctic v. BLM*, No. 23-cv-58 (D. Alaska June 28, 2023).

Interior approved a modified version of the Willow Project in 2023. *See* ROW_01386-509 (Willow Master Development Plan ROD ("2023 Willow ROD")). The 2023 Willow ROD gave effect to the court's direction by including Mitigation Measure 27, among other changes. *See* ROW_01406. Mitigation Measure 27 protects Teshekpuk Lake, a buffer along its shores, and caribou movement corridors "with a focus on restricting future leasing or surface development in those areas." ROW_01461. BLM stated that it would "provide[] durable, long-term protection for the Teshekpuk Caribou Herd," *id.*, and would "explore creating a bi-lateral or multi-lateral conservation instrument to provide protections for the Herd and its key habitat for the duration of the Project's impacts," ROW_01462.

After issuing the supplemental ROD, BLM met with various stakeholders and, in July of 2023, issued the Teshekpuk Lake Special Area Protection Options Report. *See* ROW_01526-47. BLM considered several instruments that might satisfy Mitigation Measure 27, including "permits, leases, [rights-of-way] and easements," memoranda of understanding, and cooperative agreements. ROW_01532. BLM ultimately recommended issuing a mitigation right-of-way for

several reasons, including clear statutory authority for BLM to issue such an instrument. ROW_01531 (discussing 42 U.S.C. § 6502). Courts later reviewing BLM's decision to approve Willow cited Mitigation Measure 27 in concluding that the agency complied with its obligation to provide maximum protection to the Teshekpuk Lake area. *See, e.g.*, *Ctr. for Biological Diversity*, 141 F.4th at 1006.

### D. BLM Issues the Mitigation Right-of-Way

On December 17, 2024, BLM issued the Mitigation Right-of-Way to Nuiqsut Trilateral, a nonprofit organization formed by community members to protect the Teshekpuk Caribou Herd and the Herd's critical role in the Iñupiat way of life. *See* ROW_02264-77. Nuiqsut Trilateral's board comprises members from the Native Village of Nuiqsut (a federally-recognized Alaska Native Tribe), Kuukpik Corporation (the Alaska Native Village Corporation for Nuiqsut),[2] and the City of Nuiqsut, all of which have vital interests in the long-term health and viability of the Teshekpuk Caribou Herd and the areas upon which that Herd depends for survival. *See* Sielak Decl. ¶¶ 16-18.

The Right-of-Way preamble cites the 2023 Willow ROD, noting that project development was approved subject to the ROD's mitigation measures, including Mitigation Measure 27. BLM again observed that "the Willow Project is expected to have impacts to the Herd" and that "protections are desired to offset these impacts on the Herd for the life of the Willow Project." ROW_02264. BLM repeated that subsistence resources within the Mitigation Right-of-Way "are a very important subsistence resource for communities within the [Reserve]," ROW_02264, and

---

[2] In the Alaska Native Claims Settlement Act, or "ANCSA," "Congress authorized the transfer of $962.5 million in state and federal funds and approximately 44 million acres of Alaska land to state-chartered private business corporations that were to be formed pursuant to [the Act]," known as Alaska Native Corporations. *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 343 (2021) (quotation omitted).

*Nuiqsut Trilateral, Inc. v. Burgum*                                        Case No. 3:26-cv-00098-SLG

9

that Teshekpuk Lake and the "Caribou Habitat Area" are "critical to calving and insect relief for the Herd." ROW_02265. To "achieve durable, long-term protection for the Herd and for the communities who depend on it for subsistence," ROW_02264, the Mitigation Right-of-Way "shall continue and remain in effect throughout the life of construction and operation of the Willow Project" and through "completion of post-operation reclamation activities," ROW_02266.

The Mitigation Right-of-Way encompasses a "Protected Property" of approximately 1,012,040 acres surrounding Teshekpuk Lake, constituting approximately 4.3 percent of the 23-million-acre Reserve, ROW_02265, and a small portion of the Herd's habitat, ROW_01598-600. Across this area, the Right-of-Way mitigates effects from the Willow Project by presumptively—though not absolutely—prohibiting "[i]ssuance of new oil and gas leases," oil and gas exploration and development activities and related utilities, and new construction related to oil and gas development. ROW_02269. The Mitigation Right-of-Way grants Nuiqsut Trilateral the right to enforce this prohibition through legal action, and also to waive the prohibition for specific "projects, activities, uses, or facilities," but only if Nuiqsut Trilateral determines "in writing" that "the benefits associated with the proposal outweigh any impacts to the Herd and that it is in the best interest of the community[.]" ROW_02267. The Mitigation Right-of-Way also grants Nuiqsut Trilateral the powers to monitor and assess uses of the Protected Property, to enter and survey the area, and to receive thirty days' notice of and provide input on uses of land within the Right-of-Way. *Id.*

The Mitigation Right-of-Way provides Nuiqsut Trilateral no right to approve or deny an application submitted to BLM, or to regulate or oversee any oil or gas project; that authority remains with BLM. Rather, the Mitigation Right-of-Way is a property right granting the Nuiqsut community the right to continue using the Teshekpuk Lake area for its subsistence value by

excluding activities that BLM determined would interfere with that use. The Right-of-Way also grants Nuiqsut Trilateral the right to notice of any changes within the protected area.

Consistent with the 2023 Willow ROD and the Teshekpuk Lake Special Area Protection Options Report, BLM recognized that the NPRPA granted it authority to issue the Mitigation Right-of-Way. ROW_02265. BLM identified three statutory responsibilities carried out by the Mitigation Right-of-Way and therefore bringing the grant within the ambit of 42 U.S.C. § 6503(b): (1) protection of environmental, fish and wildlife, and historical or scenic values in the Reserve, (2) maximum protection of subsistence values in the Teshekpuk Lake area, and (3) mitigation of adverse effects on surface resources of the Reserve. ROW_02265-66. BLM reaffirmed its legal reasoning in NEPA analysis, ROW_02204; ROW_02228, and a public fact sheet, ROW_02077.

