CORI MILLS
ACTING ATTORNEY GENERAL

Mary Hunter Gramling, Alaska Bar No. 1011078
David W. Duffy, Alaska Bar No. 0605016
Ronald W. Opsahl, Alaska Bar No. 2108081
Assistant Attorneys General
State of Alaska, Department of Law
P.O. Box 110300
Juneau, AK  99811-0300
Telephone:  907-465-3600
Facsimile:  907-465-2520
Email: mary.gramling@alaska.gov
        david.duffy@alaska.gov
        ron.opsahl@alaska.gov
*Attorneys for the State of Alaska*

| | |
|---|---|
| NUIQSUT TRILATERAL, INC. | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| DOUG BURGUM *et al.*, | ) |
| | ) |
| Defendants | )  Case No. 3:26-cv-00098-SLG |
| _____ | ) |

## STATE OF ALASKA'S OPPOSITION AND CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ 3

INTRODUCTION ......................................................................... 6

BACKGROUND ......................................................... 6

I.     The Production Act supports leasing and exploration in the Petroleum Reserve.

II.    Alaska has sovereign and constitutional interests in land and wildlife management throughout the state, including the Petroleum Reserve.

III.   Contrary to its own report, BLM issues a "mitigation right-of-way" without authority, public engagement, and contrary to the interests held by Alaska and other local groups.

IV.   Less than a month before a change of Presidential Administrations, BLM and NTI sign a "mitigation right-of-way" purporting to prohibit oil and gas leasing and development for an area over a million acres for an ambiguous term and without any rent.

V.    The Executive Order places a moratorium on the 2022 IAP ROD and BLM does not follow the TLCROW.

VI.   Due to the serious legal deficiencies, DOI determines the TLCROW is void ab initio and issues the Cancellation Decision.

VII.  Procedural History

STANDARD OF REVIEW ................................................................ 32

ARGUMENT ................................................................................ 33

I.     DOI properly exercised its authority with the Cancellation Decision Cancellation did not violate the APA ............................................ 33

II.    The TLCROW violates the Production Act.. .............................. 36

III.   The TLCROW violates the Subdelegation.................................... 40

IV.   The TLCROW violates the "No More" withdrawal clause of ANILCA ROW also invalid under APA and NEPA. .............................................. 41

V.    The TLCROW is an invalid rule under the APA and the CRA… .45

*Nuiqsut Trilateral, Inc. v. Doug Burgum*         Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment    Page 2 of 50
Case 3:26-cv-00098-SLG    Document 71    Filed 06/09/26    Page 2 of 50

VI.     NTI's requested relief of vacatur is unlawful and contrary to land
        management principles and public policy Plaintiffs requested relief is illegal
        and contrary to significant public policy and land management principles. 49

CONCLUSION ....................................................................................     50

Certificate of Compliance with Type-Volume Limit ............................     51

Certificate of Service .........................................................................     51

## TABLE OF AUTHORITIES

### CASES

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
        988 F.2d 146 (D.C. Cir. 1993).....................................................     49

*Batteron v. Marshall*, 648 F.2d 694 (D.C.Cir. 1980) .............................     46

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) .....     33

*Boesche v. Udall*, 373 U.S. 472 (1963) ..................................................     33

*Cal. Cmtys. Against Toxics v. U.S. Env't Prot. Agency*,
        688 F.3d 989 (9th Cir. 2012).......................................................     49

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
        807 F.3d 1031 (9th Cir. 2015).....................................................     33

*ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*

        2026 WL 1477823 ........................................................................     37

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463
        U.S. 29 (1983)...............................................................................     33

*N. Alaska Env't Ctr. v. U.S.*, 983 F.3d 1077 (9th Cir. 2020)..................     7

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089 (9th Cir.
        2025) ..............................................................................................     46

*Southeast Conference v. Vilsack*, 684 F.Supp. 2d 135 (D.D.C. 2010)     43

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment     Page 3 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 3 of 50

*Sturgeon v. Frost*, 587 U.S. 28 (2019) ...................................................... 42

*U.S. Telecom Association v. F.C.C.*, 359 F.3d 554 (D.D.C. 2004) ....... 40

*U.S. v. Alaska,* 521 U.S. 1 (1997) ...................................................... 6

## **STATUTES**

5 USCA § 551 ........................................................................................ 46

5 USCA § 553 ........................................................................................ 47

5 USCA § 701 ........................................................................................ 33

5 USCA § 706 ........................................................................................ 33

16 USCA § 668dd ................................................................................. 10

16 USCA § 3101 ................................................................................... 42

43 USCA § 1712 ................................................................................... 45

42 USCA § 6501 ................................................................................... 7

42 USCA § 6502 ................................................................................... 23,38

42 USCA § 6503 ................................................................................... 23, 37

42 USCA § 6506a ................................................................................. 7,23,36

AK CONST Art. 8, § 1 ........................................................................ 8

AK CONST Art. 8, § 3 ........................................................................ 10

**INTRODUCTION**

Without public process and on the eve of a change of Presidential administrations, the Federal Defendants and Plaintiff Nuiqsut Trilateral ("NTI") entered into a one-of-a-kind, never tried, conservation "right-of-way" to indefinitely prohibit oil and gas leasing over a million acres contrary to the Congressional purpose behind the Petroleum Reserve and public land management practices. The Federal Defendants soon came to recognize the invalidity of the one-of-a-kind decision and issued a Cancellation Decision. NTI challenges that action. The Cancellation Decision was reasoned and the purported right-of-way invalid on multiple grounds. In light of Alaska's status as an intervenor-defendant and in an effort to avoid duplication, Alaska's brief will not address NTI's arguments on due process, the National Environmental Policy Act, and various Administrative Procedure Act claims.

**BACKGROUND**

**I.      The Production Act supports leasing and exploration in the Petroleum Reserve.**

The Petroleum Reserve is a vast hydrocarbon-bearing area that was initially established to secure a supply of oil for use by the United States Navy. Congress continues to reiterate the oil supply purpose and national energy needs underlying the purpose and management of the Petroleum Reserve. *U.S. v. Alaska*, 521 U.S. 1,

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 5 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 5 of 50

39 (1997). The Naval Petroleum Reserves Production Act, 42 U.S.C. §§ 6501-6508, ("the Production Act"), mandates that the federal government is required to pay to Alaska fifty percent of the revenues received from the Petroleum Reserve "sales, rentals, bonuses, and royalties on leases issued . . . ." 42 U.S.C. § 6506a(*l*)(1). A recent amendment to the Production Act provides for leases in the Petroleum Reserve issued after July 4, 2025, that the federal government is required to pay Alaska seventy percent of these revenues beginning in fiscal year 2034. Pub. L. 119-21, 139 Stat. 144, ("One Big Beautiful Bill Act" or "OBBBA"), § 50105(e). OBBBA also instructed that leasing in the Petroleum Reserve be conducted according to the 2020 Integrated Activity Plan Record of Decision for the Petroleum Reserve ("2020 IAP ROD"), instead of the 2022 IAP ROD. *Id*. at § 50105(b) & (d). The Petroleum Reserve has been governed by a series of plans following extensive public processes about what areas will be open for leasing and how leasing will occur. *See, N. Alaska Env't Ctr. v. U.S.*, 983 F.3d 1077, 1082 (9th Cir. 2020).

The Production Act also requires the federal government to consult with Alaska prior to any reduction or waiver of royalties or fees. 42 U.S.C. § 6506a(k). The Production Act further recognizes Alaska's role as a neighboring landowner because the Production Act requires consultation with Alaska on management of units containing state land. *Id*. § 6506a(j)(2). And if not for the development of

*Nuiqsut Trilateral, Inc. v. Doug Burgum*      Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment      Page 6 of 50
Case 3:26-cv-00098-SLG      Document 71      Filed 06/09/26      Page 6 of 50

Alaska-owned lands adjacent to the Petroleum Reserve, exploration within the Petroleum Reserve would not be economically feasible. See, [ROW_00860]

## II.    Alaska has sovereign and constitutional interests in land and wildlife management throughout the state, including the Petroleum Reserve.

