Travis Annatoyn (*pro hac vice*)
Allison Rumsey (*pro hac vice*)
Sonia Tabriz (*pro hac vice*)
John V. Hoover (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
travis.annatoyn@arnoldporter.com

Patrick W. Munson (Alaska Bar 1205019)
Kody P. George (Alaska Bar 2211100)
MUNSON, CACCIOLA & SEVERIN, LLP
1029 West Third Avenue Suite 402
Anchorage, AK 99501
Tel: (907) 272-8401
pmunson@mcsalaska.com

*Counsel for Plaintiff Nuiqsut Trilateral, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| NUIQSUT TRILATERAL, INC.,<br>*Plaintiff*,<br>v.<br>DOUG BURGUM, in his official capacity as Secretary of the Interior, *et al.*,<br>*Defendants*,<br>and<br>STATE OF ALASKA,<br>*Intervenor-Defendant*. | Civil Action No. 3:26-cv-00098-SLG |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' AND INTERVENOR-DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


INTRODUCTION ..... 1

ARGUMENT ..... 2

I. Interior's Actions Are in Excess of Statutory Authority ..... 2

II. Interior's Actions Are Contrary to Law ..... 4

A. The NPRPA Authorized the Secretary to Issue the Right-of-Way ..... 5

B. The Right-of-Way Is Not a Sub-delegation ..... 7

C. The Department Cannot Rely on Post Hoc Events ..... 9

III. Interior's Actions Are Arbitrary and Capricious ..... 9

IV. The Cancellation Decision Is Without Observance of Procedure Required by Law ..... 11

V. Interior's Actions Violate the Fifth Amendment Due Process Clause ..... 12

VI. Defendants' New Arguments Violate *Chenery* and Are Meritless ..... 14

A. English Common Law Does Not Foreclose the Right-of-Way ..... 15

B. The "No More" Clause Does Not Apply to the NPR-A and the Right-of-Way Is Not a Withdrawal ..... 18

C. Dispensations of Property Rights Are Not "Rules" ..... 20

VII. The Cancellation Decision Must Be Vacated ..... 22

A. Interior's Mistakes Are Serious ..... 22

B. Remand Without Vacatur Would Be Extremely Disruptive ..... 23

CONCLUSION ..... 25

## INTRODUCTION

No party has disputed that, as a practical matter, the right-of-way that is the subject of this case (the "Mitigation Right-of-Way") facilitates *both* subsistence uses in the National Petroleum Reserve in Alaska ("NPR-A," or "Reserve") *and* oil and gas production from the Willow Project. Nor is there any dispute that Plaintiff's asserted interest in the Right-of-Way sounds in property.

Together, these two concessions rebut virtually every argument for the Right-of-Way's cancellation (the "Cancellation Decision") offered by the United States and the State of Alaska (collectively, "Defendants"). A grant advancing the "responsibilities" of the Department of the Interior ("Interior") under the Naval Petroleum Reserves Production Act ("NPRPA"), 42 U.S.C. § 6502, is a grant authorized by the Act. And many considerations that might ordinarily apply to Interior's management of the Reserve—a presumption against sub-delegations and the requirements for rulemaking, e.g.—have less salience when the government acts as a proprietor, not as a regulator. Shorn of its defenses, the Cancellation Decision is exposed for what it is: a bare change in agency policy dressed up in the language of statutory violations.

And even were there any doubt on this score, that doubt would merely point to a second, fatal infirmity in the Cancellation Decision: the deprivation of process to which Plaintiff was entitled by law. As Defendants' new, *post hoc* arguments reflect, all parties to the proceedings would have benefited from Interior testing its convictions through notice and an opportunity to be heard (among other procedural safeguards) instead of through the hasty missive now before the Court. To be sure, Defendants' arguments for cancellation would be irredeemable in all circumstances, but those shortcomings only underscore the importance of lawful process as a bulwark against the government's unlawful campaign to terminate the Right-of-Way. The Court should grant Plaintiff's motion for summary judgment and deny Defendants' cross-motions.

## ARGUMENT

### I. Interior's Actions Are in Excess of Statutory Authority

Congress has "power over the public land . . . without limitation," *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976), but Interior has only that power "specifically conferred upon it by statute," *Plaskett v. Wormuth*, 18 F.4th 1072, 1087 (9th Cir. 2021). One such statute provides Interior with general, "managerial powers over the public lands," and the Supreme Court has located within that grant a narrow, implied authority to cancel noncompetitive oil and gas leases where cancellation (1) corrects discrete and obvious inconsistencies with governing regulations; (2) proceeds from administrative process; (3) transpires nearly immediately after lease issuance; and (4) facilitates the practical operation of the Act. *Boesche v. Udall*, 373 U.S. 472 (1963); *accord Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950) (finding reconsideration proper where administrative appeal was filed within "the statutory period of twenty days"). *Boesche* is an "exceedingly narrow" decision, couched in disclaimers that—"if not quite 'no, no, a thousand times no'"—"should have sufficed to dissuade [Interior] from invoking the case" to cancel the Mitigation Right-of-Way. *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 646 & n.6 (2026).

The Cancellation Decision does not explain how *Boesche* can reach the case where *none* of that opinion's limiting principles are at work, and the government offers no such explanations in its opposition.[1] Instead—and here it is worth pausing to consider the breadth of the

[1] The government says that "other courts have had no difficulty extending *Boesche* far beyond its particular facts." Gov't's Opp'n at 15 (collecting cases). That claim says nothing about the role of *Boesche* here, and it is overstated: none of these opinions gives more than passing consideration to *Boesche*, much less extends the case. In *Silver State Land, LLC v. Schneider*, for example, the D.C. Circuit upheld Interior's authority to withdraw a *proposed* sale before property rights had even been conveyed. 843 F.3d 982, 990 (D.C. Cir. 2016). In *Texaco, Inc. v. Hickel*, the circuit merely acknowledged the existence of *Boesche* without applying it. 437 F.2d 636, 646 (D.C. Cir. 1970). *Winkler v. Andrus* considered only the bona fide purchaser amendment to the Mineral Leasing Act, not *Boesche*. 614 F.2d 707, 710-15 (10th Cir. 1980). (An earlier Tenth Circuit decision in the proceedings applied *Boesche* to functionally similar circumstances as in the

government's asserted authority—Interior says that there are literally "no . . . constraints" on its power to cancel prior grants. *See* Defs.' Opp'n to Pl.'s Mot. Summ. J. and Cross-Mot. for Summ. J. ("Gov't's Opp'n") at 13, ECF No. 70. Had the Supreme Court intended to bless Interior's boundless power to cancel virtually any property right—at any time, for any reason, and without any process—on the agency's say-so, it could have ended its opinion in *Boesche* with its citations to the statutes reflecting "general managerial powers over the public land," 373 U.S. at 476 & n.6, and would not have required a further ten pages of the United States Reports to narrow the scope of its decision. Defendants simply do not confront the rationale of those ten pages.