Nuiqsut Trilateral has since asserted its rights in the Mitigation Right-of-Way. In late 2025, Nuiqsut Trilateral learned that Narwhal Exploration, LLC had attempted to carry out oil and gas exploration activity within the Protected Property. ROW_02693-94. Nuiqsut Trilateral objected to these activities, insisted that Narwhal remove its equipment from the Protected Property, and contacted BLM in hopes of fostering better communication in the future. *See id.*; ROW_02696-97.

### E.    The Department of the Interior Cancels the Mitigation Right-of-Way

Executive Order 14153, issued on January 20, 2025, declared it the "policy of the United States to . . . fully avail itself of Alaska's vast lands and resources" and to "maximize the development and production of the natural resources" within Alaska. ROW_02284. That order instructed federal agencies to "rescind" and "revoke" any "orders . . . and any other similar agency actions . . . inconsistent" with the new policy. *Id.* On March 7, 2025, Alaska Governor Mike Dunleavy sent Secretary Burgum a letter suggesting how Interior might implement Executive Order 14153 and recommended that Interior "revoke" the Right-of-Way. ROW_02296.

According to Alaska, the Right-of-Way "prejudices" the State's revenues from the NPR-A and grants the Trilateral "veto powers over future land use changes." *Id.* The letter did not inform the Secretary of the Right-of-Way's relationship to the Willow Project or associated litigation in this Court and the Ninth Circuit. And it nowhere suggested that Interior lacked authority to issue the Right-of-Way. To the contrary, Alaska had—just months earlier—"formally request[ed] consideration to hold and manage any instrument or management tool related to mitigation measure 27 from the Willow ROD." ROW_02200.

On December 19, 2025, without any advance notice or opportunity to be heard, the Department of the Interior sent Nuiqsut Trilateral a short letter captioned "Right of Way Cancellation." *See* ROW_02699-707. After at least 700,000 pages of prior consideration and hundreds of thousands of public comments on the Willow Project, the Department upended a substantial piece of the project's legally required mitigation in six pages of reasoning and without public input. The administrative record contains no evidence that the agency evaluated the authority for or consequences of the Cancellation Decision beyond the Decision itself.

The Cancellation Decision declared the Mitigation Right-of-Way "void *ab initio*," ROW_02706, and stated cancellation was appropriate because of "serious and fundamental legal deficiencies," ROW_02699. The Department recognized that neither the NPRPA nor BLM's regulations governing the Reserve provide authority for "cancellation of authorizations," ROW_02702, and instead invoked the Secretary's purported "inherent authority, under his general managerial power over public lands, to cancel authorizations issued in violation of law." *Id.* (citing *Boesche v. Udall*, 373 U.S. 472, 485 (1963)).

The Department offered three reasons why it believed the Mitigation Right-of-Way was unlawful when it was issued. First, the agency presented a striking, novel view of the NPRPA,

claiming that because Congress's "primary direction to the Secretary [is] to undertake 'an expeditious program of competitive leasing of oil and gas' in the NPR-A," the statute provides the Secretary only limited authority to protect surface resources and subsistence uses. ROW_02700-01 (quoting 42 U.S.C. § 6506a(a)). Second, the agency concluded that the Right-of-Way represented an unlawful sub-delegation of authority, explaining that the sub-delegation doctrine "bars a Federal agency from sub-delegating its authority wholesale to an entity outside the agency without congressional authorization." ROW_02705. Third, the Department asserted that post-issuance legislation supported the Mitigation Right-of-Way's invalidity at its inception. ROW_02704-05.

The Department also disregarded any and all reliance interests in the Mitigation Right-of-Way. After years of working with local communities to develop mitigation measures that would minimize impacts on subsistence uses, the agency batted those interests away in two short paragraphs. First, the Department asserted that "it has considered the disruptive consequences of cancellation and finds those consequences to be minimal." ROW_02707. Then the Department commented that "not cancelling the [Mitigation Right-of-Way] could frustrate planned and anticipated oil and gas development activities in the area," and that "[e]xpeditious cancellation is necessary to ensure these activities can proceed without delay." *Id.*

Nuiqsut Trilateral filed this lawsuit on January 28, 2026. On March 16, 2026, this Court granted the Trilateral's motion for a preliminary injunction, concluding that it had demonstrated "serious questions going to the merits of [its] APA claim that the Department exceeded its statutory authority when it cancelled the ROW." Order Granting Pl.'s Mot. for Prelim. Inj. at 21, ECF No. 42. The Court observed that several "distinctions render *Boesche* distinguishable from the case at

hand," *id.* at 18, and that Defendants had not substantiated their assertion that the Mitigation Right-of-Way was issued in violation of law, *see id.* at 18-21.

## LEGAL STANDARD

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In APA actions, the court's review is based on the agency's administrative record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883-84 (1990). The court's role is to determine whether the agency's record supports the agency's decision as a matter of law under the APA's standard of review. *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994).

## ARGUMENT

The Cancellation Decision is fundamentally flawed and must be vacated. The Department of the Interior lacks authority to cancel the Mitigation Right-of-Way. Even if it did have that power, it would have been exercised improperly here because the Right-of-Way was lawfully issued—there was simply no error in the Right-of-Way for the Secretary to "correct" through administrative proceedings. And even if Interior *could* cancel the Right-of-Way, the Cancellation Decision is arbitrary and capricious because it fails to recognize the agency's change in position on necessary mitigation measures and disavows a nondiscretionary duty, among other faults. The Secretary's Cancellation Decision did not even attempt to comply with NEPA, and it violated Nuiqsut Trilateral's due process rights by depriving it of property rights that are critically important to local community members, including Native Alaskans.