The Alaska Constitution requires Alaska to manage resources for the maximum benefit and use by its people. Alaska Const., Art. VIII, §§1, 2. Alaska is also a neighboring landowner and land manager to the vast Petroleum Reserve located on Alaska's North Slope. Alaska Stat. §38.05. Alaska actively leases state land for oil and gas development on the northern and eastern border of the Petroleum Reserve. [ROW_00230, 2020 NPRA IAP ROD noting Horseshoe prospect on Alaska lands east of the Petroleum Reserve and that a "key consideration" in the 2020 NPRA IAP ROD "was ensuring that BLM's management of the NPR-A did not impede offshore development of State or federal leases", particularly that "pipelines from offshore development of State of Alaska submerged leases in Harrison and Smith Bay [that] could come onshore in any part of the Teshekpuk Lake Special Area and could cross any part of the special area with the exception of the lake itself"]

*Nuiqsut Trilateral, Inc. v. Doug Burgum*            Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment            Page 7 of 50
Case 3:26-cv-00098-SLG    Document 71    Filed 06/09/26    Page 7 of 50



Some Alaska leases bordering the Petroleum Reserve are held jointly by Alaska and Arctic Slope Regional Corporation.[1] Alaska leases held by Narwhal Exploration, LLC are located adjacent to the Petroleum Reserve in offshore in state waters, bordered onshore by the Petroleum Reserve and offshore by federal Outer Continental Shelf waters of the Beaufort Sea. Access to offshore Alaska leases requires crossing the Petroleum Reserve and the most direct paths occur near the Teshekpuk Lake. *See,* map above.

Wildlife in Alaska is reserved to the people for common use, and must be "utilized, developed, and maintained on the sustained yield principle, subject to

---

[1] *See,* Lease Ownership by Notification Lessee, State of Alaska, Department of Natural Resources, Division of Oil and Gas, September. 2025 ("Map") (available online at https://dog.dnr.alaska.gov/Document/Download/DE66422D86FA4EE0ACFC52645B174761/North%20Slope%20Notifcation%20Lessee%20Map.pdf).

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 8 of 50

preferences among beneficial uses." Alaska Const. Art. VIII, §§ 3, 4. Alaska was directed by Congress to manage and regulate fish and wildlife in Alaska under the Alaska Statehood Act. Alaska Statehood Act of 1958, Pub. L. No. 85-508 §6(e), (federal delegation of control over fish and wildlife to the State of Alaska); see, 16 U.S.C. §668dd(m). Thus, Alaska has a fundamental sovereign role in the management of the Teshekpuk Caribou Herd that travels across the boundaries of the Petroleum Reserve.

### III. Contrary to its own report, BLM issues a "mitigation right-of-way" without authority, public engagement, and contrary to the interests held by Alaska and other local groups.

#### A. The Willow Project and Mitigation Measure 27.

BLM issued a record of decision ( "Willow ROD") approving ConocoPhillips' Willow Master Development Plan ("Willow Project") to allow for construction and operation of oil and gas infrastructure for ConocoPhillips' leases within portions of the Petroleum Reserve in March 2023. [ROW_01387] Alaska was a cooperating agency in the federal reviews leading to the Willow ROD and in the federal reviews leading to the integrated activity plans ("IAPs") for the Petroleum Reserve. [ROW_01387; ROW_01396] Following public consideration of a myriad of potential restrictions and protective measures, BLM included, among other stipulations and mitigation measures, Mitigation Measure 27

*Nuiqsut Trilateral, Inc. v. Doug Burgum*　　　　Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment　　　Page 9 of 50
Case 3:26-cv-00098-SLG　　Document 71　　Filed 06/09/26　　Page 9 of 50

("MM27") in the Willow ROD. [ROW_01461] Under the heading

"Requirement/Standard" for MM27 the Willow ROD stated that *BLM*

> *will develop* compensatory mitigation that provides durable, long-term protection for the Teshekpuk Caribou Herd to fully offset impacts of the project on that Herd, to include protecting the surface area of Teshekpuk Lake, a buffer along all shores of the lake, and the K-10 Caribou Movement Corridors/K-16 Deferral Areas (under Alternative E in the 2020 National Petroleum Reserve in Alaska Integrated Activity Plan Final Environmental Impact Statement) *using existing statutory, management or administrative authorities, with a focus on restricting future leasing or surface development in those areas*." (emphasis supplied) [ROW_01461]

The Willow ROD directed in the section titled "Potential Benefits and Residual Unavoidable Impacts" for MM27 that "BLM *shall explore* creating a bi-lateral or multi-lateral conservation instrument to provide protections for the [Teshekpuk Lake] Herd and its key habitat for the duration of the Project's impacts" and within 120 days submit a report to address "*who* would hold the instrument; *the scope* of the lands to be protected; and *the types of protections*, with a *focus on restricting future leasing and/or surface development*." (emphasis added) [ROW_01462] BLM in its report was to include a discussion of BLM's "*findings and recommendations* to this conservation instrument, including a proposal for stakeholder engagement and implementation, if approved."(emphasis added) *Id*. Given the public process from the Willow ROD and the mitigation

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 10 of 50
Case 3:26-cv-00098-SLG    Document 71    Filed 06/09/26    Page 10 of 50

measure's instructive to use "existing statutory, management, or administrative authorities" it was presumed that the report would involve a public process as well.

> **B        BLM's efforts to implement MM27 and impose greater restrictions purposefully avoid public process and transparency.**

Shortly after the Willow ROD was issued, the North Slope Borough ("Borough") submitted a detailed letter expressing concerns about "the Biden Administration's plan to implement new conservation measures" in the Teshekpuk Lake area and requesting further discussions. [ROW_01524-25][2] The Borough explained its involvement in the Willow reviews and IAP process and advised that "DOI should acknowledge the work that has already gone into ensuring the protection of this area and *should not endorse additional restrictions* absent close coordination with and support from the Borough." [ROW_01525] The Borough also requested briefing on the Biden Administration's announcement of initiation of a rulemaking for the Petroleum Reserve[3] that indicated an "inten[t] to propose to limit future oil and gas leasing and industrial development in the Teshekpuk Lake…" [ROW_01525]

---

[2]        To be clear, Alaska only became aware of nearly all these communications to implement MM27 when the record was filed in this case.

[3]        Alaska, as well as the North Slope Borough and many others, filed a challenge to this rulemaking concerning the Petroleum Reserve. *Alaska v. Burgum*, 3:24-cv-00144-SLG. The Court accepted the parties' stipulation for a voluntary dismissal without prejudice in February 2026 following repeal of the regulations.

*Nuiqsut Trilateral, Inc. v. Doug Burgum*                    Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 11 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 11 of 50

The Borough Mayor had met with DOI officials in April 2023 and then in May, through outside counsel expressed that that the Borough requested "a seat at the table" on the rulemaking and "near-term outreach" on implementation of MM27. [ROW_01522] The Borough noted in response to a different proposed rulemaking for conservation leasing[4] that the Borough assumed the rulemaking was not relevant to MM27 because "BLM indicated in the Willow NEPA documents-in response to Kuukpik's request for a conservation easement that – that [BLM] is unable to engage in conservation leasing under the [Production Act]". [ROW_01522] The Borough encouraged BLM to explore other options than conservation leasing including co-management or co-stewardship. [ROW_01522]

In late June 2023, the Mayor of the City of Nuiqsut, through counsel in an email, expressed "welcome" of "BLM's effort to create a conservation easement", but cautioned that "BLM's process in creating the report called for by the Willow ROD, and ultimately, in creating the easement, must be open, transparent, science-based, and allow for adequate time for all stakeholder[s] to provide input." [ROW_01519] The email explained that Kuukpik [Corporation] had presented an unsigned letter to the Mayor that characterized "its position as being on behalf of

---

[4]     Alaska filed a challenge to this rulemaking. Alaska asserts that the "Landscape Health Rule" is ultra vires, arbitrary and capricious, violates the Major Questions Doctrine, ANILCA, and NEPA. *Alaska v. Burgum*, 3:24-cv-00161-SLG.