Interior's power grab is particularly brazen because it reaches beyond the ministerial correction of "clerical errors" to reach new substantive decisions. *Nat'l TPS All. v. Noem*, 166 F.4th 739, 762 (9th Cir. 2026); *see also Am. Trucking Ass'ns v. Frisco Transp. Co.*, 358 U.S. 133, 146 (1958). But where an agency moves to "revoke or modify substantially" its prior decision based on "new policy," the relevant statute must explicitly "*authorize*[]" such action. *United States v. Seatrain Lines*, 329 U.S. 424, 429 (1947) (emphasis added). Interior's "new policy" in this case is made plain both by the agency's prior determination that the Right-of-Way "is consistent with the authority provided in the NPRPA," ROW_02215, and Alaska's successful request that Interior cancel the Right-of-Way for policy reasons, *see* ROW_02292-96. Neither *Boesche* nor any other authority licenses this type of about-face.

If Interior finds its statutory "authority too cumbersome or otherwise inadequate, it is, of course, free to ask Congress to grant it further remedial authority," but it cannot simply help itself

---

Supreme Court's opinion—not a new "factual context." *See Winkler v. Andrus*, 594 F.2d 775, 776 (10th Cir. 1979).) Finally, the summary of *Boesche* in *Texas Oil & Gas Corporation v. Andrus* is dicta: the action "depend[ed] entirely" on the substance of Interior's decision, not the agency's authority, 498 F. Supp. 668, 675 (D.D.C. 1980), and the opinion reversing the district court also did not turn on *Boesche*, *see Texas Oil & Gas Corp. v. Watt*, 683 F.2d 427 (D.C. Cir. 1982).

to undelegated power on the grounds of "policy-related importance." *AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 593 U.S. 67, 82 (2021). The good news for Defendants is that "[t]he judicial remedy is adequate and available[]" should they have grantors' remorse. *Pan Am. Petroleum Corp. v. Pierson*, 284 F.2d 649, 656 (10th Cir. 1960).[2] If Interior actually issues a right-of-way without authority, that decision may be challenged by an aggrieved third party under the Administrative Procedure Act, 5 U.S.C. § 702, and, in at least some circumstances, the Constitution provides an implied right of action for the United States "to protect or defend" its property. *United States v. Republic Steel Corp.*, 362 U.S. 482, 492 (1960) (citing *United States v. San Jacinto Tin Co.*, 125 U.S. 273 (1888)); *accord Alaska Indus. Dev. & Exp. Auth. v. Interior*, No. 3:24-CV-00051-SLG, 2025 WL 903331, at *7 (D. Alaska Mar. 25, 2025) ("*AIDEA*") ("there is no reason DOI could not file an action seeking declaratory relief").[3] Defendants do not need *Boesche* to achieve their policy goals, and—more to the point—that need is no substitute for delegated authority.

## II. Interior's Actions Are Contrary to Law

Even if Interior could cancel the Mitigation Right-of-Way based on belated, post-issuance changes in its interpretation of the law, each of the three reasons provided in the Cancellation Decision badly misreads that law. Nothing in Defendants' briefs rescues the Decision.

---

[2] *Pan American* rejected Interior's argument that it had inherent authority to cancel an oil and gas lease allegedly procured by fraud. 284 F.2d at 654-55. Three years later, the Supreme Court noted that it had granted certiorari in *Boesche* in part due to "a seeming conflict *in principle*" between the decision below in that case (which had recognized the inherent authority later endorsed by the Supreme Court) and *Pan American*. 373 U.S. at 473 (emphasis added). Consistent with the narrowness of the authority recognized in *Boesche*, the Supreme Court did not overrule *Pan American*, which remains good law.

[3] In *AIDEA*, the Court recognized that the authority at issue in *Boesche* was specific to the peculiar facts at work in that case: it quoted *Boesche's* reference to "this" lease, as opposed to leases or property rights generally. 2025 WL 903331, at *7. The Court then declined to extend *Boesche* to leases issued under the NPRPA, relying on Congress' *implied* withdrawal of any cancellation authority *assumed* to reside in the Act. *Id.* In other words, the Court did not definitively or comprehensively locate *Boesche*-type discretion in the NPRPA.

### A. The NPRPA Authorized the Secretary to Issue the Right-of-Way

The NPRPA authorizes the Right-of-Way because it provides for such grants "as may be necessary to carry out [Interior's] responsibilities under [the] Act," 42 U.S.C. § 6502, and the Right-of-Way furthers two such responsibilities: oil and gas development (via the Willow Project) and subsistence uses. Neither Interior nor Alaska contests the first of these functions, at least as applied to Willow. And although both the State and Interior complain that the Right-of-Way is not "consistent" with oil and gas production in the broader Reserve, *see, e.g.*, Gov't's Opp'n at 17, they have yet to explain why the restrictions in the Right-of-Way are meaningfully less "consistent" with that aim than decades of conservation and mitigation measures in both Integrated Activity Plans ("IAPs") and leases, including *current* restrictions in the area of the Right-of-Way. *See* Pl.'s Mot. Summ. J. ("Pl.'s Mot.") at 22, ECF No. 56 (listing examples of such restrictions). Against that undeveloped grousing, the Right-of-Way's explicit benefits for Willow's production—and therefore for the Secretary's "responsibilities"—are a beacon.

With respect to the Right-of-Way's second function, Interior, echoed by Alaska, claims that the NPRPA has only a single purpose: "to advance the leasing, exploration, and development of oil and gas resources." Gov't's Opp'n at 16; State of Alaska's Opp'n and Cross-Mot. for Summ. J. ("Alaska's Opp'n") at 43-44, ECF No. 71. But as this Court and the Ninth Circuit have noted, the Act "is a dual-purpose statute" and encompasses protection of sensitive resources. *Nuiqsut Trilateral, Inc. v. Burgum*, No. 3:26-CV-00098-SLG, 2026 WL 734749, at *7 (D. Alaska Mar. 16, 2026); *see also Ctr. for Biological Diversity v. BLM*, 141 F.4th 976, 1002 (9th Cir. 2025). Defendants' bald disagreement with binding Circuit precedent requires no response. For the sake of completeness, however, Plaintiff notes that no party contests the Right-of-Way's usefulness for subsistence uses *in fact*: To the extent those uses are among the Secretary's "responsibilities" under

the NPRPA (and they are), the Right-of-Way sits comfortably and undisputedly within the statute's grant of authorities.