## I. Defendants' Actions Are in Excess of Statutory Authority

The Department of the Interior lacks authority to unilaterally cancel the Mitigation Right-of-Way. An agency has only that power "specifically conferred upon it by statute," *Plaskett v.*

*Nuiqsut Trilateral, Inc. v. Burgum*                                    Case No. 3:26-cv-00098-SLG

14

*Wormuth*, 18 F.4th 1072, 1087 (9th Cir. 2021), and the NPRPA empowers the Secretary to "grant such rights-of-way . . . as may be necessary to carry out his responsibilities under" the statute, 42 U.S.C. § 6502, but provides no mechanism to cancel those grants. Congress plainly knows how to empower the Department of the Interior to terminate rights-of-way—it provided a mechanism, for example, to revoke rights-of-way governed by the Federal Land Policy and Management Act. *See* 43 U.S.C. § 1766. Because the Cancellation Decision admits that "[t]he NPRPA does not address cancellation of authorizations," ROW_02702, and does not ground agency action in *any statutory authorization whatsoever*, it is plainly in excess of statutory authority.

The Cancellation Decision instead relies on the Secretary's purported "inherent authority, under his general managerial power over public lands, to cancel authorizations issued in violation of law." *Id.* (citing *Boesche*, 373 U.S. at 476-77). *Boesche* cannot bear the weight placed upon it. The petitioner in that case filed an application for an 80-acre lease, which a local land office erroneously issued even though regulations had required the petitioner to apply for a 120-acre lease. *See Boesche*, 373 U.S. at 473-74. Competing applicants immediately challenged the lease, which the Department administratively cancelled. *Id.* at 474. The Supreme Court observed that Congress had long respected the Secretary's "traditional administrative authority" under the Mineral Leasing Act ("MLA") to cancel a lease "on the basis of pre-lease factors," *id.* at 479, but limited its blessing of that authority to run-of-the-mill "administrative errors by cancellation of leases in proceedings timely instituted by competing applicants for the same land." *Id.* at 485.

The Cancellation Decision is not authorized by *Boesche*, which is a strikingly narrow decision. The *Boesche* Court "sanction[ed] no broader rule than is called for by . . . the circumstances of th[at] particular case," limiting its holding to "administrative errors" identified by "competing applicants for the same land," 373 U.S. at 485. Indeed, it is not obvious that

*Boesche* even applies to all types of leases under the MLA, much less to different types of property rights issued under different statutes. *See, e.g.*, *id.* at 483 n.11 (distinguishing between Interior's historical approach to cancelling competitive and non-competitive leases under the MLA). These disavowals are not window dressing: *Boesche*'s logic depends on the carefully circumscribed authority asserted by Interior in that case, which was cabined by several practical limitations and safeguards that are conspicuously absent from the Cancellation Decision. Without those limitations, the power asserted by the agency here no longer resembles a discrete capacity to fix mistakes in the nature of scrivener's errors—the authority recognized by *Boesche*—but is instead a vague, roving license to unwind property rights that risks administrative vigilantism.

For example, *Boesche* relied on Interior's provision of adversarial procedures sufficient to safeguard "private parties . . . affected by the decision" from "administrative abuses," *id.* at 485-86, but the Department concedes that *no* procedures at all were available to Nuiqsut Trilateral. *See* ROW_02707. *Boesche* noted that the legal issue relevant to Interior's administrative proceeding had already been decided and therefore did "not warrant initial submission to the judicial process," 373 U.S. at 484, but Interior's justifications here are far from settled (they are, in fact, unlawful). And *Boesche* considered a cancellation that was "essential to secure the rights of competing applicants" and lubricate the complex machinery of the MLA, which at that point required Interior to process a nearly continuous stream of lease applications, many of which were invalid upon receipt. *See id.* at 484 n.13 ("in the three-year period ending June 30, 1960, there were 1,129 administrative cancellations out of the total of 54,000 leases issued during that period"). Nuiqsut Trilateral is unaware of any remotely comparable administrative burdens in the NPR-A, and Interior has supplied no reason to think that *Boesche's* discussion of these burdens—or any other of the case's limiting facts—enables cancellation of the Right-of-Way.

Even assuming that the authority described in *Boesche* somehow reached cancellation of the Right-of-Way in the abstract, Interior far exceeded the permissible timeframe for exercising that authority. Under *Boesche*, proceedings to correct ministerial errors must be "timely instituted," 373 U.S. at 485, meaning the agency must ordinarily exercise those powers within "weeks, not years," *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977); *see also Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1023 (9th Cir. 2025) (holding that the power to "correct clerical or typographical errors" must be exercised "in a timely manner"). The reconsideration process in *Boesche* began almost immediately after issuance because of the competing applicants' challenge, *see* 373 U.S. at 474, as did the process in *Cameron v. United States*, a case cited by *Boesche*, 252 U.S. 450, 456 (1920). In this case, however, the Department's decision had remained settled for a full year before the agency suddenly reversed course. Whatever the reach of *Boesche*, it does not extend to that species of dalliance.

Interior's delay points to one of the most significant dangers of a freewheeling, extra-statutory authority to cancel rights-of-way in the NPR-A: the possibility that the government will, as here, invoke a "power to correct small errors" to "change course on a substantive policy decision." *Nat'l TPS All.*, 150 F.4th at 1023. The Ninth Circuit has recently and repeatedly observed that this tactic is unlawful, for reasons that are nearly self-evident. *Id.*; *see also Nat'l TPS All. v. Noem*, 166 F.4th 739, 762 (9th Cir. 2026). If Interior may "use . . . pretext . . . as a way to bootstrap *de novo* review" of its earlier action, it would "render meaningless even those agency decisions that purport to grant vested property interests," including, potentially, mineral leases and unpatented mining claims, *Prieto v. United States*, 655 F. Supp. 1187, 1193-94 (D.D.C. 1987). The Court need not encourage those abuses by adopting the government's overbroad reading of *Boesche*.