*Nuiqsut Trilateral, Inc. v. Doug Burgum*                Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment        Page 12 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 12 of 50

Kuukpik, the City, and the Native Village." [ROW_01516] The Mayor had not agreed to sign the letter and the email stated that "a Kuukpik representative stated that Kuukpik need not "negotiate" with the City about the easement." [ROW_01516] Unsurprisingly, the email requested BLM to "hold off on finalizing your report until the City has had an adequate opportunity to consider its views about the easement." [ROW_01516]

BLM's Arctic District Office responded to the Mayor's email at the end of June explaining that DOI had asked for a report "including a communication plan, to be approved before starting the public meetings", but that BLM was limited in preliminary outreach. [ROW_01518] "The BLM was allowed to do some preliminary outreach with you and certain other stakeholders on the topics raised in the mitigation measure, but only enough to make general recommendations about moving forward." [ROW_01518] Despite the Mayor's email expressing concerns and a lack of consensus, BLM stated that its draft report would "characterize the sentiment we got from the Nuiqsut [T]rilateral meeting in May, as appearing to have conceptual agreement from the entities and people in attendance, about continuing to work with BLM on this idea." [ROW_01518]

On July 20, 2023, counsel for the City of Nuiqsut followed up by email with BLM, informing Arctic District Office that the "Nuiqsut City Council was unable to form a position on the conservation instrument at its last meeting. We will keep

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 13 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 13 of 50

you posted as the conversations continue." [ROW_01586] The email requested "a copy of the draft (and final) report" that BLM would send to the "HQ". [ROW_01586] The record is devoid of any draft versions of the referenced report. While the "Options Report" dated simply as "July 2023" is in the record, the transmittal form approving this report is dated October 12, 2023. [ROW_01608-1611] BLM did not make this "Options Report" available to the general public until December 20, 2024, several days after the TLCROW was signed. The record and the "Options Report" itself show that BLM purposefully limited public input in the formation of the report and its distribution after October 2023 [ROW_02189, initial outreach only to Audubon Society, NTI, Kuukpik Corporation, and the Borough; ROW_01661, January 2023 asking Kuukpik Corporation about sending a copy of the Options report to NTI, Utqiagvik Trilateral, ICAS, ASRC, and the Borough and then members of the NPR-A Working Group[5]] Alaska was only provided with a copy of the report on December 9, 2024 after directly requesting of it once it learned of it shortly before. [ROW_02167]

The Options Report recommended creating a "conservation right-of-way authorization" through purported authority in the Production Act and implementing

---

[5] Under President Biden's Administration, BLM excluded Alaska from the NPR-A Working Group. This was contrary to Alaska's expertise and the purposes for which the group was first establishment for the 2013 NPRA IAP ROD. [ROW_00028]

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 14 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 14 of 50

regulations. [ROW_02170] BLM relied on the absence of regulations in the Production Act as providing "greater flexibility" than the Federal Land Policy and Management Act ("FLMPMA") and its regulations because those "require the BLM to charge fair market value." [ROW_02174] The Options Report did not include any analysis as to why fair market value was not appropriate consideration for a purported durable conservation instrument covering over a million acres. BLM in the Options Report meagerly opined that "[w]e think a conservation ROW *could be written to legally preclude the BLM from offering any tracts for lease, or from authorizing oil and gas exploration activities or infrastructure*, subject to valid existing rights." (emphasis supplied)[ROW_2174] The Options Report clearly disclosed that "[t]he goal would be to have those *protections apply beyond the reach of future changes to the IAP*, and to remain in place for as long as the Teshekpuk Caribou Herd and other significant resources in the area are adversely impacted by the Willow Project". (emphasis supplied) [ROW_02176] BLM in the Options Report characterized as "[o]ne benefit unique to a conservation instrument is it provides local communities entities greater ability to directly influence the pace, scale and location of future leasing activities and/or surface development impacting an important subsistence resource." [ROW_02177] BLM acknowledged in the Options Report that "the management of caribou and the various factors that influence their populations are complex and multi-jurisdictional" and that any

*Nuiqsut Trilateral, Inc. v. Doug Burgum*         Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment         Page 15 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 15 of 50

cooperative agreement "include representation of all the communities that harvest from the Teshekpuk Caribou Herd, as well as state, federal and borough regulatory agencies." [ROW_02177]

As for the NEPA, the Options Report was ambiguous. On the one hand, the Options Report noted that it may be that no additional NEPA would be needed and BLM would not need to amend the [2022] IAP, and yet on the other hand suggested that "it may be advisable" to prepare an environmental assessment "especially *for any rules* that would differ from the IAP (e.g., disallowing oil and gas infrastructure in areas that would otherwise be open), with additional opportunities for public engagement. (emphasis added) [ROW_02179] The Options Report included a "stakeholder engagement plan." [ROW_02186] The engagement plan stated that "[o]nce the BLM receives a formal application for a possible instrument, we will implement our standard NEPA public involvement process including associated public meetings, responding to public comments and posting of meeting schedules and documents on the BLM National NEPA Register." [ROW_02186] The record reflects that this engagement plan was not followed. No formal application was published and no public comments or public meetings were scheduled. Not a single one.

Despite BLM's Option Report recommendations for stakeholder engagement and public process, the record reflects that BLM and NTI were

*Nuiqsut Trilateral, Inc. v. Doug Burgum*  Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment  Page 16 of 50
Case 3:26-cv-00098-SLG Document 71 Filed 06/09/26 Page 16 of 50

finalizing the purported "mitigation right-of-way" long before - and without consideration of - any "invitation for consultation" or public process. By late July, 2024, the bulk of the purported "mitigation right-of-way" terms, conditions, and area were already negotiated, outside the public eye, between NTI and BLM. [ROW_01752-56; BLM indicating that "we will be routing this version on our side for final review…"] BLM on October 18, 2024 suggested to NTI "Nov. 18-20 for a signing ceremony" in Nuiqsut. [ROW_02056] NTI's counsel responded that "the first and third weeks of December might be a possibility." [ROW_02056]

After these negotiations, BLM selectively circulated a "Fact Sheet" in mid-November 2024 that it provided to villages and select other groups as an "invitation for consultation."[*See*, ROW_02075-80] The record reveals that Alaska was excluded from this email distribution of this  "Fact Sheet" at that time. The "Fact Sheet" announced that "BLM and [NTI], a non-profit corporation formed by the community closest to and most impacted by oil and gas development on the North Slope …are now collaborating on a community-led method to implement that mitigation measure…" [ROW_02121] BLM noted that "BLM and NTI are inviting Tribes, Alaska Native Corporations, and the North Slope Borough to consult on this proposal, which is in development. Following consultations, BLM and NTI would seek to finalize this first-of-its-kind ROW agreement…". [ROW_02123] The "Fact Sheet" did not disclose that on November 6, 2024, that

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 17 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 17 of 50

the Inupiat Community of the Arctic Slope ("ICAS") had made a "No Action" Proposal to BLM on MM27. [ROW_02165]

ICAS proposed "No Action" to allow time to establish a baseline for assessing the potential impacts of development activities in the region." [ROW_02328-30] The "Fact Sheet" similarly did not address that on November 1, 2024, the Borough had submitted a proposal for a co-management framework for the Teshekpuk Caribou Herd to accomplish the objectives of MM27. [ROW_02320] On December 5, 2024, ICAS characterized the "Fact Sheet" as basic and noted that "ICAS has not been provided with any information on the formal process for the NTI proposal, and more disconcerting, BLM has not spoken with us regarding our proposal regarding [MM27]." [ROW_02162] ICAS also expressed that it was "disheartening" that BLM was trying to schedule its consultation with the Borough. [ROW_02162-65] ICAS formally requested that "this entire process be delayed by 60 days in order for all parties to understand the BLM process which is not clearly defined and to allow all interested parties to be heard." [ROW_02162]

The Borough's proposal also included comments on the "Options Report" explaining that the proposed right-of-way with locked in measures was contrary to the "fundamental objective" of MM27 to allow local communities "to inform and direct future development activities." [ROW_02321] The Borough questioned the

*Nuiqsut Trilateral, Inc. v. Doug Burgum*                    Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 18 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 18 of 50

legal authority under the Production Act and ANILCA for issuance of a "conservation right-of-way" and commented that "a right-of-way seems to effectively lock into place a management approach that has not been contemplated in the public process that led to the development of the [IAP]." [ROW_02322] The Borough also noted that communities other than just those in the Nuiqsut trilateral "engage in subsistence activities within the proposed conservation area and depend on the TLCH for food security." [ROW_02322] In support of the Borough's proposal, it noted that BLM, Alaska, and the Borough already had a data sharing agreement regarding the Teshekpuk Caribou Herd. [ROW_02325]

After a call with BLM on December 9, 2024, a copy of the "Options Report" was shared with Alaska. [ROW_02200] Alaska's Commissioner of Natural Resources wrote to BLM after the call expressing that the call "was the first time" his department had been made aware of "any specific potential [BLM] actions implementing the mitigation measure." [ROW_02200] The Commissioner explained that "we are still uncertain of many of the specifics of the proposals you discussed, and would appreciate reviewing any other documents, draft decisions, or other materials as they are available." [ROW_02200] Alaska's letter "formally request[ed] consideration to hold and manage any instrument or management tool related to [MM27]". [ROW_02200] The letter also requested BLM to "identify the specific authorization or instrument being evaluated and how the State could be

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 19 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 19 of 50

considered, as we have not yet seen any application, notice, or process from the BLM on this proposal to date." [ROW_02200] NTI asserts that this letter "nowhere suggested" DOI lacked authority, but the letter clearly requested information regarding the nature of the authorization since it was unknown. NTI Br. at 14.