Finally, Interior and Alaska question whether the Right-of-Way might be authorized under *other* sections of the NPRPA, such as the Act's provision for "rules and regulations as [the Secretary] deems necessary and appropriate for the protection of [conservation] values within the reserve." 42 U.S.C. § 6503(b); *see* Gov't's Opp'n at 17; Alaska's Opp'n at 36-37. But in granting the Right-of-Way, Interior relied on § 6503(b) only as evidence of the NPRPA's overall purposes, not a freestanding grant of authority. ROW_02265-66. And there is nothing unusual about land management statutes providing for both adjudications (in § 6502) and rulemakings (in § 6503(b)) as complementary tools. *Accord SEC v. Chenery Corp.,* 332 U.S. 194, 203 (1947) ("the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency"). Defendants' hypothetical is irrelevant to the Court's examination of the authority Interior *actually* asserted.[4]

[4] Defendants offer a smattering of other attacks on the Right-of-Way's validity, all of which can be quickly resolved. There is nothing unlawful, for example, about a right-of-way larger than the 60,000-acre limit for oil and gas leases. *See* Gov't's Opp'n at 22 (citing 42 U.S.C. § 6506a). Acreage limitations ensure competition among lessees, a goal with no application to subsistence uses. *See* Michael C. Blumm & Kara Tebeau, *Antimonopoly in American Public Land Law*, 28 Geo. Env't L. Rev. 155, 192 (2016) (describing origin of policy in the Mineral Leasing Act). Interior also has a long history of issuing significant grants (or collections of grants) in Alaska, as befits the State's sheer size. *See, e.g.*, *Wilderness Soc'y v. Morton*, 479 F.2d 842, 849-851 (D.C. Cir. 1973) (describing Trans-Alaska Pipeline System); *accord Sturgeon v. Frost*, 577 U.S. 424, 438-39 (2016) ("Alaska is different[.]"). Nor was Interior required to charge rent to the Trilateral under a regulation implementing a different statute. *See* Alaska's Opp'n at 39 (citing 43 C.F.R. § 2920.8). And Alaska offers no specific critique of the extensive consultation and outreach from Interior in advance of the Right-of-Way. *Compare* Alaska's Opp'n at 38 ("numerous stakeholders [were] abandoned"), *with* ROW_01536-37 (describing Interior's community outreach).

### B. The Right-of-Way Is Not a Sub-delegation

Defendants emphasize the existence of and reasons for the presumption against sub-delegation, but that is talking past Plaintiff. As Nuiqsut Trilateral has explained, the Right-of-Way is not a "sub-delegation" *at all*. That is because property rights inherently limit conflicting uses, and those narrow, commonplace limitations do not usurp Interior's regulatory authority for any part of the Reserve. Pl.'s Mot. at 23-25 & n.4. Through Interior, Congress "exercises the powers both of a proprietor and of a legislature over the public domain," *Kleppe*, 426 U.S. at 540, and sub-delegation implicates only the latter authority—one that Interior has not surrendered. The government points to no case in which a property right was deemed an unlawful sub-delegation.

To the extent that Interior contests this principle at all, it is only to argue that the Right-of-Way's enforcement provisions are "novel," "allowing the Trilateral to . . . prevent a third party from engaging in otherwise lawful activity on public lands," including by seeking appropriate remedies. Gov't's Opp'n at 28 n.6. Far from "novel," a grantee's capacity to enforce its servitudes is a core and ancient provision of state law, which applies on the Reserve absent "conflict [with] some federal policy or interest." *Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 68 (1966). *See also* Restatement (Third) of Property (Servitudes) §§ 8.1, 8.3, 8.5 (A.L.I. 2000) (describing remedies). Nor need the government worry that the Right-of-Way somehow enlarges the universe of available relief in startling new directions. That universe is defined not by the grant itself, nor by Plaintiff's isolated characterizations thereof (such as its communications with Narwhal Exploration), *see* Gov't's Opp'n at 30, but "by existing rules or understandings that stem from an independent source such as state law," *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). The Right-of-Way's invocation of these "independent sources" of law is a necessary incident of property rights issued by a federal agency, not a delegation.

And even were it otherwise, the Right-of-Way would at most constitute "legitimate outside party input into agency decision-making processes" by enshrining "a reasonable condition for granting federal approval" of development. *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 566 (D.C. Cir. 2004). The test for "legitimate input" does not depend on whether the outside party is an Indian tribe, a sufficient but not necessary condition for the outside party's involvement. *See S. Pac. Transp. Co. v. Watt*, 700 F.2d 550, 556 (9th Cir. 1983). Instead, the question is whether there is "a reasonable connection between the outside entity's decision and the federal agency's determination." *U.S. Telecom Ass'n*, 359 F.3d at 567. For obvious reasons, no party contends that the subsistence communities abutting the Right-of-Way lack a "reasonable connection" to the Teshekpuk Caribou Herd and Interior's related management decisions. That truism dooms the government's argument.

Interior also appears to believe that a grant's *prohibitions*—as opposed to its permissions—are *per se* sub-delegations. Gov't's Opp'n at 27-28. But Interior supplies no authority or rationale for this theory, and Plaintiff is aware of none. To the contrary, it is just as easy to say that the Right-of-Way "unabashed[ly]" prohibits certain activities and "abdicates" the United States' discretion in the area of the Right-of-Way, *id.* at 27-28, as it is to say that the various rights-of-way for the Trans-Alaska Pipeline System "unabashedly" permit construction and "abdicate" the United States' discretion to allow competing uses in the same physical spaces. *See Wilderness Soc'y*, 479 F.2d at 849-51. The relevant question is not whether an outside party provides input to "approve" or "disapprove," but whether the input is "final," *Watt*, 700 F.2d at 556, and "entire," *U.S. Telecom Ass'n*, 359 F.3d at 567. As applied to oil and gas development in the Right-of-Way, the answer to that question is plain: no party contends that Nuiqsut Trilateral administers the

program of leasing contemplated by the NPRPA. *See* Attachment A (describing BLM's regulatory authority over the Reserve).