## II. Defendants' Actions Are Contrary to Law

Even if the Department could cancel the Mitigation Right-of-Way based on belated, post-issuance changes in its interpretation of the law, each of the three reasons provided in the Cancellation Decision badly misreads that law. The NPRPA's plain language grants the Secretary the power to issue rights-of-way that further his responsibilities under the Act, and the Mitigation Right-of-Way carries out those responsibilities. The Right-of-Way—which is a property interest that grants Nuiqsut Trilateral no regulatory power over oil and gas activities—is not an unlawful sub-delegation. *See* ROW_02705. And the Cancellation Decision may not look to post-cancellation developments to conclude that the Right-of-Way was unlawful when issued. Interior's conclusions "rest on an erroneous legal foundation" and must be "set aside." *N.L.R.B. v. Brown*, 380 U.S. 278, 292 (1965) (internal quotation marks omitted).

### A. The NPRPA Authorized the Secretary to Issue the Right-of-Way

The Mitigation Right-of-Way was properly issued pursuant to the NPRPA's plain text. The Department's conjectures regarding the statute's purpose cannot override that text and, in any event, those purposes supported issuance of the Right-of-Way.

#### 1. *The Plain Text of the NPRPA Authorizes the Right-of-Way*

The NPRPA grants the Secretary of the Interior the power to "grant such rights-of-way . . . as may be necessary to carry out his responsibilities under this Act." 42 U.S.C. § 6502. There are thus two steps to determining whether the Secretary may issue a particular right-of-way pursuant to the NPRPA. First, the Secretary must identify a "responsibilit[y] under" the NPRPA. *Id.* Second, the Secretary must issue the right-of-way in a manner that "carr[ies] out" that responsibility. *See Cameron*, 252 U.S. at 455 (upholding creation of forest reserve containing land "of unusual scientific interest" because statute permitted President to create "reserves embracing 'objects of historic or scientific interest'").

*Nuiqsut Trilateral, Inc. v. Burgum*          Case No. 3:26-cv-00098-SLG

18

Congress has assigned the Secretary at least two types of relevant duties within the NPR-A. First, Congress instructed the Secretary to "conduct an expeditious program of competitive leasing of oil and gas in the Reserve in accordance with" the NPRPA. 42 U.S.C. § 6506a(a). Second, Congress mandated in three different provisions that surface values within the Reserve must be protected. The Secretary must "protect[] environmental, fish and wildlife, and historical or scenic values" throughout the NPR-A. *Id.* § 6503(b). Activities under the NPRPA must also "mitigate reasonably foreseeable and significantly adverse effects on the surface resources of" the NPR-A. *Id.* § 6506a(b). The NPRPA also includes a "statutory directive that 'maximum protection' be given to surface values" in the area near Teshekpuk Lake, *Sovereign Iñupiat for a Living Arctic*, 555 F. Supp. 3d at 770, including for "subsistence, recreational, fish and wildlife, or historical or scenic value[s]," 42 U.S.C. § 6504(a).

The Mitigation Right-of-Way directly serves each of these statutory commands. By offsetting the Willow Project's impacts, it furthers "maximum protection" of subsistence and wildlife values around Teshekpuk Lake, *see id.* § 6504(a), "mitigate[s] . . . adverse effects on" the NPR-A's "surface resources," *see id.* § 6506a(b), and "protect[s] environmental, fish and wildlife, and historical or scenic values," *id.* § 6503(b). The Right-of-Way also furthers an "expeditious program of competitive leasing," *id.* § 6506a(a), because it assures that the Willow Project complies with the NPRPA, providing heightened protection for one area of the Reserve while committing another to long-term oil and gas development. *Compare Sovereign Iñupiat for a Living Arctic*, 555 F. Supp. 3d at 770 (remanding 2020 Willow ROD for failure to comply with "maximum protection" requirement), *with Sovereign Iñupiat for a Living Arctic v. BLM*, 701 F. Supp. 3d 862, 896 (D. Alaska 2023) (upholding 2023 Willow ROD because BLM provided "durable, long-term protection for the Teshekpuk Caribou Herd to fully offset impacts of the

project on that Herd").  Because the Mitigation Right-of-Way "carr[ies] out" at least *four* separate duties under the NPRPA, it is a lawful exercise of the Secretary's statutory authority.

The Cancellation Decision reverses course, claiming that the provision "must be understood to authorize rights-of-way related to oil and gas activities."  ROW_02702.  But the NPRPA requires only that a right-of-way "carry out" the Secretary's various "responsibilities under [the] Act," 42 U.S.C. § 6502, and Interior may not "graft an atextual limitation onto [§ 6502's] broad . . . grant."  *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 269 (2023). The agency's conclusion that § 6502 "plainly does not authorize a ROW for a non-use," ROW_02702, is no more grounded in the statute's text, and fails on its own terms: the grant is "used" for subsistence purposes in connection with mitigation for the Willow Project.  Properly shorn of Interior's would-be amendments to the statute, the plain text of the NPRPA authorizes the Mitigation Right-of-Way.