The Commissioner asserted that Alaska "manages many resources within the proposed area (i.e. fish, wildlife, and water use/resources) and owns and manages adjacent lands and waters to the [Petroleum Reserve] and Teshekpuk Lake area. [ROW_02200] Although unaware of "the specifics of what is being considered or proposed" Alaska's letter further explained that Alaska as a sovereign governmental organization would provide:

- Long-term stability;
- Financial stability;
- Public transparency and visibility regarding process and management decisions;
- A long history managing these types of resources and protections;
- Dedicated professional staff and capacity for land management and wildlife biology;
- Technical, scientific, and process expertise regarding resource management and use;
- Funding support to manage such an instrument for its duration;
- Transparent public management;
- The ability to convene the many stakeholders of the NPR-A; and
- A long history and experience coordinating with NPR-A communities… [ROW_02200-01]

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 20 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 20 of 50

**D. Less than a month before a change of Presidential Administrations, BLM and NTI sign a "mitigation right-of-way" purporting to prohibit oil and gas leasing and development for an area over a million acres for an ambiguous term and without any rent.**

Without any public notice of the proposals brought forward by ICAS, the Borough, and Alaska for MM27, representatives of BLM and NTI appear to sign the "Mitigation Right-of-Way" (TLCROW) on December 17, 2024. [ROW_02274] The TLCROW in its premising "Whereas" clauses describes the "Protected Property" under the "Grant" to include "approximately 1,012,040 acres within the 3.65 million acres [Teshekpuk Lake Special Area]." [ROW_02264] The "Whereas" clauses go on to declare that "approximately 7,000 acres of the Protected Property are open to oil and gas leasing and under the [2022 IAP ROD], with the remaining acres closed to oil and gas leasing" and that "approximately 115,000 acres of the Protected Property are open to new oil and gas infrastructure under the [2022 IAP ROD], with the remaining acreage closed to new oil and gas infrastructure." [ROW_02265] Next, the TLCROW asserts that "the Parties desire to establish more durable protections for the Herd than are currently provided under the IAP, as called for in [MM27]." [ROW_02265] The stated purpose for the TLCROW is "to offset the impacts on the Herd from the Willow Project by providing durable and long-term protections for the Herd by prohibiting certain activities and facilities within the Protected Property for the benefit of the Herd and

*Nuiqsut Trilateral, Inc. v. Doug Burgum*     Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment     Page 21 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 21 of 50

the Herd's most important habitat." [ROW_02265] The TLCROW lists as its authority provisions of the Production Act, 42 U.S.C. §§ 6502, 6503(b), 6504(a), 6506a(b), and MM27. [ROW_02265-66]

The TLCROW purports to be in effect during construction and operation of the Willow Project and remain in effect until "reclamation has been completed and is deemed substantially effective in restoring caribou habitat and the population and health of the Herd adversely impacted by the Willow Project." [ROW_02266] No rent is due under the TLCROW. [ROW_2266] The TLCROW does not contain any provisions regarding insurance or other financial assurances from NTI. The TLCROW purports to grant NTI the right to take legal action "to prevent any activity on or use of the Protected Property that is prohibited by or inconsistent with the purpose." The TLCROW further asserts that the United States "shall" be "preclude[d]" "from issuing a decision on a proposed use prior to it notifying [NTI] of the proposed use" and allows NTI at least 30 calendar days to provide input on a proposed use. [ROW_02267]

TLCROW does not contain an "Allowed Uses" section. The TLCROW contains over a page of "Prohibited Activities." [ROW_02268-70] The TLCROW declares prohibited:

1) issuance of new oil and gas leases;
2) "the surface or subsurface exploration, development, mining, or extraction of oil, gas, or other mineral resources, or sand or gravel

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 22 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 22 of 50

in pursuit of oil, gas, or other mineral resources, from the surface or subsurface of the Protected Property";

3) "[t]ransportation of oil or gas over or across the Protected Property through any means, including pipelines, and the construction of roads to support any of these uses";

4) construction of new facilities to support oil or gas;

5) "new installation or relation of public or private utilities" in support of oil or gas. [ROW_02268-69]

The TLCROW purports to allow NTI to "waive its right to enforce the prohibition of uses" for "specific projects" following a written determination that "the benefits associated with the proposal outweigh any impacts to the Herd and that it is in the best interest of the community for the project, activity, use, or facility to go forward." [ROW_02267] The TLCROW provides that facilities used for community purposes and for oil and gas activities "may be prohibited" if the parties "make a written determination that the use will primarily be to support oil and gas activities or if the facility's benefit to local communities does not outweigh the impact on the Herd or its habitat." [ROW_02269]

The TLCROW purports that NTI "may transfer, assign, or delegate any of its rights and responsibilities under this Grant to a third party" with only a "requirement" and agreement from the third party that it carry out the purpose of the "Grant". [ROW_02272] NTI is a non-profit corporation and it is not a government entity or even an Alaska Native Claims Settlement Act village corporation.

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 23 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 23 of 50

BLM in its Decision for the TLCROW characterized itself as having "consulted on the proposed action." [ROW_02221-22] No analysis of the comments received by Alaska, the Borough, or ICAS were included in the Decision. [ROW_02222] The Decision stated that "Public notification of the proposed conservation ROW and DNA development was announced on November 14, 2024 on the BLM NEPA website." [ROW_02220] A review of the documents on the website reveals that only the "Fact Sheet" was on the website on November 14, 2024.[6] Neither the "Fact Sheet" nor the "Decision" mention that the TLCROW would be without any rent or financial assurances or that the TLCROW would be assignable. The Decision stated its determination of consistency with the Production Act and "in conformance" with the 2022 IAP ROD." [ROW_02222] BLM's "Determination of NEPA Adequacy" ("DNA") for the TLCROW. reasoned that the TLCROW was "essentially similar" to Alternative B, analyzed in the 2020 IAP EIS. [ROW_02230] The DNA, similar to the Decision, did not include discussion of comments and proposals by Alaska, the Borough, or ICAS on MM27. [ROW_02236]

---

[6] The "Options Report" was not posted on the website until December 20, 2025.

*Nuiqsut Trilateral, Inc. v. Doug Burgum*  Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment  Page 24 of 50
Case 3:26-cv-00098-SLG  Document 71  Filed 06/09/26  Page 24 of 50

**E. The Executive Order places a moratorium on the 2022 IAP ROD and BLM does not follow the TLCROW.**

Following the November 2024 elections and prior to TLCROW, Governor Dunleavy wrote to incoming President Trump to request an Alaska specific executive order be issued at the start of President Trump's administration. Exh. 2. Governor Dunleavy requested actions for "Ending the Biden "Deep State" overreach by reversing agency actions that lock up Alaska lands and resources" and requested reversals of anticipated actions of the exiting President Biden's Administration. *Id*. President Trump issued Executive Order 14153, "Unleashing Alaska's Extraordinary Resource Potential" on his first day in office. Executive Order 14153 [ROW_02284-88] The Executive Order explained that to unleash Alaska's resources "requires an immediate end to the assault on Alaska's sovereignty and its ability to responsibly develop these resources" and reasoned that it was "imperative to immediately reverse the punitive restrictions implemented by the previous administration that specifically target resource development on both State and Federal lands in Alaska." [ROW_02284] The Executive Order called for the DOI to "place a temporary moratorium on all activities and privileges granted to any party pursuant to [2022 IAP ROD]", rescind the 2024 NPR-A regulations, rescind any BLM guidance on protection of subsistence in special areas in the Petroleum Reserve, and reinstate the 2020 IAP