### C. The Department Cannot Rely on Post Hoc Events

Plaintiff has previously explained that Defendants' reliance on *post hoc* legislation—specifically various re-adoptions of the 2020 IAP—is incompatible with Interior's invocation of *Boesche*, misconstrues the relevant legislation, and calls for impermissibly retroactive effects. The government has answered none of these arguments, and Plaintiff respectfully refers the Court to its earlier briefing on this score. *See, e.g.*, Pl.'s Mot. at 26-27; Pl.'s Mot. for Prelim. Inj. at 26; *Montana Wildlife Fed'n v. Burgum*, No. CV-18-69-GF-BMM, 2026 WL 1707576, at *6 (D. Mont. June 12, 2026) ("[T]he text of [the One Big Beautiful Bill Act] expressly requires BLM to apply [the Act] provisions prospectively.").

## III. Interior's Actions Are Arbitrary and Capricious

The obligation to engage in reasoned decisionmaking does not fall away simply because the government declares that its prior decision was legally unsound. *See* Gov't's Opp'n at 31-34. The government took this tack in *Department of Homeland Security v. Regents*—hardly a "paucity of supporting authority," Gov't's Opp'n at 31—by rescinding a prior decision on the sole basis that it was "unlawful." 591 U.S. 1, 24 (2020). The Supreme Court held that the rescission was arbitrary and capricious *even if* the agency's prior decision were unlawful, because "deciding how best to address a finding of illegality moving forward can involve important policy choices." *Id.* at 25. While an agency need not consider "every alternative device and thought conceivable by the mind of man," *id.* at 33, it must deliberate on the best approach and consider "important aspect[s] of the problem," *id.* at 30; *see also Louisiana v. United States Dep't of Energy*, 90 F.4th 461, 476 (5th Cir. 2024) (holding that even if prior actions are "illegal," agency must "consider alternatives to repealing them *in toto*"). Because these cases do not turn on the *reason* for the alleged

unlawfulness of the repealed agency action, the government cannot evade its duty merely by asserting that the Right-of-Way was "unauthorized," as opposed to suffering from some other defect, *see* Gov't's Opp'n at 31-32.

Yet that is what Interior has tried. With all of its focus on the Right-of-Way's legality, the Cancellation Decision devotes no analysis at all to the core problem the instrument was designed to address: protection for the Teshekpuk Caribou Herd and the effects of oil and gas development on subsistence uses in the Teshekpuk Lake area. *See* ROW_02203. "Recognizing the importance" of durable protections for the Teshekpuk Caribou Herd as a subsistence resource, the 2023 Willow Record of Decision ("ROD") directed BLM to develop a conservation instrument to protect the Herd and its key habitat. ROW_01462. The Cancellation Decision is "intolerably mute" on this score, *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687-88 (9th Cir. 2007), and that silence is doubly suspect because Interior reached its new decision "on precisely the same record" it possessed in late 2024. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015). The government's omissions violate its duty both to consider alternatives and to acknowledge a change in agency policy.

Belatedly trying to plug the gap, Interior suggests it might eventually get around to fulfilling Mitigation Measure 27. *See* ROW_02706-07; Gov't's Opp'n at 32-33. But Administrative Procedure Act ("APA") review is based on the record that exists "at the time the agency made its decision," and that record contains no indicia that Interior is serious about its obligations. *Corrigan v. Haaland*, 12 F.4th 901, 908 n.3 (9th Cir. 2021). Nor may Interior hide behind the alternatives analysis for the Right-of-Way itself, including the Teshekpuk Lake Special Area Protection Options Report. *See* Gov't's Opp'n at 32; ROW_01526-01547. The Options Report and its alternatives were never "invoked by the agency" in the Cancellation Decision and

cannot now be marshalled as a *post hoc* rationale. *Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 624 (2023).

Likewise forgone by the Cancellation Decision was any serious discussion of reliance interests. The Iñupiat people and other subsistence communities on the North Slope have gathered resources in the Teshekpuk Lake area for millennia, *see* Pl.'s Mot. at 3-4, and subsistence is necessary to many Native Alaskans' way of life. *See id.* Interior's conclusion that the Right-of-Way must be cancelled immediately to permit oil and gas development activities, *see* ROW_02707, displays no awareness of this established reliance on policies favorable to subsistence uses. Contrary to the government's assertions, *see* Gov't's Opp'n at 33, the concept of "reliance interests" has never been cabined to monetary investments, and plainly reaches a decision's effects on the policies around which interested parties structure their lives, *see Regents*, 591 U.S. at 32-33. So too does the government blithely cast aside the judicial processes that relied on fulfillment of Mitigation Measure 27 to uphold the Willow Project. *See* Pl.'s Mot. at 9, 30. In the absence of any consideration of cancellation's effect on these interests, the Cancellation Decision cannot stand.

## IV. The Cancellation Decision Is Without Observance of Procedure Required by Law

The government appears to concede that it did not conduct any analysis under the National Environmental Policy Act ("NEPA") in connection with the Cancellation Decision, instead implying that the Cancellation was not a "major federal action" under NEPA. Gov't's Opp'n at 30. But the government's view of its NEPA obligations does not actually appear in the record. It also runs aground on the statutory definition of "major federal action," which is "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A). The Cancellation Decision—which is Interior's

conclusive, final determination of Plaintiff's property right—is subject to the "control and responsibility" of no one outside the government. *See* ROW_02699-707.