### 2. The NPRPA's "Purpose" Does Not Preclude the Right-of-Way

Effectively conceding the point, Interior ultimately invokes what it believes to be the statute's "purpose."  According to the Cancellation Decision, the NPRPA does not authorize the Mitigation Right-of-Way because the statute's "dominant purpose"—a phrase found nowhere in the NPRPA nor in caselaw interpreting the statute—is to promote oil and gas leasing, and the Right-of-Way does not serve that purpose.  *See* ROW_02703.  Of course, this type of reasoning is irrelevant to the NPRPA's plain text, which ties rights-of-way to the Secretary's "responsibilities" under the Act: "[I]t is quite mistaken to assume that any interpretation of a law that does more to advance a statute's putative goal must be the law."  *Stanley v. City of Sanford, Fla.*, 606 U.S. 46, 58 (2025) (cleaned up).  In any event, there is no "dominant purpose" to the NPRPA, which balances development against preservation of subsistence uses. And even then, the Mitigation Right-of-Way *does* promote Interior's "dominant purpose" by enabling Willow.

*First*, the NPRPA's text, later amendments, historical context, and legislative history all demonstrate that Congress has instructed the Secretary of the Interior to "balance" the statute's "two objectives: oil and gas development and protection of surface resources." *Ctr. for Biological Diversity*, 141 F.4th at 1002. When it passed the NPRPA in 1976, Congress immediately transferred responsibility over "the protection of environmental, fish and wildlife, and historical or scenic values" to the Secretary of the Interior, instructing him to promulgate regulations "for the protection of such values . . . [a]s soon as possible." NPRPA § 103(b) (codified at 42 U.S.C. § 6503(b)). Congress provided these instructions even though jurisdiction over the NPR-A would not transfer from the Secretary of the Navy until more than a year later, *see id.* § 103(b) (codified at 42 U.S.C. § 6503(a)), intending that "activities which are or might be detrimental to such values will be carefully controlled," H.R. Conf. Rep. 94-942, at 20, *as reprinted in* 1976 U.S.C.C.A.N. 516, 523.

Even before it permitted petroleum extraction, Congress commanded that subsistence surface values, including those near Teshekpuk Lake, must be protected. NPRPA § 104(b) (presently codified at 42 U.S.C. § 6504(a)). And in 1980, when Congress funded an "expeditious program of competitive leasing of oil and gas in the National Petroleum Reserve in Alaska," it established as the very first out of nine separate conditions on that funding that "activities undertaken pursuant to this Act shall include or provide for such conditions, restrictions, and prohibitions . . . necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources" of the Reserve. Department of the Interior Appropriations Act, Pub. L. No. 96-514, 94 Stat. 2957, 2964 (Dec. 12, 1980) (presently codified at 42 U.S.C. § 6506a).

In the wake of both the 1976 and the 1980 Acts, Interior has consistently recognized that conservation and protection of the Reserve's subsistence resources are among the Secretary's "responsibilities" under the NPRPA, withholding from oil and gas leasing areas far larger than the Right-of-Way. *See* 43 C.F.R. § 2361.4 (stating that BLM "is responsible for . . . the protection of surface values from environmental degradation" in the Reserve); ROW_02718 (2025 IAP) (recognizing need to exclude 4.1 million acres of land from leasing "to protect and conserve important surface resources"); ROW_00223; ROW_00228 (2020 IAP) (excluding certain lands from leasing to "balance[] BLM's legislatively mandated goals" of "development of oil and gas . . . while protecting surface values"). Just three days after the Cancellation Decision, Interior issued its 2025 IAP for the broader NPR-A, explaining that "federal laws mandate protection for surface values in the NPR-A," ROW_02723-24 (citing 42 U.S.C §§ 6503(b), 6504(a)), and requiring lease stipulations intended to mitigate the effects of development on surface values, ROW_02747-87. In short, the entirety of the NPRPA's statutory and regulatory history points *away* from any single purpose—including oil and gas extraction—as "dominant." "[T]he [NPRPA], like all statutes, does not 'pursue a single policy at all costs.'" *Ctr. for Biological Diversity*, 141 F.4th at 1002.[3]

*Second*, even if the NPRPA's text did not plainly authorize the Mitigation Right-of-Way (it does), and even if hydrocarbon extraction were the "dominant purpose" of the Act (it is not), the Mitigation Right-of-Way would be reasonably related to that purpose. This Court vacated BLM's original approval of the Willow Project, in part, for failure to comply with the "maximum

---

[3] Interior appears to have concluded that oil and gas production is the statute's "dominant" purpose because, under various sections of the NPRPA, the Secretary may only execute certain conservation and subsistence goals "consistent with the exploration and production requirements of the Act" or in response to "activities undertaken pursuant to the NPRPA." ROW_02704. To state the obvious, however, nothing in the NPRPA *requires* exploration, production, or any other activities in the area of the Right-of-Way, and Interior cites no authority for that proposition.

protection" requirement found in 42 U.S.C. § 6504(a). *See Sovereign Iñupiat for a Living Arctic*, 555 F. Supp. 3d at 770. BLM's inclusion of Mitigation Measure 27 in its revised plan ensured that it would survive scrutiny and that the Willow Project could proceed. BLM anticipated that this "durable, long-term protection" would take the form of "a bi-lateral or multi-lateral conservation instrument," ROW_01461-62, and that is exactly what it created, *see* ROW_01526-37 (Teshekpuk Lake Special Area Protection Options Report). BLM thus viewed the Mitigation Right-of-Way as a pathway to conform the revised Willow Project to the NPRPA, and courts—including this Court—later rejected challenges to the revised Willow ROD in part because BLM had committed to Mitigation Measure 27. *See, e.g.*, *Ctr. for Biological Diversity*, 141 F.4th at 1006, 1015. The Cancellation Decision thus errs in concluding that the Mitigation Right-of-Way "hinder[s] oil and gas activities in the NPR-A"—in fact, it does just the opposite. ROW_02703.