*Nuiqsut Trilateral, Inc. v. Doug Burgum*                Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment        Page 25 of 50
Case 3:26-cv-00098-SLG    Document 71    Filed 06/09/26    Page 25 of 50

ROD. [ROW_2286] On February 3, 2025, Secretary Burgum issued Secretarial Order 3422 directing a plan for implementation of the Executive Order including the provisions governing the Petroleum Reserve. Secretarial Order 3422, [ROW_02289-90]

On March 7, 2025, Governor Dunleavy wrote to Secretary Burgum to provide Alaska's insights into the implementation of the Executive Order and Secretarial Order 3422. [ROW_02292-2309] Alaska recommended rescission of "conservation rights-of-ways and co-management agreements that block vital oil and gas development in the [Petroleum Reserve]." [ROW_02296] Alaska explained how BLM with the TLCROW "closed over 7,000 acres that were previously open to oil and gas leasing and over 115,000 acres that were previously open to oil and gas infrastructure under the restrictive [2022 IAP ROD] that the Alaska EO place[d] a moratorium on." [ROW_02296] The letter also detailed how the TLCROW granted a non-profit "veto powers over future land use changes by the United States" and "further usurps" Alaska's management of fish and wildlife. [ROW_02296] Alaska declared that the TLCROW "unlawfully grants an interest in land without rent and prejudices [Alaska's] receipt of revenues from [the Petroleum Reserve] and its sharing of those revenues with communities." [ROW_02296] The letter also outlined for Secretary Burgum how Alaska has fish

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 26 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 26 of 50

and game management authority under the Alaska National Interest Lands Conservation Act ("ANILCA") and the Alaska Statehood Act. [ROW_2307-08]

As noted above in July 2025, Congress once again acknowledged the need for oil and gas leasing and the primary purpose of the Petroleum Reserve with the enactment of OBBBA requiring leasing in the Petroleum Reserve in areas designated for leasing in the 2020 IAP ROD. Pub. L. 119-21, 139 Stat. 144, § 50105(b) & (d). On July 24, 2025, the Government Accountability Office ("GAO") issued a decision that the 2022 IAP ROD was a rule for the Congressional Review Act ("CRA"). Exh. 1.

In October 2025, NTI wrote to Narwhal Exploration, LLC ("Narwhal") following Narwhal's summer exploration work, which required access to Alaska offshore waters through the Petroleum Reserve and staging of equipment[7]. [ROW_02693-94] NTI asserted that "[t]he TLCROW gives NTI the right to prohibit oil and gas exploration and development activities on one million acres around Teshekpuk Lake…" [ROW_02693] NTI expressed disappointment that BLM approved the work "without following the process required by the TLCROW" and that BLM was "sidestepping [] its responsibilities under the TLCROW." [ROW_02693] NTI reproached Narwhal for not contacting NTI about

---

[7] *See also,* https://eplanning.blm.gov/Documents/?id=be4f2bf5-a7f2-f011-8407-001dd803d7d3&spid=4b801195-a8f2-f011-8407-001dd80c29f3#]

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 27 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 27 of 50

"Narwhal's proposed use of the right of way". [ROW_02693] NTI directed Narwhal to remove any material stored and to contact NTI's counsel confirming removal. [ROW_02694]

NTI later wrote to BLM "to request BLM and NTI agree on additional details of the process described in the TLCROW. [ROW_2696] NTI acknowledged that the TLCROW "is relatively new." [ROW_02696] In advocating for information from BLM, NTI explained that without notice, "BLM could, for example, deny a proposal that NTI believes should have been allowed (or vice versa), or deny a proposal that NTI would have been willing to issue a waiver for if only NTI had been consulted." [ROW_02696] Shortly after this, President Trump on December 5, 2025, signed the Joint Resolution providing Congress' disapproval of the 2022 IAP ROD under the Congressional Review Act. Pub. L. No. 119-47 (2025).

### F. Due to the serious legal deficiencies, DOI determines the TLCROW is void ab initio and issues the Cancellation Decision.

Subsequent to its review of the TLCROW, DOI notified NTI on December 19, 2025, that the TLCROW "was improperly issued" and accordingly that DOI had determined cancellation was appropriate. [ROW_02699] This letter ("Cancellation Decision") was styled as a "Decision" and titled "Right of Way Cancellation." [ROW_02699] The Cancellation Decision outlined the background

*Nuiqsut Trilateral, Inc. v. Doug Burgum*      Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment      Page 28 of 50
Case 3:26-cv-00098-SLG    Document 71    Filed 06/09/26    Page 28 of 50

of the Petroleum Reserve and Production Act. [ROW_02699] The Cancel Decision described the recommendation in the Options Report for a conservation right-of-way as "based on a novel interpretation of the agency's authorities." [ROW_02700] The Cancellation Decision opined that the Options Report "misinterprets" the Production Act and "flouts [the Production Act's] primary direction to the Secretary to undertake 'an expeditious program of competitive leasing of oil and gas'." [ROW_02700-01]

The Cancellation Decision noted that "NTI did not pay any fees to obtain the TLCROW nor does it pay any rent for the TLCROW." [ROW_02700] The Cancellation Decision considered that the TLCROW "was not required under MM27, covers a more expansive area than identified in MM27, and restricts future leasing *and* surface development, instead of just one or the other." (emphasis original) [ROW_02701] The Cancellation Decision identified two legal flaws in the TLCROW. [ROW_02702] First, the Cancellation Decision found that the plain language of the Production Act "does not authorize a ROW for a non-use." [ROW_02702] The Production Act provision for the protection of surface resources during exploration in the Petroleum Reserve included the important caveat "to the extent consistent with the requirements of this Act for the exploration of the [Petroleum Reserve]." [ROW_02704] The Cancellation Decision also noted that the immense size of the TLCROW area and the "highly

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 29 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 29 of 50

prospective for oil and gas development" nature of the subsurface made the TLCROW "clearly unlawful" under the Production Act by frustrating "an essential purpose" of the Production Act. [ROW_02704] The Cancellation Decision considered the OBBBA and the Joint Resolution nullifying the 2022 IAP ROD as supporting the "fundamental inconsistency" of the TLCROW with the Production Act's text and purpose. [ROW_02705]

The second legal deficiency identified in the Cancellation Decision was that the subdelegation doctrine prohibits "the TLCROW's sharing of the BLM's land management duties with NTI." [ROW_02705] The Cancellation Decision considered NTI's response to Narwhal as a "power imbalance" from the "third-party veto authority" and "transfer" of the oil and gas program from the Secretary to NTI for over a million acres. [ROW_02705-06] The Cancellation Decision found the TLCROW to be "wholly unlike" normal authorizations BLM would issue in the Petroleum Reserve. [ROW_02707] As an example, oil and gas leases "may be no more than 60,000 acres" and the Cancellation Decision explained that the TLCROW "covers more than 15 times that amount." [ROW_02706]

As for the timing of the Cancellation Decision, since the legal deficiencies were "so serious and fundamental" and "cannot be cured since the BLM is wholly without statutory authority", the Cancellation Decision recognized that the TLCROW was "void ab initio." [ROW_02706] The BLM found "no reason" to

*Nuiqsut Trilateral, Inc. v. Doug Burgum*     Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment     Page 30 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 30 of 50

delay. [ROW_02707] The Cancellation Decision would allow BLM to consider other ways to implement MM27 after consulting with stakeholders and comply with recent Congressional directives for expedited oil and gas leasing in the Petroleum Reserve. [ROW_02707] After the Cancellation Decision, BLM issued a new IAP for the Petroleum Reserve and held an oil and gas lease sale in the Petroleum Reserve. [ROW_02715]

## II.     Procedural History.

NTI filed its Complaint, seeking an order to vacate the Cancellation Decision. ECF No. 1. Following BLM's notice of intent to hold a lease sale, NTI moved from a preliminary injunction requesting the Court to stay the Cancellation Decision. ECF No. 12. Following venue transfer to Alaska, supplemental briefing, and argument, this Court granted NTI's motion from preliminary injunction. ECF No. 42. The Order did not find NTI likely to prevail on the merits and instead used the "serious questions going to the merits" and equities "sharply tipping" as the standard for the grant of preliminary relief due to a subset of NTI's APA claims. ECF No. 42. Alaska's motion to intervene was granted on April 16, 2026. ECF No. 53.