Interior also contends that NEPA analysis was unnecessary because the statute "does not require an agency to prepare [analysis] to evaluate 'the environmental impact of an action it could not refuse to perform.'" Gov't's Opp'n at 34 (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 769 (2004)). But that justification appears nowhere in the Cancellation Decision and should be rejected as an impermissible *post hoc* rationalization. *See Regents*, 591 U.S. at 20. Nor does Interior identify anything resembling the action that the Department of Transportation "could not refuse" in *Public Citizen*: an unambiguous Presidential order executed pursuant to a ratified treaty. 541 U.S. at 759-63. The ostensible analogue—the One Big Beautiful Bill Act—is a mirage. *See* Pl.'s Mot. at 26. Even were it not, Interior was obligated to consider alternatives to the Right-of-Way's wholesale revocation, Pl.'s Mot. at 28, a requirement for which NEPA analysis would have been essential. *See Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 102 (D.C. Cir. 2014); 42 U.S.C. § 4332(C)(iii). The abandonment of that process is unlawful.[5]

## V. Interior's Actions Violate the Fifth Amendment Due Process Clause

Under Alaska state law, rights-of-way and conservation easements are legally recognized property interests. *See SOP, Inc. v. State, Dep't of Nat. Res., Div. of Parks & Outdoor Recreation*, 310 P.3d 962, 968 (Alaska 2013); Alaska Stat. § 34.17.060(1); *see also* Gov't's Opp'n to Pl.'s Mot. for Prelim. Inj. at 22, ECF No. 21 (conceding that the Mitigation Right-of-Way "convey[ed]

[5] The government states that BLM's Record of Decision approving the Right-of-Way contained "neither an [Environmental Impact Statement] nor an [Environmental Assessment]." Gov't's Opp'n at 34. But the Record of Decision contains a Determination of NEPA Adequacy concluding that the Right-of-Way was "within the scope and appropriately analyzed" within the Impact Statement completed for the 2022 NPR-A IAP. ROW_02204-05. Interior points to no analogue in the record for the Cancellation Decision.

an interest relating to public lands"). Instead of availing itself of the procedural tools it had to contest the Right-of-Way, *see supra* Section I, Interior provided no process at all before depriving Plaintiff of its property interest. That deprivation violates Plaintiff's Fifth Amendment rights.

Interior suggests that no process was due because the Department asserted the Right-of-Way was issued unlawfully. *See* Gov't's Opp'n at 35. That cannot be right. For purposes of the Due Process Clause, property interests are creatures of state law, and—as no party apparently contests—the Right-of-Way is a valid interest under Alaska law. *Roth*, 408 U.S. at 577. A hearing is thus required "before [Nuiqsut Trilateral] is finally deprived of [its] protected property interest," *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982), even if the government were ultimately correct that the Right-of-Way was improperly issued, *see Dudley v. Boise State Univ.*, 152 F.4th 981, 987 (9th Cir. 2025). In *Dudley*, the defendant school retroactively declared a student's degree "invalid" because of alleged pre-graduation misconduct. *Id.* The court held that because the plaintiff challenged "*revocation*" of a state-law property interest "*already* conferred" to her—rather than the failure to issue that property in the first place—she had a protectible property interest requiring pre-deprivation notice and an opportunity to be heard. *Id.* at 991, 995-99. The Ninth Circuit thus reasoned that the right to a property interest vests at the time it is "conferred," even if the government later thinks that conferral was improper. *Id.* at 991. So too has the government already conferred the Mitigation Right-of-Way to Nuiqsut Trilateral, such that notice and a hearing were required before deprivation.

Interior's authority does not change the analysis. *Bradley v. Village of University Park* did not consider a contested due process interest at all, and the excerpt on which the government relies is unreasoned dicta with no persuasive value. 59 F.4th 887, 902 (7th Cir. 2023). And in *Shiny Rock Mining Corp. v. United States*, plaintiff did not complain that the agency provided insufficient

process—the agency allowed the company to submit an application, appeal its decision, and petition for reconsideration. 825 F.2d 216, 217-18 (9th Cir. 1987). The case thus does not hold that an agency may simply declare an interest void with no process at all. Moreover, the unpatented mining claim at issue in *Shiny Rock* never actually conveyed to the plaintiff, as a longstanding publicly available land order immediately foreclosed that conveyance. *See id.* at 217. Here, however, the government took affirmative steps to convey the Mitigation Right-of-Way to Nuiqsut Trilateral and has only later sought to recast its initial decision as improper.

If accepted, the government's theory of due process would improperly require Plaintiff to seek out and obtain the very process it is owed. The Supreme Court has rejected this exact framework. *See Nelson v. Colorado*, 581 U.S. 128, 130 (2017) (holding that the Due Process Clause does not require a party to "institute[] a discrete civil proceeding" and carry his own burden to recover property). The burden falls on the government to initiate proceedings and prove that Nuiqsut Trilateral should be deprived of its property interest, not on Nuiqsut Trilateral to sue the government. *See id.* at 137. The government's assertion that the protected interest was unlawfully issued is not a get-out-of-due-process-free card.

## VI. Defendants' New Arguments Violate *Chenery* and Are Meritless

It is "a simple but fundamental rule of administrative law" that a reviewing court "must judge the propriety of [agency] action solely by the grounds invoked by the agency." *Chenery*, 332 U.S. at 196. *Chenery* thus "requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962). "'[P]ost hoc' rationalizations" will not do. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971). In their opposition briefs, counsel for Alaska and the United States advance several arguments for the Right-of-Way's cancellation that violate *Chenery*'s rule. ROW_02699-707. These rationales are "entirely absent from the

administrative record" and cannot inform the Court's review. *Arrington v. Daniels*, 516 F.3d 1106, 1113 (9th Cir. 2008). In any event, these novel arguments do not undermine the Right-of-Way.

### A. English Common Law Does Not Foreclose the Right-of-Way

Interior now contends that the common law would have characterized the Mitigation Right-of-Way as a disfavored "negative easement," and from there concludes that the NPRPA does not authorize the grant. But the government cannot "reject the [NPRPA's] statutory text in order to imply common law limitations," *Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1068 (9th Cir. 2011), and the face of the Act authorizes rights-of-way based on a grant's purpose, not its form. *See* Pl.'s Mot. at 18-20. The relevant authorization contains no distinction between "affirmative" and "negative" easements,[6] and Congress' earlier and contemporaneous recognition of conservation easements shows that it was aware of the instruments and could have excluded them from the NPRPA had it so wished. *See, e.g.*, Wild and Scenic Rivers Act, Pub. L. No. 90-542, § 15(c), 82 Stat. 906, 918 (1968) (recognizing "scenic easements"); Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520 (1976) (allowing deductions for donations of conservation easements).[7] If the Right-of-Way in all its specifics was not "expressly anticipated by Congress,"

[6] When it passed the NPRPA, Congress used the term "right-of-way" alongside "permits" and "licenses" to mean something less than a fee interest, including "easements." For example, the Federal Land Policy and Management Act ("FLPMA"), passed just a few months after the NPRPA, defines "right-of-way" to "include[] an easement, lease, permit, or license," 43 U.S.C. § 1702(f), and therefore does not limit the term to its narrow common law definition. *See Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005) ("when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes"). Interior, in other words, is generally correct that the rights-of-way described by the NPRPA "are subject to the principles that govern the scope of easements." Gov't's Opp'n at 19 n.4 (citation omitted). Consistent with this understanding, Interior has for decades alluded to its authority to grant "easements" in the Reserve, notwithstanding any explicit reference to "easements" in the Act. *See, e.g.*, 46 Fed. Reg. 45,205, 45,207 (Sept. 10, 1981).