**B.      The Right-of-Way is Not a Sub-delegation**

The Cancellation Decision characterizes the Mitigation Right-of-Way as an unlawful sub-delegation from BLM to Nuiqsut Trilateral. According to Interior, the Right-of-Way is unlawful because it gives Nuiqsut Trilateral the power to "veto" oil and gas development and "transfers the program for mitigating effects from oil and gas activities in a meaningful portion of the NPR-A from the Secretary to" Nuiqsut Trilateral. ROW_02705-06. Interior's conclusion is a category error: the congressionally-authorized dispensation of property rights is not a "delegation" or "sub-delegation" at all, but a routine part of federal land management. And even if the rights-of-ways and other interests were "delegations," the Right-of-Way would be lawful because it implicates the expertise and authority of parties with obvious connections to and stakes in the congressional mandate to manage the Reserve for subsistence interests.

A sub-delegation can occur when an agency transfers wholesale "decision-making authority" to an outside party. *Louisiana Pub. Serv. Comm'n v. FERC*, 860 F.3d 691, 696 (D.C.

*Nuiqsut Trilateral, Inc. v. Burgum*                                        Case No. 3:26-cv-00098-SLG

23

Cir. 2017). For instance, in *U.S. Telecom Association v. FCC*, the D.C. Circuit struck down the *explicit* nationwide delegation "to another actor almost the entire determination of whether a specific statutory requirement . . . ha[d] been satisfied," as opposed to the permissible practice of "*adopt[ing]* an obviously relevant local concern" in connection with an agency's "broad permitting authority." 359 F.3d 554, 563, 567 (D.C. Cir. 2004) (emphasis added). And in *National Park & Conservation Association v. Stanton*, the court held that the National Park Service's complete delegation to a private council of its management responsibilities for Niobrara National Scenic River—including hiring staff, providing law enforcement and emergency services, and maintaining roads, bridges, and other river access sites—was unlawful where the Park Service itself held only one council seat, and retained only the ability to terminate the council. 54 F. Supp. 2d 7, 19 (D.D.C. 1999).

The Mitigation Right-of-Way is not like these actions because it does not vest Nuiqsut Trilateral with wholesale or absolute authority over activities within the subject acreage. By executing the Right-of-Way, *BLM*—not Nuiqsut Trilateral—decided exactly which activities are prohibited within the Mitigation Right-of-Way. *BLM*—not Nuiqsut Trilateral—is the party that puts its name to land use authorizations such as oil and gas leases. And the Trilateral's ability to *waive* certain enforcement rights is merely a run-of-the-mill incident to grants of property rights on federal land, not a novel decisionmaking authority that somehow transforms the grant into a sub-delegation of the agency's regulatory power. *Accord* Termination by estoppel—Basic concept, The Law of Easements & Licenses in Land § 10:21. The Cancellation Decision's discussion of sub-delegation does not explain why the Mitigation Right-of-Way is somehow

different from analogous provisions in federal mineral leases and similar instruments,[4] which Interior presumably believes are lawful despite grantees' capacity to waive their rights. (Indeed, the Trilateral's authority to surrender its property rights is *narrower* than in other federal grants, and may be exercised only when "the benefits associated with the proposal outweigh any impacts to the [caribou] Herd and [waiver] is in the best interest of the community for the project, activity, use, or facility to go forward." ROW_02267.)

Even if the grant of a waivable property interest could be characterized as a "sub-delegation," Nuiqsut Trilateral's rights would constitute "legitimate outside party input into agency decision-making processes." *U.S. Telecom Ass'n*, 359 F.3d at 566. BLM "may condition its grant of permission on the decision of another entity, such as a state, local, or tribal government, so long as there is a reasonable connection between the outside entity's decision and the federal agency's determination." *Id.* at 567; *accord S. Pac. Transp. Co. v. Watt*, 700 F.2d 550, 556 (9th Cir. 1983) (upholding delegation to local and tribal governments of a "power to disapprove" of activities on lands of central importance to native communities). Under the NPRPA, there is plainly a "reasonable connection" between Nuiqsut Trilateral's mission to preserve local subsistence uses and BLM's decisions to permit (or not) oil and gas development in the Teshekpuk

---

[4] *Compare, e.g.*, https://www.blm.gov/sites/blm.gov/files/uploads/Services_National-Operations-Center_Eforms_Fluid-and-Solid-Minerals_3100-011.pdf (granting "exclusive right to drill for, mine, extract, remove and dispose of … oil and gas"), *with* 43 C.F.R. § 3108.10 (an oil and gas lessee "may relinquish the lease … at any time"); https://www.blm.gov/sites/default/files/docs/2024-02/3400-012.pdf (granting "exclusive right and privilege to drill for, mine, extract, remove, or otherwise process and dispose of [] coal") *with* 43 C.F.R. § 3452.1-1 ("The lessee may surrender the entire lease, a legal subdivision thereof, an aliquot part thereof . . . or any bed of the coal deposit therein[.]"); 43 C.F.R. § 3501.16 ("your permit or lease gives you an exclusive right to the mineral [other than coal or oil shale]") *with* 43 C.F.R. § 3514.11 ("If you can show, to BLM's satisfaction, that the public interest will not be impaired, you may relinquish your entire lease or any legal subdivision of it.").

Lake area. *See, e.g.*, 42 U.S.C. § 6504(a) (requiring "maximum protection" for subsistence values). Delegation to the Trilateral would therefore be lawful.