## STANDARD OF REVIEW

The Court is to review the propriety of an agency action pursuant to the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C.

*Nuiqsut Trilateral, Inc. v. Doug Burgum*                    Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 31 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 31 of 50

§§ 701-706. Under the APA, courts are to uphold agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1042 (9th Cir. 2015). Agency actions are unlawful "if the agency …relied on factors which Congress has not intended it to consider…[or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)(quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

## ARGUMENT

### I. DOI properly exercised its authority with the Cancellation Decision.

DOI in the Cancellation Decision properly exercised its authority to correct its own legal errors and recognize the invalidity of a "right-of-way" egregiously flawed from inception. The Cancellation Decision relied on the Secretary's general land management powers and *Boesche v. Udall*, 373 U.S. 472 (1963). [ROW_02702] While Alaska would argue differently had this case been about cancellation of an oil and gas lease issued under the Production Act or a right-of-way under a different statute, this case is not about a lease, but a "first-of-its-kind" purported "right-of-way" under the Production Act. [ROW_02149]

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 32 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 32 of 50

The Court in *Boesche v. Udall* distinguished leases from fee ownership explaining that "the Secretary's connection with the land continues to subsist, he should have the power, in a proper case, to correct his own errors." *Id.* at 478. The question then became whether the Mineral Leasing Act had withdrawn that power from the Secretary. *Id.* Notably, the Mineral Leasing Act addressed forfeiture and cancellation of a lease. *Id.* First, a "right-of-way" issued by the Secretary's authority, even more than a lease, maintains the Secretary's connection with the land so it logically stands that the ability to correct errors also is maintained. The "first-of-its-kind" nature of the TLCROW also supports that errors were likely and the Secretary has power to correct course absent withdrawal by statute or regulation. Second, NTI argues that because the Production Act does not mention cancellation of right-of-way that DOI lacks inherent authority, but *Boesche* supports the opposite. NTI Br. at 17.

This Court's Order on the Motion for Preliminary Injunction was without the benefit of the administrative record when it distinguished the Cancellation Decision from *Boesche* as "not arising from a proceeding initiated by a competing applicant for the same land under the MLA." ECF No. 42 at 17. The record shows that in the Options Report BLM doubted its own authority to issue a right of way, the Borough during the purposefully circumscribed public process challenged the authority for a right-of-way, and Alaska before and after the TLCROW questioned

*Nuiqsut Trilateral, Inc. v. Doug Burgum*  Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment  Page 33 of 50
Case 3:26-cv-00098-SLG  Document 71  Filed 06/09/26  Page 33 of 50

and challenged the authority. [ROW_02174; ROW_02322; ROW_02200; ROW_02286; ROW_02296] Also, here DOI did not employ any "application" process similar to that of *Boesche,* which highlights that any concern about "administrative abuses" the Court has should be with the issuance of the right-of-way at its inception rather than its termination. Given the serious and fundamental nature of the legal deficiencies identified in the Cancellation Decision, the Executive Order, and Congress' actions through the OBBBA and the Joint Resolution disapproving the restrictive 2022 IAP ROD, any perceived lack of administrative process for NTI was harmless due to the lack of legal options available for a similar "right-of-way." [ROW_02706, noting inability to cure] The Cancellation Decision also directed a future administrative process that NTI could participate in when it directed BLM to "appropriately implement MM27 in consultation with key stakeholders and in a way that conforms with the laws governing the BLM's management of the [Petroleum Reserve]." [ROW_02707]

As to the Court's second consideration that *Boesche* concerns only administrative errors, Alaska notes above that the limitation was in the context of specific language in the Mineral Leasing Act. ECF No. 42 at 18. More fundamentally, Alaska rejects the notion that the TLCROW was a right-of-way for any purposes and certainly not the purposes contemplated by Congress for rights-of-way in the Production Act. The TLCROW was DOI's blatant attempt to

*Nuiqsut Trilateral, Inc. v. Doug Burgum*               Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 34 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 34 of 50

circumvent future public land management processes or illegally contract around those public processes and Congress' authority leasing. [ROW_02265] The TLCROW is an illegal rule and DOI has the authority to repeal rules. Similarly, if considered closer to is an illegal contract, contracts can also be recognized as void ab initio just as DOI did here.

As to the Court's third distinction from *Boesche* that the "delayed" timing has any significance, the Executive Order and Secretarial Order called for mortarium and suspension of privileges that put NTI on notice. ECF No. 42 at 18. It is clear from the record that NTI itself considered the TLCROW "relatively new", that implementation procedures were needed, and that BLM was not providing notice NTI suggests was due to it. [ROW_02696] DOI's Cancellation Decision here given the TLCROW was consistent with the Secretary's broad land management authorities and general principles in *Boesche*.

## II.     The TLCROW violates the Production Act.

The TLCROW violates the Production Act because: 1) it is not a "right-of-way" for the purposes of the Production Act; 2) unlawfully restricts public land management processes governing the Petroleum Reserve; and 3) is arbitrary and capricious. The Production Act provides that the Secretary "shall conduct an expeditious program of competitive leasing of oil and gas" in the Petroleum Reserve. 42 U.S.C. § 6506a(a). Immediately following this directive, the

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 35 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 35 of 50

Production Act requires "[*A]ctivities undertaken* pursuant to this Act *shall include* or provide for such *conditions, restrictions, and prohibitions* as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [Petroleum Reserve]." (emphasis added) 42 U.S.C. § 6506a(b). The Production Act mandates oil and gas leasing and as part of those oil and gas leasing "activities undertaken" the Secretary is to include conditions to mitigate "reasonably foreseeable and significantly adverse effects on surface resources." *Id*. This is consistent with how the 9th Circuit recently in *ConocoPhillips Alaska, Inc. v. Alaska Oil and Gas Conservation Commission* characterized these two sections of the Production Act. 2026 WL 1477823 at 6 (noting that §6506a(b) as authorizes [DOI] to promulgate regulations for the protection of the Reserve's surface environment.). The TLCROW does not authorize activities with conditions from those set out in regulation. Instead, the TLCROW exists to prohibit oil and gas leasing "activities undertaken" and is contrary to the dominant leasing framework of the Production Act. NTI improperly relies on the section of the Production Act related to the transfer of jurisdiction from the Secretary of the Navy to DOI as supporting the TLCROW. 42 U.S.C.§ 6503(b); NTI Br. at 21. The first sentence of the section relates to "activities" conducted by the Navy as being transferred to DOI, likely studies and activities related to wells put in place by the Navy, not rights-of-way

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 36 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 36 of 50

for conservation. *Id*. The second sentence demonstrates the invalidity of the TLCROW because it calls on DOI to promulgate "rules and regulations…necessary and appropriate for the protection of such values within the [Petroleum Reserve]." Again, DOI had authority to promulgate rules and regulations, not rights-of-way for protective purposes contrary to the primary purpose of the Production Act. In NTI's history about the various protections IAPs that have addressed Teshekpuk Lake serve only to highlight more that DOI acts through public processes and rules and regulations to protect surface values, not rights-of-way. NTI Br. at 6. This point is bolstered further by the recent Joint Resolution disapproving the 2022 IAP ROD due to its "rule" status.

The Production Act contains two references to "rights-of-way." The statutory framework and context of neither provide authority for the TLCROW and its prohibitions. One reference is in the context of a list of dispositions for the use and activities on public lands expected for oil and gas leasing: "such dispositions of mineral materials *and* grant such rights-of-way, licenses, and permits as may be necessary to carry out his responsibilities under the Production Act." (emphasis supplied) 42 U.S.C. § 6502. The second reference is also use and access oriented consistent with common understanding of the term "right-of-way." 42 U.S.C. § 6502 (grant of rights-of-way to the Borough under FLMPA or the MLA for energy supplies).