[7] Because these statutes were "single-purpose" and aimed to promote conservation, Congress predictably did not mention other types of easements. Accordingly, there is no negative inference

that would "simply demonstrate[] the breadth" of the delegation in the NPRPA. *Bostock v. Clayton Cnty.,* 590 U.S. 644, 674 (2020) (cleaned up). Interior has no warrant to second-guess Congress' legislative judgment.

That judgment, moreover, was sound. The 1976 Congress would not have transplanted the "old soil" of "negative easements" into the NPRPA, *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019), because that soil was denuded beyond use. The common law's approach to "negative easements" was unique to England, a nation with "no requirement or norm of publicly recording interests in land," in the early 1600s, and only a "very limited" practice of recordation deep into the nineteenth century and beyond. K-Sue Park, *Property and Sovereignty in America: A History of Title Registries & Jurisdictional Power*, 133 Yale L.J. 1487, 1499 & nn.21-22 (2024). A limited class of negative easements "saves the costs of judicial supervision in [such] a country," particularly where "easements can be created . . . by implication and . . . prescription." Antony Dnes & Dean Lueck, *Asymmetric Information and the Law of Servitudes Governing Land*, 38 J. Legal Stud. 89, 108 (2009). In the United States, however, modern recording statutes foreclosed those problems and facilitated new use restrictions via negative easements, real covenants, equitable servitudes, and—most importantly for this dispute—the dissolution and comingling of this common law taxonomy into near-meaninglessness. *See* Uriel Reichman, *Toward a Unified Concept of Servitudes,* 55 S. Cal. L. Rev. 1177, 1187-90, 1212-30 (1982); Dnes & Lueck, 38 J. Legal Stud. at 106 & Table 1. Among the innovations of this period was the conservation easement, *see* Andrew Dana & Michael Ramsey, *Conservation Easements and the Common Law*, 8 Stan. Env't L.J. 2, 13 (1989), which took root and flourished even as the term "negative easement"

to be drawn from the lack of explicit references to conservation easements in the NPRPA, a dual-purpose statute: Congress drafted broadly in that piece of legislation and narrowly in others, as befitted their respective purposes.

limped toward permanent obsolescence. *See* Restatement (Third) of Property (Servitudes) § 1.2 cmt. g (A.L.I. 2000) (abandoning phrase as lacking any "descriptive utility").

Legislating in the midst of this evolution, Congress had no reason to buck the trend and inject a *numerus clausus* approach to the public lands. When Interior grants an easement under the NPRPA or the like, there is no suggestion that title might be muddied through shoddy recordkeeping or implied or prescriptive easements. *See, e.g.*, *United States v. Vasarajs*, 908 F.2d 443, 446 n.3 (9th Cir. 1990) (recognizing bar on prescriptive rights against the United States). Absent the common law's need to limit those downsides and facilitate the orderly transfer of property, the division urged by Interior collapses into absurdity. According to Interior, for instance, the agency may grant an "affirmative" easement over the area of the Right-of-Way to "access subsistence resources, improve wildlife habitat, or conduct environmental monitoring," Gov't's Opp'n at 21, presumably precluding any use that "interfere[s] with [that] exercise" (such as oil and gas development), Restatement (First) of Property § 450 cmt. h (A.L.I. 1944). But on Interior's view of the NPRPA, the agency simultaneously cannot grant what it describes as a "negative" easement with functionally identical effect, e.g., a right-of-way with rights to access and monitor that are incidental to preclusions of oil and gas development. *See* ROW_02267-68. The government supplies no justification for this empty formalism, and no indication it was embraced by Congress.[8]

[8] Unlike the NPRPA, FLPMA defines rights-of-way as grants to "occupy, use, or traverse" public lands. 43 U.S.C. § 1702(f). But as commentators have observed and the Right-of-Way demonstrates, affirmative grants frequently can be characterized in the negative, and vice versa. *See* Reichman, 55 S. Cal. L. Rev. at 1260 & n.47 (characterizing negative easements recognized at common law as affirmative easements); Justin R. Pidot & Ezekiel A. Peterson, *Conservation Rights-of-Way on Public Lands*, 55 U.C. Davis L. Rev. 89, 132-33 (2021) (discussing FLPMA). The relevant clause in FLPMA is therefore less restrictive than it might first seem.

Even if the government is correct—even if the 1976 Congress silently chained Interior to the anchor of the common law—the Right-of-Way would nonetheless be valid in view of intervening changes to that law. On Interior's reading, the NPRPA cannot "stand on its own terms, without need for reference to any outside body of law," because, "[a]t the time of [the statute's] enactment," negative servitudes constituted an "important field within the common law, with well-developed legal principles reflected in numerous legal treatises and decisions." *S. Utah Wilderness All. v. BLM*, 425 F.3d 735, 763 (10th Cir. 2005) ("*SUWA*") (discussing rights-of-way under the statute known as "R.S. 2477"). If that is right, then the test for a valid right-of-way "'borrows' from long-established principles of state law, to the extent that state law provides convenient and appropriate principles for effectuating congressional intent." *Id.* at 768; *see also Cnty. of Shoshone, Idaho v. United States*, 589 F. App'x 834, 836 (9th Cir. 2014) (adopting rationale of *SUWA*). That borrowing happens "at the time the grant in question issued," such that Interior's theory would test the Right-of-Way's validity as of 2024. *Doe ex dem. Patterson v. Winn*, 24 U.S. 380, 387 (1826); *see also SUWA*, 425 F.3d at 765-66. The Right-of-Way was a valid state law conservation easement at that time, *see* Alaska Stat. §§ 34.17.010-060, and—as Plaintiff has explained at length—the Right-of-Way "effectuat[es] congressional intent" by simultaneously furthering both subsistence uses and oil and gas development, *SUWA*, 425 F.3d at 740-41, 768; *accord Bostock*, 590 U.S. at 674. The Right-of-Way is thus valid even on Interior's reading of the statute.