## C. The Department Cannot Rely on Post-Hoc Events

Finally, the Cancellation Decision suggests that the Mitigation Right-of-Way should be vacated because of statutes enacted *after* the Right-of-Way was granted. ROW_02702; ROW_02704-05. That rationale is irreconcilable with *Boesche*, which endorsed (at most) consideration of the Secretary's "own errors" when issuing leases. 373 U.S. 472, 478 (1963). In any event, the One Big Beautiful Bill Act does not "explicitly direct[] the Department to make available for leasing the approximately 1,012,040 acres that are currently subject to the ROW." ROW_02705. That statute merely instructs the Secretary to "resume oil and gas lease sales . . . in the areas designated for oil and gas leasing as described" in the 2020 IAP Environmental Impact Statement, and nowhere directs Interior to revoke or impair existing rights. OBBBA § 50105(b). Indeed, Interior's logic would require it to cancel all leases and confiscate all property interests within areas marked as "open to leasing" within the NPR-A, including those underlying Willow, since lands encumbered with preexisting leases are nonetheless marked "open to leasing" in the 2020 and 2025 IAPs. *See* ROW_02793 (labeling areas south of Teshekpuk Lake as "[o]pen to fluid mineral leasing"). Of course, the Act lacks anything resembling a "clear" statement from Congress endorsing that type of retroactive effect, and Interior does not even bother identifying anything that might qualify. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Interior's appeal to post-issuance history is thus a red herring several times over.

\* \* \*

The Right-of-Way gives the Nuiqsut community the time-limited right to continue relying on the Teshekpuk Lake area for subsistence uses free from activities that negatively impact those

*Nuiqsut Trilateral, Inc. v. Burgum*                                    Case No. 3:26-cv-00098-SLG

26

uses.  BLM properly issued the Mitigation Right-of-Way to further the Secretary of the Interior's responsibility to protect subsistence values and to enable the Willow Project to proceed.  By its own terms, the Cancellation Decision cannot rely on post-issuance events, and the Right-of-Way subdelegates no regulatory authority to Nuiqsut Trilateral.  Because the Mitigation Right-of-Way was lawful when issued, the Cancellation Decision's conclusions are not in accordance with law and must be set aside.

### III.  Defendants' Actions Are Arbitrary and Capricious

Even if Interior had the power to cancel the Mitigation Right-of-Way (it does not), and even if it had been erroneously issued (it was not), the Cancellation Decision must nonetheless be vacated because its reasoning is arbitrary and capricious.  The Department failed to acknowledge its change in position on the need for the Mitigation Right-of-Way, failed to consider alternatives, declined to engage with the very core of the mitigation problem and its non-discretionary duty, and ignored reliance interests.  Indeed, *the only document reflecting Interior's consideration of the Cancellation Decision is the Decision itself*.  That process more closely resembles a game of darts than reasoned decisionmaking, and therefore cannot survive under the APA's standard of review.

#### A.  Failure to Recognize or Justify Change in Position

"[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored."  *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007) (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)).  There is no such reasoned analysis here: although the Cancellation Decision purports merely to correct a legal error, the decision is a total, unrecognized departure from BLM's prior approach to mitigating the effects of the Willow Project. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not, for example, depart from a prior policy *sub silentio*.").  BLM issued the 2023 Willow ROD after years

*Nuiqsut Trilateral, Inc. v. Burgum*                                           Case No. 3:26-cv-00098-SLG

27

of public input and study, conducted further analysis on the best execution of Mitigation Measure 27, and carefully documented the legal authority and reasons for the Right-of-Way. The agency's Supplemental EIS for the Willow Project, for instance, mentioned "caribou" 1,031 times. The Cancellation Decision sweeps all of this reasoning aside without comment, much less an explanation of what circumstances have changed or what measures will effectively mitigate the Willow Project's effects on subsistence resources after the key measure is "cancelled." The Decision's vague promises on this score—that "BLM will ensure that the issues addressed in [Mitigation Measure 27] are appropriately addressed going forward"—only emphasize Interior's irrational and unlawful "revers[al] . . . at the eleventh hour." *Mobile Commc'n Corp. of Am. v. F.C.C.*, 77 F.3d 1399, 1407 (D.C. Cir. 1996).

### B. Failure to Consider Alternatives

Moreover, "[e]ven if the [Right-of-Way] were illegal"—and it is not—Interior would have erred by "not consider[ing] alternatives to repealing [it] *in toto*." *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 476 (5th Cir. 2024). "[I]n rescinding a prior action, an agency cannot simply brand it illegal and move on." *Id.* at 475. Instead, the APA requires an agency to "consider alternatives" and "give a reasoned explanation for its rejection of such alternatives." *State v. Su*, 121 F.4th 1, 17 (9th Cir. 2024) (quoting *City of Brookings Mun. Tel. Co. v. F.C.C.*, 822 F.2d 1153, 1169 (D.C. Cir. 1987)). "The failure of an agency to consider obvious alternatives has led uniformly to reversal." *Yakima Valley Cablevision, Inc. v. F.C.C.*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986). The Cancellation Decision considers exactly zero alternatives to terminating the Right-of-Way despite BLM's prior consideration, for example, of at least five other mechanisms to achieve durable protections for the herd in its options report. ROW_01531-32.

## C. Failure to Consider Important Aspects of the Problem

The Cancellation Decision is also arbitrary and capricious because it "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In fact, it wholly ignored at least two critical issues. First, BLM's reasoning for creating the Mitigation Right-of-Way centered on the Willow Project's impacts on the Teshekpuk Caribou Herd and other surface resources in the area. *See* ROW_02264. The Cancellation Decision did not in any way consider the effect of cancellation on the Teshekpuk Caribou Herd, ignoring the core problem the Right-of-Way was designed to address. ROW_02699-707.

Second, Interior failed to address the non-discretionary duty the 2023 Willow ROD imposes on BLM to carry out Mitigation Measure 27. The agency's promise—that it "*will* develop durable, long-term protection for the Teshekpuk Caribou Herd to fully offset impacts of the project on that Herd," ROW_01461 (emphasis added)—is a "clear indication of binding commitment in the terms of the plan" for Willow. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69 (2004); *accord Oregon Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 835 (D. Or. 2022) ("[C]lear language of commitment requires a court to enforce a land use plan."). When an agency makes this type of decision following a "years-long process replete with public participation and scientific assessment," and relies on its promise in litigation, it cannot later "disclaim its responsibility to follow through with that commitment." *Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*, No. 20-cv-3706, 2024 WL 1344450, at *18 (D.D.C. Mar. 29, 2024). The Department has acted unlawfully by overlooking the inevitable effects of its decision and the binding nature of its past commitments.