*Nuiqsut Trilateral, Inc. v. Doug Burgum*　　　　　Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment　　　Page 37 of 50
Case 3:26-cv-00098-SLG　　　Document 71　　　Filed 06/09/26　　　Page 37 of 50

NTI mischaracterizes the nature of MM27 and the Willow ROD to support the TLCROW. NTI Br. at 19. The Willow ROD was not conditioned on the grant of any right-of-way, let alone the TLCROW at issue here. MM27 directed essentially the creation of the Options Report. Moreover, the prohibitions and area of the TLCROW go beyond any those contemplated in MM27 as explained in the Cancellation Decision. [ROW_02701]

In addition to the TLCROW being costumed as a right-of-way unlike one Congress, or even BLM, had ever considered, the TLCROW, its process, and underlying Decision were arbitrary and capricious in violation of the APA which provide additional support for the Cancellation Decision and evidence its reasonableness. 5 U.S.C. § 706(2)(A).[8] For example, the Decision underlying the TLCROW lacked any explanation as to why the public engagement process contemplated in MM27, BLM's Options Report, and numerous stakeholders was abandoned and public notice of other alternatives never provided. Despite knowledge that the Teshekpuk Caribou Herd is used for subsistence by many communities beyond those with members in NTI; the TLCROW without any

---

[8]   Alaska highlights these additional legal deficiencies to support the reasonableness of the Cancellation Decision and the public interest against vacatur. Alaska in no way waives its right to bring these claims separately should the Cancellation Decision be vacated.

*Nuiqsut Trilateral, Inc. v. Doug Burgum*                  Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 38 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 38 of 50

explanation or accountability would have NTI determine the best interest of those communities and the Teshekpuk Caribou Herd. [ROW_02267-69]

Similarly, the Decision and TLCROW failed to offer any rationale as to why a purported "right-of-way" covering over one million acres that would prohibit oil and gas leasing in an area of high potential for oil should be offered without any application process, fee, or importantly rent for this alleged "use" of the Petroleum Reserve. *See*, 43 C.F.R. § 2920.8 (requiring rental be at least fair market value).

NTI argues that the TLCROW does not hinder oil and gas activities in the Petroleum Reserve, but this argument is cannot be reconciled with the immense prohibitions in the TLCROW. Even worse, neither the Decision nor TLCROW offer any explanation as to why the TLCROW includes prohibitions for activities entirely unrelated to the Willow Project, particularly prohibitions contrary to Alaska's interest in responsible exploration and development of neighboring Alaska offshore leases.

## III. The TLCROW violates the Subdelegation Doctrine.

The Cancellation Decision appropriately found that the TLCROW violated the subdelegation doctrine. [ROW_02705] The D.C. Circuit in *U.S. Telecom Association v. F.C.C.* explained the distinction between a subdelegation to a subordinate and a subdelegation to an outside party. 359 F.3d 554, 564 (D.C.Cir. 2004). A subdelegation to a subordinate enjoys a presumption of validity but "the

*Nuiqsut Trilateral, Inc. v. Doug Burgum*      Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment      Page 39 of 50
Case 3:26-cv-00098-SLG      Document 71      Filed 06/09/26      Page 39 of 50

case law strongly supports that subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization." *Id.* The Court in *U.S. Telecom* detailed the "entirely sensible" reasons for this distinction: accountability remains with the federal agency with subordinates but outside parties risk accountability, that the "national vision and perspective" will not be shared, or that the goals pursued by be inconsistent with the agency and "underlying statutory scheme." *Id*. These risks are readily apparent in the subdelegations to NTI found in the TLCROW.

The "waiver" process in the TLCROW lacks any accountability or transparency and may create behaviors between NTI and third-parties that are contrary to good governance, accountability, and sound land management practices. Alaska finds that the subdelegation to NTI to take into account the well-being of the Teshekpuk Caribou Herd to be particularly contrary to public policy and law since Alaska has expertise and management authority over the Herd. The assignability feature of the TLCROW further highlights the risks and public policy against subdelegation to private parties.

## IV. The TLCROW violates the "No More" withdrawal clause of ANILCA.

The TLCROW violates the "No More" withdrawal clause of ANILCA by creating a de facto caribou refuge across a million acres to contravene the

*Nuiqsut Trilateral, Inc. v. Doug Burgum*      Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment      Page 40 of 50
Case 3:26-cv-00098-SLG    Document 71    Filed 06/09/26    Page 40 of 50

fundamental purposes of the Petroleum Reserve. ANILCA presented a great compromise between land use and conservation, and was intended to settle, the extent of the land conservation system in Alaska. *Sturgeon v. Frost*, 587 U.S. 28, 36 (2019). In ANILCA, which set aside large tracts of Alaska as wilderness, Congress clearly stated its finding that the proper balance mechanism had been reached on protection and development of Alaska's vast federal land resources. ANILCA §101(d) provides:

> This Act provides sufficient protection for the national interest in the scenic, natural, cultural, and environmental values on the public lands in Alaska, . . . the designation and disposition of the public lands in Alaska pursuant to this Act are found to represent a proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition, and thus Congress believes that the need for future legislation designating new conservation system units, new national conservation areas, or new national recreation areas has been obviated thereby. 16 U.S.C. §3101(d).

Having obviated the need for any additional statutory protections for Alaska public lands, Congress also explicitly prohibited "future executive branch action which withdraws more than five thousand acres, in the aggregate, of public lands within the State of Alaska" without the approval of Congress. *Id.* § 3213(a). In the event of a withdrawal not approved by Congress, ANILCA provided that "[s]uch withdrawal shall terminate unless Congress passes a joint resolution of approval within one year after the notice of such withdrawal has been submitted to

*Nuiqsut Trilateral, Inc. v. Doug Burgum*  Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment  Page 41 of 50
Case 3:26-cv-00098-SLG  Document 71  Filed 06/09/26  Page 41 of 50

Congress." *Id.* Congress even prohibited executive branch studies of public lands in Alaska for the establishment of an additional "conservation system unit, national recreation area, national conservation area, or *for related or similar purposes*" without a further act of Congress. (emphasis supplied) *Id.* §3213(b).

Although Congress prohibited executive branch withdrawals in Alaska absent legislative approval to preserve the balance of protection and development that it had established in ANILCA, the term "withdrawal" was not specifically defined in the statute. In *Southeast Conference v. Vilsack*, 684 F.Supp. 2d 135 (D.D.C. 2010), the court determined that although ANILCA did not define the term withdrawal, "statutory evidence supports the application of the [FLPMA] definition of withdrawal to ANILCA." *Id*. at 143-44. The court concluded that "[a] withdrawal exempts covered land from the operation of laws that otherwise authorize the transfer of federal lands to the private domain for private use." *Id* at 143. Alaska views the term "withdrawal" in ANILCA as covering a broader range than of actions than contemplated under FLPMA due to the history underlying ANILCA; but for the purposes of this case, the Court need not decide those contours to find a violation.

The Court may look to the following four questions to determine whether an action violates the "No More" withdrawal clause of ANILCA: 1) was there an executive branch action? 2) did the action affect over 5,000 acres in aggregate? 3)

*Nuiqsut Trilateral, Inc. v. Doug Burgum*  Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment  Page 42 of 50
Case 3:26-cv-00098-SLG  Document 71  Filed 06/09/26  Page 42 of 50

was the land "withdrawn", *i.e.* made unavailable for certain kinds of private appropriation ("more intensive use and disposition") under public land laws? and 4) was the action approved by Congress? The first two inquiries are easily answered in the affirmative for the TLCROW. The TLCROW was an executive branch action. And purports to apply to over one million acres of the "Protected Property." [ROW_02264]

Turning to the question of "withdrawal," the stated purpose of the TLCROW is "to offset the impacts on the Herd from the Willow Project by providing durable and long-term protections for the Herd by prohibiting certain activities and facilities within the Protected Property for the benefit of the Herd and the Herd's most important habitat." [ROW_02265] Thus, the creation of large-scale areas for conservation purposes or similar purposes through executive action that were of concern in the ANILCA balance leading to the "No More" withdrawal clause abound in the TLCROW. First, the size of the TLCROW at over a million acres would rank as one of the largest conservation unit set asides. Second, the TLCROW goes on to declare as prohibited "the issuance of new oil and gas leases", "surface or subsurface exploration", "transportation of oil or gas", road construction to support oil and gas, construction of new facilities to support oil and gas, and even installation of utilities to support oil and gas. [ROW_02268-69] This balance is particularly skewed given the dominant purpose of the Petroleum Reserve and Production Act compared to

*Nuiqsut Trilateral, Inc. v. Doug Burgum*              Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment              Page 43 of 50
Case 3:26-cv-00098-SLG    Document 71    Filed 06/09/26    Page 43 of 50

other land management frameworks. Congress exempted the Petroleum Reserve from 42 U.S.C. §1712 and §1782 to preclude BLM from designating the Petroleum Reserve as an Area of Critical Environmental Concern ("ACEC") or a Wilderness Study Area. 42 U.S.C. §6506a(c). The prohibited activities in the TLCROW are all activities that the Production Act, through Congress' repeated focus on leasing, contemplates BLM will make available to private entities to effectuate the "expeditious program" of oil and gas leasing under the Production Act. 42 U.S.C. § 6506a(a).