### B. The "No More" Clause Does Not Apply to the NPR-A and the Right-of-Way Is Not a Withdrawal

Subsection 1326(a) of the Alaska National Interest Lands Conservation Act ("ANILCA") prohibits any "executive branch action which withdraws more than five thousand acres, in the aggregate, of public lands within the State of Alaska" without subsequent congressional approval

within one year. 16 U.S.C. § 3213.[9] Alaska asserts that the Right-of-Way operates as a withdrawal under Subsection 1326(a), Alaska's Opp'n at 40-44, but, four years before Congress passed ANILCA, Congress withdrew the NPR-A "from all forms of entry and disposition under the public land laws, including the mining and mineral leasing laws, and all other Acts." NPRPA, Pub. L. No. 94-258, § 102, 90 Stat. 303 (1976) (codified at 42 U.S.C. § 6502). Instead of instructing the government to oversee the NPR-A under these generally applicable statutes, Congress established a separate mechanism in the NPRPA to "balance[] two objectives: oil and gas development and protection of surface resources" in the Reserve. *Ctr. for Biological Diversity*, 141 F.4th at 1002.

ANILCA did not retroactively undo this withdrawal. The Act nowhere explicitly countermands the direction in 42 U.S.C. § 6502, and "repeals by implication are not favored," *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662 (2007), particularly when "a statute dealing with a narrow, precise, and specific subject" (like the NPRPA) threatens to be "submerged by a later enacted statute covering a more generalized spectrum" (like ANILCA). *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976). To the contrary, Congress enacted Subsection 1326(a) in response to the Carter administration's late 1978 withdrawal of approximately 172 million acres of land in Alaska under FLPMA and the Antiquities Act. *See* Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 Ga. L. Rev. 473, 502-07 (2003). When Congress permanently withdrew 100 million acres under ANILCA in 1980, it took away the Executive's keys by including Subsection 1326(a) and did not obscure its target: the Executive's would-be "establishment of a conservation system unit, national recreation area,

[9] ANILCA itself does not define "withdrawal," but FLPMA defines the term as "withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws." 43 U.S.C. § 1702(j); *see also Se. Conf. v. Vilsack*, 684 F. Supp. 2d 135, 143-44 (D.D.C. 2010) (relying on FLPMA definition to interpret ANILCA's use of "withdrawal").

national conservation area," or similar permanent reserve in Alaska. 16 U.S.C. § 3213(b). Congress was not concerned with the authorities in the NPRPA, and it took no action to narrow those authorities when, just ten days after passing ANILCA, it amended the NPRPA to permit oil and gas leasing. Appropriations Act, Pub. L. No. 96-514, 94 Stat. 2957, 2964 (1980).

Furthermore, the Right-of-Way would not conflict with Subsection 1326(a) even if that provision applied to the NPR-A because the instrument acts as a grant of federal land rights rather than a withdrawal. BLM granted the Right-of-Way under a federal land law, *see* 42 U.S.C. § 6502, rather than withholding the land as unavailable. The *Southeast Conference* court, for instance, held that forestry plan land use designations did not represent withdrawals because they "are merely examples of the Forest Service's statutory responsibility under the National Forest Management Act." 684 F. Supp. 2d at 144. So too here: in issuing the Right-of-Way, BLM simply attended to its statutory duty to balance oil and gas development with protection of surface resources, *Ctr. for Biological Diversity*, 141 F.4th at 1002, and carried out that obligation through tools Congress had provided for that purpose.

### C. Dispensations of Property Rights Are Not "Rules"

The APA divides agency action between "rules" and "orders." A "rule" is the "whole or a part of an agency statement of general or particular applicability and future effect," 5 U.S.C. § 551(4), while an order is a "disposition . . . other than rule making but including licensing." *Id.* § 551(6). Rules must be adopted pursuant to specific "rulemaking" procedures in 5 U.S.C. § 553, while orders are adopted via more flexible "adjudications." *Id.* § 554. One difference between adjudication and rulemaking is temporal: adjudications "have an immediate effect on specific individuals," whereas rulemaking is entirely "prospective, and has a definitive effect on individuals *only* after the rule subsequently is applied." *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994) (emphasis added).

The Right-of-Way, like other property rights granted by the government, cannot be a rule—and is therefore an "order"—because it immediately grants legal rights and obligations, without need for prospective application. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216 (1988) (Scalia, J., concurring) (the APA "could not possibly mean that merely *some* of [rulemaking's] legal consequences must be for the future"); *accord Alaska Indus. Dev. & Exp. Auth. v. Biden*, 685 F. Supp. 3d 813, 845 (D. Alaska 2023) (moratorium on leasing was an adjudication where "it directly and immediately affected the rights of the identified lessees on the Coastal Plain"). And because the Right-of-Way is not a rule, Interior need not have adopted the rulemaking procedures of the APA. (Nonetheless, Interior *did* conduct an extensive campaign of notice and outreach in connection with the Right-of-Way. *See* ROW_02207-08.)

The State of Alaska likens the Right-of-Way to land management plans. As the congressional office charged with certain responsibilities under the Congressional Review Act ("CRA"), 5 U.S.C. § 801, the Government Accountability Office ("GAO") has identified such plans as "rules" for purposes of that statute. But unlike management plans, the Right-of-Way affected "present conduct" (by immediately prescribing rights and obligations) and proclaimed no new *agency* "policy" or "practice" for future decisionmaking in the Reserve. *Matter of: U.S. Dep't of the Interior, Bureau of Land Mgmt.—Applicability of the Cong. Rev. Act to 2022 Nat'l Petroleum Rsrv. in Alaska Integrated Activity Plan Rec. of Decision*, B-337234 (July 24, 2025). Of course, the Right-of-Way prohibits incompatible uses within its subject acreage, as is true for virtually any property right. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149-52 (2021). But that prohibition merely flows from Interior exercising its delegated authority as "proprietor . . . over the public domain," *Kleppe*, 426 U.S. at 540, not—as is necessary for rulemaking—its "quasi-legislative" regulatory power. *See RLC Indus. Co. v. Comm'r of Internal Revenue Serv.*, 58 F.3d

413, 417 (9th Cir. 1995). If the exclusionary property rights springing from this authority are "rules," as Alaska contends, then many mineral leases and similar property rights across the country have been issued absent necessary process and are unlawful. *See* 5 U.S.C. § 706(2)(D).