### D. Failure to Consider Reliance Interests

The Cancellation Decision is arbitrary and capricious for failure to provide due consideration to reliance interests. An agency must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Pacito v. Trump*, 169 F.4th 895, 937 (9th Cir. 2026) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020)). The Department reasoned only that Nuiqsut Trilateral has limited reliance interests in the Mitigation Right-of-Way because Nuiqsut Trilateral did not pay for it. *See* ROW_02707. But there are additional reliance interests at stake. For instance, this Court and the United States Court of Appeals for the Ninth Circuit relied on the agency's commitment to carry out Mitigation Measure 27 when upholding the 2023 Willow ROD. Parties intervened in that litigation to support the ROD because BLM had committed to offset the Willow Project's impacts by fulfilling Mitigation Measure 27. *See* Sielak Decl. ¶¶ 18-20. And, of course, populations living near Teshekpuk Lake rely on the stability of protections for subsistence resources to support their survival and ways of life. Nuiqsut Trilateral has already acted to protect its subsistence rights under the Right-of-Way, such as when Narwhal sought to conduct exploration activities in the area. ROW_02693-94. The Cancellation Decision's failure to consider effects on these interests is fundamentally arbitrary and capricious.

## IV. Defendants' Actions Are Without Observance of Procedure Required by Law

The Cancellation Decision fails to comply with NEPA. Congress enacted NEPA to ensure that federal agencies consider the environmental consequences of their actions. 42 U.S.C. § 4331(a)-(b). NEPA requires that agencies prepare an EIS for any "major Federal action[] significantly affecting the quality of the human environment." *Id.* § 4332(C). An agency will ordinarily prepare a shorter document—an "environmental assessment"—"with respect to a proposed agency action that does not have a reasonably foreseeable significant effect on the quality

of the human environment, or if the significance of such effect is unknown." *Id.* § 4336(b)(2). If a lawful environmental assessment (or other authorized process) reveals that the proposed action will not have a significant impact on the environment, the preparing agency may render a "finding of no significant impact," which absolves the agency of a need to prepare an EIS. *Id.* § 4336e(7).

Unlike Willow or the Right-of-Way itself (each of which ultimately relied on multiple EISs), the Cancellation Decision appears to have wholly ignored NEPA and the process it requires. The possibility for significant effects from both the Right-of-Way and its cancellation is obvious: as this Court held when vacating the original Willow project, Willow's effects on the Teshekpuk Caribou Herd will turn in part on whether and to what extent BLM chose to mitigate or limit development in the area. *Sovereign Iñupiat for a Living Arctic*, 555 F. Supp. 3d at 769. These effects notwithstanding, Interior has nowhere indicated that it undertook any NEPA analysis before removing the key plank of Willow's mitigation. To be sure, that NEPA analysis could in theory have concluded that the environmental effects of the Cancellation are *not* significant (and therefore do not require an EIS), and certain of these conclusions may even have warranted judicial deference. *See Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 174 (2025). Here, however, the Court "do[es] not owe deference to [Interior] because there is nothing to defer to," and Interior's procedural omissions are fatal to the Cancellation Decision. *Diamond Walnut Growers, Inc. v. NLRB*, 113 F.3d 1259, 1283 (D.C. Cir. 1997) (Henderson, J., concurring).

## V. Defendants' Actions Violate the Fifth Amendment Due Process Clause

The Fifth Amendment Due Process Clause provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "Due Process analysis involves a two-step process." *Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321, 331 (9th Cir. 1995). First, a court determines whether the plaintiff "had a protected property

interest." *Id.* Second, the court "must determine whether, in being deprived of this interest, [the plaintiff] received all the process that was due." *Id.*

Under Alaska state law, "[r]ights-of-way are . . . legally recognized property interests." *SOP, Inc. v. State, Dep't of Nat. Res., Div. of Parks & Outdoor Recreation*, 310 P.3d 962, 968 (Alaska 2013). BLM plainly conveyed that property interest to the Trilateral. ROW_02264-77. There can be no serious dispute that the Department cancelled the Mitigation Right-of-Way without affording the Trilateral any process at all. It is a "fundamental due process requirement" that Nuiqsut Trilateral be granted "notice and an opportunity to respond . . . to present reasons, either in person or in writing, why proposed action [i.e. cancellation] should not be taken." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). The Department's failure to provide Nuiqsut Trilateral *any* procedural protections before depriving it of the Mitigation Right-of-Way represents "a clear constitutional violation" that must be set aside. *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 320 (D.C. Cir. 2014).

**CONCLUSION**

The Court should grant Nuiqsut Trilateral's motion for summary judgment.

Dated: April 24, 2026                    Respectfully submitted,

                                         /s/ Travis Annatoyn
Patrick W. Munson (Alaska Bar 1205019)   Travis Annatoyn (*pro hac vice*)
Kody P. George (Alaska Bar 2211100)      Allison Rumsey (*pro hac vice*)
Munson, Cacciola & Severin, LLP          Sonia Tabriz (*pro hac vice*)
1029 West Third Avenue Suite 402         John V. Hoover (*pro hac vice*)
Anchorage, AK 99501                      Arnold & Porter Kaye Scholer LLP
Tel: (907) 272-8401                      601 Massachusetts Ave., NW
pmunson@mcsalaska.com                    Washington, DC 20001-3743
                                         Tel: (202) 942-5000
                                         travis.annatoyn@arnoldporter.com

*Counsel for Plaintiff Nuiqsut Trilateral, Inc.*