The TLCROW acknowledged that the Protected Property took prohibitions beyond the prohibitions in the 2022 IAP ROD. [ROW_02265, acknowledging that 7,000 acres were open to oil and gas leasing and 115,000 were open to new oil and gas infrastructure] While the 2022 IAP ROD was eventually submitted to Congress and subsequently disapproved, the additional withdrawals in the TLCROW were certainly never submitted to Congress. Pub. L. 119-47 (2025). Accordingly, BLM with the TLCROW withdrew more than 5,000 acres of public land without Congressional approval in violation of ANILCA.

## V.    The TLCROW is an invalid rule under the APA and the CRA.

Just as the 2022 IAP ROD was determined to be a rule, the TLCROW meets the definition of a "rule" for the purposes of the APA and the Congressional

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 44 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 44 of 50

Review Act. Accordingly, the TLCROW is also of no effect due to violations of those acts.

The APA broadly defines a "rule" and looks to the nature of the statement rather than its label. 5 U.S.C.A. § 551(4). The 9th Circuit has held that the "definition of 'rule' includes 'nearly every statement an agency can make.'" *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1107 (9th Cir. 2025)(quoting *Batterton v. Marshall*, 648 F.2d. 694, 700 (D.C. Cir. 1980)). The Congressional Review Act ("CRA") provides that "[b]efore a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing" a copy of the rule. 5. U.S.C.A § 801(a)(1)A). The CRA incorporates by reference the APA definition of "rule" with three exceptions: 1) rules of particular applicability, 2) rules relating to agency management or personnel; or 3) rules of agency organization or procedure. 5. U.S.C.A § 804(3).

The Government Accountability Office (GAO) considered whether the 2022 IAP ROD was a rule under the APA. Exh. A. The GAO found the 2022 IAP ROD was a rule under the APA. *Id*. at 9. The same reasoning applies to the TLCROW statements reincorporating certain prohibitions of the 2022 IAP ROD and expanding the prohibitions to areas and activities beyond those of the 2022 IAP ROD. [ROW_02266-70] The TLCROW and the Decision supporting it are agency

*Nuiqsut Trilateral, Inc. v. Doug Burgum*　　　　Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment　　　Page 45 of 50
Case 3:26-cv-00098-SLG　　　Document 71　　　Filed 06/09/26　　　Page 45 of 50

statements of the U.S. and BLM for the purposes of the APA. [ROW_02264] The TLCROW purports to be of future effect regarding activities and management of the "Protected Area." [ROW_02266, duration of the grant ambiguous and likely decades into the future; ROW_02268-70, prohibitions including and broader than the 2022 IAP ROD]. The TLCROW like the 2022 IAP ROD purported to prescribe and restrict future uses including oil and gas leasing and exploration activities. [ROW_02268-69] In considering the 2022 IAP ROD, the GAO noted that the 2022 IAP ROD "reduces the area available for oil and gas leasing and new infrastructure in the [Petroleum Reserve] compared to the 2020 [IAP ROD]." Exh. A at 10. Likewise, the TLCROW also reduces the area available for oil and gas leasing and new infrastructure in the Petroleum Reserve compared to the 2022 IAP ROD and certainly the 2020 IAP ROD. [ROW_02265]

The TLCROW is a rule for the purposes of the APA but, unlike the 2022 IAP ROD, was not adopted following any public notice and public comment procedures. The APA requires notices of rule making appear in the Federal Register. 5 U.S.C.A §553(b). The "Fact Sheet" was did not meet the specifications for notice under the APA and was not posted in the Federal Register. [ROW_02220] BLM and NTI cannot costume a rule as a "right-of-way" to circumvent public land management planning processes and the APA.

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 46 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 46 of 50

Turning to the CRA, none of the exemptions for rules apply to the TLCROW. Just as the 2022 IAP ROD was of general applicability, rather than particular applicability, over the Petroleum Reserve, so too is the TLCROW. Exh. A at 12 (finding the 2022 IAP ROD focused on a geographic area and "applies to all persons or entities engaged in covered actions in the [Petroleum Reserve], including oil and gas exploration and development.") Although styled as a "right-of-way," the TLCROW purports to apply across over a million acres and prohibit activities of non-parties. According to NTI, the TLCROW applies to nearly all activities in the "Protected Area" even activities to develop neighboring Alaska lands. [ROW_02693-94]

The CRA exemptions for rules of agency management and organization are clearly inapplicable. The TLCROW - like the 2022 IAP ROD- is a rule for the purposes of the CRA. The TLCROW was not submitted to Congress and thus is of no effect. Moreover, Congress disapproved the 2022 IAP ROD and therefore BLM is prohibited from adopting a similar rule. Even if BLM could now submit the TLCROW to Congress, it would already be in violation of the CRA since the TLCROW closed to oil and gas leasing and infrastructure some of the same acreage as in the 2022 IAP ROD.

*Nuiqsut Trilateral, Inc. v. Doug Burgum*  Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment  Page 47 of 50
Case 3:26-cv-00098-SLG  Document 71  Filed 06/09/26  Page 47 of 50

## VI. NTI's requested relief of vacatur is unlawful and contrary to land management principles and public policy.

Alaska maintains that the Cancellation Decision was lawful. Alaska submits that should this Court find any legal defect that a remedy other than vacatur of the Cancellation Decision be considered by this Court. Vacatur is an exercise of the Court's powers in equity and not an automatic remedy. *Cal. Cmty. Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012). The Court when considering whether an action should be vacated depends on several factors: 1) the seriousness of the agency's error and 2) "the disruptive consequences of an interim change that may itself be changed." Id. (quoting *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F. 2d 146, 150-151 (D.C. Cir. 1993).

As for the first factor, NTI has not established any error as explained above. Assuming some error exists, it would not rise to the level to warrant vacatur. As for the second factor, vacatur of the Cancellation Decision would reinstate the TLCROW and that would be disruptive on multiple fronts and against significant public interest. The TLCROW was created without public process and in contravention of established land planning frameworks. Moreover, it is violative and of no effect under ANILCA and the CRA. As explained above, the prohibition on leasing in the TLCROW is contrary to the purposes of the Production Act and significant financial and developmental interests of Alaska in the Petroleum

*Nuiqsut Trilateral, Inc. v. Doug Burgum*            Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment            Page 48 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 48 of 50

Reserve and on neighboring Alaska lands. The energy needs of the nation leading

to the Production Act still ring true today and caution against vacatur.

**CONCLUSION**

The Court should deny NTI's motion and enter summary judgment in favor

of the Federal Defendants and Alaska.


DATED: June 9, 2026

CORI MILLS
ACTING ATTORNEY GENERAL

By: */s/Mary Hunter Gramling*
Mary Hunter Gramling
Alaska Bar No. 1011078
State of Alaska
Department of Law
P.O. Box 110300
Juneau, AK 99811-0300
Telephone: (907) 465-3600
Facsimile: (907) 465-2520
Email: mary.gramling@alaska.gov
Attorney for the State of Alaska

By: */s/David W. Duffy*
David W. Duffy  (Alaska Bar No. 0605016)
Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
907-269-5601
david.duffy@alaska.gov

*Nuiqsut Trilateral, Inc. v. Doug Burgum*                    Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 49 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 49 of 50

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.4, I hereby certify that this memorandum contains 9,828 words excluding parts exempted.

*/s/ Mary Hunter Gramling*
Mary Hunter Gramling


## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2026, a true and correct copy of the foregoing was served on all registered parties via the CM/ECF system.

*/s/ Mary Hunter Gramling*
Mary Hunter Gramling

*Nuiqsut Trilateral, Inc. v. Doug Burgum*          Case No. 3:26-cv-00098-SLG
Alaska's Opposition and Cross-Motion for Summary Judgment          Page 50 of 50
Case 3:26-cv-00098-SLG     Document 71     Filed 06/09/26     Page 50 of 50