Alaska's related argument—that the Right-of-Way is a "rule" promulgated in violation of the CRA—is a non-starter for three reasons. First, the CRA incorporates the APA's definition of a "rule," *id.* § 804(3), and, as noted above, the Right-of-Way is not a rule. Second, if the Right-of-Way *were* a rule, it would be a "rule of particular applicability," *id.* § 804(3)(A), because it is confined to the "designation" of a specific area for defined uses. *Nat'l Wildlife Fed'n v. Costle*, 629 F.2d 118, 126 & n.27 (D.C. Cir. 1980). The CRA exempts such rules from its ambit. 5 U.S.C. § 804(3)(A). Third, an agency's compliance with the CRA is not subject to judicial review for non-constitutional violations. *Id.* § 805; *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 561 (9th Cir. 2019).

## VII. The Cancellation Decision Must Be Vacated

"[V]acatur is the presumptive remedy under the APA," *350 Montana v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022), and courts "order remand without vacatur only in 'limited circumstances,'" *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015). "Whether agency action should be vacated depends on [1] how serious the agency's errors are and [2] the disruptive consequences of an interim change that may itself be changed." *350 Montana*, 50 F.4th at 1273.

### A. Interior's Mistakes Are Serious

Interior's mistakes are serious because there is no prospect that a "different result may be reached" on remand. *Montana Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50-51 (9th Cir. 2025). This Court has previously vacated agency action that "failed to adequately analyze a reasonable range of alternatives" and where the agency's "analysis . . . was in violation of law." *Sovereign Iñupiat*

*for a Living Arctic v. BLM*, 555 F. Supp. 3d 739, 804 (D. Alaska 2021). The Cancellation Decision's "fundamental flaws" are even further beyond repair, as the Decision is "unlawful in a way that precludes [its] readoption on remand." *Nat. Grocers v. Rollins*, 157 F.4th 1143, 1170-71 (9th Cir. 2025). Interior has no power to unilaterally cancel the Right-of-Way, and further deliberation will neither conjure that authority into being nor amend the clear congressional delegation through which Interior granted the Right-of-Way. Remand without vacatur would serve no purpose, whereas vacatur would appropriately place the agency back at "square one and free to determine which . . . procedure it would use to implement its statute and regulations." *Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1206 (D.C. Cir. 2020).

**B. Remand Without Vacatur Would Be Extremely Disruptive**

Defendants do not contest that any errors identified by the Court would be "serious" for purposes of remedy, but "only in rare instances do . . . disruptive consequences alone determine whether the order is vacated." *N.J. Conservation Found. v. FERC*, 111 F.4th 42, 64 (D.C. Cir. 2024). This is not one of those cases. The Court stayed and enjoined operation of the Cancellation Decision because "loss of Plaintiff's real property rights" and "substantial uncertainty and confusion regarding competing property interests" would cause Nuiqsut Trilateral irreparable harm. Order on Mot. for Prelim. Inj. at 12-13, ECF No. 42; *see also Sovereign Iñupiat for a Living Arctic*, 555 F. Supp. 3d at 804 (relying on findings supporting prior injunction when denying remand without vacatur). *That* is the disruption to be prevented when evaluating the proper remedy, and the Court has already decided that "principles of equity" support leaving the status quo in place. *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018). Nor will vacatur upset oil and gas development in areas of the Reserve unaffected by the Cancellation Decision, *Se. Alaska Conservation Council v. U.S. Forest Serv.*, 468 F. Supp. 3d 1148, 1151 (D. Alaska 2020), or interim protections for protected species or resources, *see, e.g.*,

*Ctr. for Food Safety v. Regan*, 56 F.4th 648, 668 (9th Cir. 2022) (remanding flawed pesticide approval because alternatives posed greater risk to honey bees).

The government's only argument against vacatur is that, some seventeen months ago, the President declared a "National Energy Emergency" reflecting a general policy preference for mineral leasing. *See* Exec. Order No. 14,156 (Jan. 20, 2025), *reprinted in* 90 Fed. Reg. 8433 (Jan. 29, 2025). But Section 9(b) of the Executive Order directs that it "shall be implemented consistent with applicable law," and the Court's remedial inquiry would necessarily imply that the Cancellation Decision has already been deemed unlawful. *Id.* The remedy most "consistent" with unlawful agency action is vacatur. *350 Montana*, 50 F.4th at 1273. In any event, nothing in the record connects the asserted emergency of 2025 with the relatively small slice of marginal leasing that might transpire in the Right-of-Way absent vacatur. That showing would likely be difficult, given that leases on the North Slope may not produce for up to three decades after lease execution, by which point last year's emergency may have abated. *See Ctr. for Biological Diversity*, 141 F.4th at 990 (timeline of Willow development). The Executive Order simply does not reflect "irremediable harms that *significantly outweigh* the magnitude of [Interior's] error." *Cook Inletkeeper v. Raimondo*, 541 F. Supp. 3d 987, 989 (D. Alaska 2021) (emphasis added).[10]

[10] Consistent with the APA's presumption of vacatur, it is unremarkable that Plaintiff did not anticipate and rebut Defendants' novel argument for remand-only. *See* Gov't's Opp'n at 36. Nonetheless, Plaintiff's opening brief clearly and distinctly communicated that Nuiqsut Trilateral seeks vacatur of the Cancellation Decision, providing the government and Alaska a full opportunity to respond. *See* Pl.'s Mot. at 2, 14, 26, 27, 32. Even if Plaintiff had not already presented the issue, the arguments related to remedy in this memorandum would be properly before the Court as responsive to issues "raised in . . . [Defendants'] brief" and, separately, as causing no prejudice to Defendants. *Lui v. DeJoy*, 129 F.4th 770, 780 (9th Cir. 2025).

## CONCLUSION

The Court should grant Nuiqsut Trilateral's motion for summary judgment, vacate the Cancellation Decision, and deny Defendants' cross-motions for summary judgment.

Dated: June 23, 2026

Respectfully submitted,


/s/ Travis Annatoyn
Travis Annatoyn (*pro hac vice*)
Allison Rumsey (*pro hac vice*)
Sonia Tabriz (*pro hac vice*)
John V. Hoover (*pro hac vice*)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
travis.annatoyn@arnoldporter.com

Patrick W. Munson (Alaska Bar 1205019)
Kody P. George (Alaska Bar 2211100)
Munson, Cacciola & Severin, LLP
1029 West Third Avenue Suite 402
Anchorage, AK 99501
Tel: (907) 272-8401
pmunson@mcsalaska.com

*Counsel for Plaintiff Nuiqsut Trilateral, Inc.*