IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NUIQSUT TRILATERAL, INC.,<br><br>Plaintiff,<br>v.<br><br>DOUG BURGUM, in his official capacity as Secretary of the Interior, *et al.*,<br><br>Defendants,<br>and<br><br>STATE OF ALASKA,<br><br>Intervenor-Defendant. | Case No. 3:26-cv-00098-SLG |

**<u>DECISION AND ORDER</u>**

Before the Court at Docket 56 is Plaintiff Nuiqsut Trilateral, Inc.'s Motion for Summary Judgment. Defendants Secretary of the Interior Doug Burgum, Deputy Secretary of the Interior Katharine MacGregor, the United States Department of the Interior ("Interior"), Acting Director of the Bureau of Land Management Bill Groffy, Alaska State Director of the Bureau of Land Management Kevin Pendergast, and the United States Bureau of Land Management (collectively, "Federal Defendants") responded in opposition and cross-moved for summary judgment at Docket 70. Intervenor-Defendant State of Alaska likewise responded in opposition and cross-moved for summary judgment at Docket 71. Plaintiff

replied at Docket 74. Oral argument was not requested by any party and was not necessary for the Court's determination.

## BACKGROUND

The National Petroleum Reserve–Alaska ("NPR-A"), on Alaska's North Slope, consists of 23.6 million acres and is the nation's largest single unit of public land.[1] The Bureau of Land Management ("BLM") administers the NPR-A under the Naval Petroleum Reserves Production Act ("NPRPA"), 42 U.S.C. § 6501 *et seq*. The NPRPA directs the Secretary of the Interior to "conduct an expeditious program of competitive leasing of oil and gas in the Reserve in accordance with this Act,"[2] while "protect[ing] . . . environmental, fish and wildlife, and historical or scenic values."[3] Section 6502 authorizes the Secretary to "make . . . dispositions of mineral materials and grant . . . rights-of-way, licenses, and permits as may be necessary to carry out his responsibilities under this Act." Certain lands within the NPR-A, including the Teshekpuk Lake Special Area ("TLSA"), have been designated as special areas and are subject to heightened protection under the NPRPA.[4] Section 6504(a) requires any exploration within the TLSA to "be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration

---

[1] *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 973 (9th Cir. 2006).

[2] 42 U.S.C. § 6506a(a).

[3] *Id.* §§ 6503(b), 6506a(b).

[4] *Id.* § 6504(a).

of the reserve." The TLSA consists of approximately 3.65 million acres within the NPR-A.[5]

BLM manages the NPR-A through Integrated Activity Plans ("IAPs"), which determine which lands are available for leasing and establish mitigation measures and stipulations governing development.[6] BLM analyzes an IAP through an Environmental Impact Statement ("EIS"), then adopts the final IAP in a Record of Decision ("ROD").[7]

Earlier IAPs for the NPR-A generally restricted development around the TLSA and large portions of the NPR-A.[8] The 2013 IAP closed roughly half the NPR-A to leasing.[9] The 2020 IAP then made approximately 18.6 million acres available for leasing, including much of the TLSA.[10] The 2022 IAP then restricted leasing in substantial portions of the NPR-A and largely reflected the more restrictive 2013 framework.[11]

---

[5] ROW_02265.

[6] *See Kempthorne,* 457 F.3d at 973; *N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 983 F.3d 1077, 1082 (9th Cir. 2020).

[7] *See, e.g.*, *N. Alaska Env't Ctr.*, 983 F.3d at 1082.

[8] *See* Designation of Additions to Special Areas in National Petroleum Reserve-Alaska, 64 Fed. Reg. 16747-03 (Apr. 6, 1999); Notice of Availability of the Record of Decision for the Northeast National Petroleum Reserve-Alaska (NPR-A) Supplemental Integrated Activity Plan (IAP), 73 Fed. Reg. 43258 (July 24, 2008).

[9] ROW_00017; *see also* ROW_00012-125.

[10] ROW_00221, ROW_00227; *see also* ROW_00215-302.

[11] ROW_00309; *see also* ROW_00303-30.

In March 2023, BLM approved the Willow Master Development Plan, a large oil and gas project in the NPR-A. The Willow Master Development Plan included Mitigation Measure 27 ("MM27"), which provides in relevant part:

> BLM will develop compensatory mitigation that provides durable, long-term protection for the Teshekpuk Caribou Herd to fully offset impacts of the project on that Herd, to include protecting the surface area of Teshekpuk Lake, a buffer along all shores of the lake, and the K-10 Caribou Movement Corridors/K-16 Deferral Areas (under Alternative E in the 2020 National Petroleum Reserve in Alaska Integrated Activity Plan Final Environmental Impact Statement) using existing statutory, management or administrative authorities, with a focus on restricting future leasing or surface development in those areas.[12]

On December 17, 2024, BLM issued the Teshekpuk Lake Conservation Right-of-Way ("ROW") to Plaintiff Nuiqsut Trilateral, Inc., a nonprofit organization formed by Nuiqsut's city government, Tribe, and village corporation.[13] The ROW identifies its authority as "Section 102 of the NPRPA, 42 U.S.C. § 6502" and encompasses approximately 1,012,040 acres within the Teshekpuk Lake Special Area (the "Protected Property").[14] The ROW's stated purpose is "[t]o offset the impacts on the Herd from the Willow Project by providing durable and long-term protection for the Herd by prohibiting certain activities and facilities within the Protected Property for the benefit of the Herd and the Herd's most important habitat."[15]

---

[12] ROW_01461–62; *see also* ROW_01386-1509.

[13] *See* Docket 56 at 11; ROW_02264.

[14] ROW_02265.

[15] ROW_02265.

"Subject to valid existing rights," the ROW prohibits new oil and gas leasing and specified exploration, development, extraction, and supporting infrastructure, "unless waived by Grantee under the terms of this Grant on a proposal-specific basis."[16] The ROW grants Plaintiff "the right to enter the Protected Property at reasonable times for the purpose of inspecting the Protected Property" and "[t]he right to take legal and any other lawful action" to prevent activities prohibited by or inconsistent with the ROW's purpose.[17] The ROW also requires the United States to provide at least 30 days advance notice of a proposed use in the Protected Property for Plaintiff to provide input as to that proposed use.[18] Plaintiff may waive enforcement of the development prohibition in the ROW after determining in writing that "the benefits associated with the proposal outweigh any impacts to the Herd" and that proceeding "is in the best interest of the community."[19] The ROW's duration is not perpetual; it states it will remain in effect through Willow's construction, operation, and reclamation, until BLM determines that reclamation "is deemed substantially effective in restoring the caribou habitat and the population and health of the Herd adversely impacted by the Willow Project."[20]

---

[16] ROW_02268-69.

[17] ROW_02267.

[18] ROW_02267.

[19] ROW_02267.

[20] ROW_02266.

On July 4, 2025, Congress passed the One Big Beautiful Bill Act ("OBBBA"), which directed the Secretary to "expeditiously restore and resume oil and gas lease sales under the Program" established in the NPR-A "for domestic energy production and Federal revenue in the areas designated for oil and gas leasing as described in" the 2020 IAP EIS and the 2020 IAP ROD.[21] The OBBBA instructs the Secretary to "conduct not fewer than 5 lease sales under the Program by not later than 10 years after the date of enactment of this Act," each of which "shall offer not fewer than 4,000,000 acres."[22] The OBBBA does not mention the ROW.

On December 5, 2025, Congress nullified the 2022 IAP ROD under the Congressional Review Act.[23]

On December 19, 2025, Interior issued the "Right of Way Cancellation" decision ("ROW Cancellation"), which purported to immediately and unilaterally cancel the ROW.[24]

The ROW Cancellation states that the Department had determined that there were "serious and fundamental legal deficiencies" with the ROW, and that it was exercising the Secretary's "inherent authority, under his general managerial power over public lands, to cancel authorizations issued in violation of law."[25] The

---

[21] Pub. L. No. 119-21, § 50105(b), 139 Stat. 72, 144.

[22] OBBBA § 50105(b).

[23] 5 U.S.C. § 801(f); Pub. L. No. 119-47, 139 Stat. 696.

[24] ROW_02699-707

[25] ROW_02699, ROW_02702 (citing *Boesche v. Udall*, 373 U.S. 472, 476-77 (1963)).

ROW Cancellation stated that the ROW was "at odds with the text and purpose of the NPRPA," constituted an improper sub-delegation of federal authority, and cancellation was necessary to ensure compliance with the OBBBA.[26] No advance notice of the Department's decision to cancel the ROW was given to Plaintiff before it received the December 19, 2025 ROW Cancellation letter.[27]

Shortly thereafter, on December 22, 2025, BLM issued the 2025 IAP opening approximately 18.6 million acres, or 82 percent, of the NPR-A to oil and gas leasing, while deferring leasing on approximately 132,000 of those acres for ten years.[28] The 18.6-million-acre leasing designation includes the entirety of the approximately 1-million-acre ROW.[29]

Plaintiff filed this action on January 28, 2026, seeking vacatur of the ROW Cancellation.[30] On February 11, 2026, BLM published a Notice of Intent to hold a lease sale on March 18, 2026 ("Notice of Sale") involving approximately 5.5 million acres of NPR-A land, including tracts within the ROW.[31] On February 20, 2026, Plaintiff moved for preliminary injunctive relief asking the Court to stay the ROW

---

[26] ROW_02704-06.

[27] Docket 12-1 at 21.

[28] ROW_02718.

[29] ROW_02704-05.

[30] Docket 1 at 42, ¶ 2.

[31] Notice of 2026 National Petroleum Reserve—Alaska Oil and Gas Lease Sale Lease Sale, 91 Fed. Reg. 6248 (Feb. 11, 2026); Docket 12-4 (Detailed Statement of Sale).

Cancellation.[32] On March 16, 2026, the Court granted Plaintiff's motion and stayed the ROW Cancellation pending resolution of Plaintiff's claims.[33]

BLM proceeded with its March 18 lease sale, offering approximately 5.5 million acres.[34] The sale included bids for lease tracts fully or partially within the ROW, but leases for those tracts have not been issued.[35]

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the [Administrative Procedure Act, 5 U.S.C. §§ 701-706,] of its own force may serve as a jurisdictional predicate."[36]

## LEGAL STANDARD

Section 706 of the APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

---

[32] Docket 12-7 (Proposed Order) at 2.

[33] Docket 42 at 26.

[34] Docket 70 at 19; BLM, *Interior Generates over $163 Million from National Petroleum Reserve in Alaska Oil and Gas Lease Sale* (Mar. 18, 2026) (reporting that BLM offered 625 tracts across approximately 5.5 million acres), available at https://www.doi.gov/pressreleases/interior-generates-over-163-million-national-petroleum-reserve-alaska-oil-and-gas (last visited Nov. 19, 2026).

[35] Docket 70 at 19.

[36] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

law . . . [or] in excess of statutory jurisdiction, authority, or limitations."[37] "Whether agency action is 'not in accordance with law' is a question of statutory interpretation, rather than an assessment of reasonableness in the instant case."[38] A court must exercise its independent judgment in determining whether an agency acted within its statutory authority and "may not defer to an agency interpretation of the law simply because a statute is ambiguous."[39] Instead, courts must use their "'full interpretive toolkit' to find the 'best meaning' of ambiguous statutes."[40]

## DISCUSSION

Plaintiff challenges the ROW Cancellation under the APA as contrary to law and in excess of the Secretary's statutory authority.[41] Interior issued the ROW Cancellation pursuant to the Secretary's asserted "inherent authority, under his general managerial power over public lands, to cancel authorizations issued in violation of law."[42] In issuing the ROW in December 2024, Interior stated that "[t]he

---

[37] 5 U.S.C. § 706(2).

[38] *Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010) (citing *Nw. Env't Advocs. v. EPA*, 537 F.3d 1006, 1014 (9th Cir. 2008)).

[39] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024).

[40] *Comm. for a Better Arvin v. EPA*, 185 F.4th 957, 963 (9th Cir. 2026) (quoting *Loper Bright*, 603 U.S. at 408-09).

[41] Docket 56 at 16-29; 5 U.S.C. § 706(2)(A), (C). Plaintiff separately challenges the ROW Cancellation as arbitrary and capricious and as issued without compliance with NEPA and constitutional due process. Docket 56 at 29-34. Because the Court concludes that Interior's stated grounds for the ROW Cancellation do not establish that the ROW was unlawfully issued and therefore cannot sustain cancellation under the authority invoked, the Court does not decide whether the Secretary possesses the asserted administrative cancellation authority or reach Plaintiff's remaining arbitrary and capricious, NEPA, and due process claims.

[42] ROW_02702 (citing *Boesche*, 373 U.S. at 476-77).

authority for th[e] [ROW] is Section 102 of the NPRPA, 42 U.S.C. § 6502."[43] But one year later, in the ROW Cancellation, Interior presented a new legal interpretation of the NPRPA, stating that the ROW was "improperly issued" based on "two legal deficiencies:"[44] that "the plain language of the NPRPA does not authorize the TLCROW"[45] and that "the sub-delegation doctrine bars the TLCROW's sharing of the BLM's land management duties with the NTI."[46] The Court independently reviews whether those grounds establish that the ROW was issued unlawfully to determine whether the ROW Cancellation was in excess of the Secretary's statutory authority.[47]

The State advances additional grounds to assert that the ROW was unlawfully issued.[48] However, in *SEC v. Chenery Corp.*, the Supreme Court held that a reviewing court must assess agency action "solely by the grounds invoked

---

[43] ROW_02265.

[44] ROW_02702; ROW_02707.

[45] ROW_02702.

[46] ROW_02705.

[47] *See Loper Bright*, 603 U.S. at 412-13.

[48] The State contends that issuance of the ROW was arbitrary and capricious because BLM inadequately explained its public participation process, selection of Nuiqsut Trilateral, Inc., and decision to issue the ROW without an application process, fees, or rent; that the ROW violates the "No More" withdrawal clause in § 101(d) of the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 3101(d); and that the ROW is a rule adopted without the procedures required by the APA and Congressional Review Act. Docket 71 at 38-47. Interior did not invoke those asserted violations as grounds for the ROW Cancellation. Although Interior noted the absence of fees and rent and discussed congressional disapproval of the 2022 IAP in the ROW Cancellation, it did not find that the ROW violated a rental requirement or was itself an improperly promulgated rule. ROW_02701, ROW_02705, ROW_02707.

by the agency" and may not substitute a different justification when those grounds are inadequate.[49] While that limitation does not preclude additional legal arguments supporting the agency's existing rationale,[50] the Court cannot uphold the ROW Cancellation on independent grounds that Interior did not invoke.[51]

Accordingly, the Court assumes without deciding that the Secretary may administratively cancel a right-of-way if it was unlawfully issued at inception and considers whether Interior's NPRPA and subdelegation grounds establish that predicate.

## I. NPRPA

Interior's first asserted ground for the ROW Cancellation was that "the plain language of the NPRPA does not authorize the TLCROW."[52] Federal Defendants defend that conclusion on three grounds: that (1) the ROW's conservation purpose conflicts with the NPRPA's oil and gas development mandate; (2) the ROW falls outside § 6502's authorization of rights-of-way; and (3) the ROW conflicts with

---

[49] 332 U.S. 194, 196 (1947); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("The courts may not accept appellate counsel's post hoc rationalizations for agency action[.]").

[50] *See Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061, 1083 (9th Cir. 2019) ("*Chenery* does not require agencies to provide exhaustive, contemporaneous legal arguments to preemptively defend its action[.]" (internal quotation marks and citation omitted)).

[51] *See Chenery*, 332 U.S. at 196.

[52] ROW_02702.

subsequent legislation directing leasing in the NPR-A.[53] The Court addresses each argument in turn.

### A. Purpose of NPRPA

Federal Defendants contend that the NPRPA's primary purpose is oil and gas development and that § 6502 therefore does not authorize a right-of-way intended to prohibit or hinder those activities.[54] Plaintiff responds that the Secretary's responsibilities under the NPRPA include conservation and mitigation and that the ROW serves those responsibilities by compensating for the impact of the Willow Project.[55]

Section 6502 provides, in relevant part:

> Subject to valid existing rights, all lands within the exterior boundaries of such reserve are hereby reserved and withdrawn from all forms of entry and disposition under the public land laws, including the mining and mineral leasing laws, and all other Acts; but the Secretary is authorized to . . . make such dispositions of mineral materials and grant such rights-of-way, licenses, and permits as may be necessary to carry out his responsibilities under this Act. . . .

The Secretary's responsibilities under the NPRPA are outlined in various provisions of the Act. Section 6506a(a) provides that "[t]he Secretary shall conduct an expeditious program of competitive leasing of oil and gas in the Reserve in accordance with this Act." Section 6503(b) directs the Secretary to "assume all

---

[53] Docket 70 at 24-31.

[54] Docket 70 at 24-25.

[55] Docket 56 at 20-25; Docket 74 at 7-8.

responsibilities" "[w]ith respect to any activities related to the protection of environmental, fish and wildlife, and historical or scenic values." To that end, § 6504(a) requires any exploration within the Teshekpuk Lake and other designated areas to "be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve." And § 6506a(b) requires activities undertaken pursuant to the NPRPA to "include or provide" for "conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [NPR-A]."

In reviewing BLM's approval of the Willow Project, the Ninth Circuit explained that the NPRPA "balances two objectives: oil and gas development and protection of surface resources."[56] It added, "BLM can satisfy the Reserves Act's maximum-protection directive with mitigation measures that 'the Secretary deems necessary or appropriate.'"[57] Despite Interior's current characterization of the Secretary's conservation responsibilities as "secondary and subordinate" to oil and gas development, the Ninth Circuit has held that the protection of surface resources is one of the two objectives of the NPRPA; nothing in its holding

---

[56] *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 1002 (9th Cir. 2025) (citing 42 U.S.C. §§ 6504(a), 6506a(a), (b)).

[57] *Id.*

indicates that it interpreted the statute to make that objective secondary and subordinate to the oil and gas development objective of the Act.[58]

Plaintiff asserts that the ROW's surface development restrictions further this balancing of the Act's objectives by compensating for the surface impacts associated with the Willow Project.[59] The record fully supports that conclusion. MM27 provides that "BLM will develop compensatory mitigation that provides durable, long-term protection for the Teshekpuk Caribou Herd to fully offset impacts of the project on that Herd . . . using existing statutory, management or administrative authorities, with a focus on restricting future leasing or surface development in those areas."[60] It further directs BLM to "explore creating a bi-lateral or multi-lateral conservation instrument" providing protection of the Herd—a critical surface resource of the TLSA—"for the duration of the Project's impacts."[61]

The ROW expressly connects its protections to that mitigation commitment. Its preamble states that "the Willow Project is expected to have impacts to the Herd" and that "protections are desired to offset these impacts on the Herd for the life of the Willow Project."[62] And the ROW states that its objective "is to achieve

---

[58] ROW_02704.

[59] Docket 56 at 21, 24-25; Docket 74 at 7-8.

[60] ROW_01461.

[61] ROW_01462.

[62] ROW_02264.

durable, long-term protection for the Herd and for the communities who depend on it for subsistence use in order to offset the impacts on the Herd from the Willow Project."[63]

Congress expressly requires exploration in the Teshekpuk Lake area to "be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve."[64] The ROW serves that protective function for the Willow Project by protecting the Teshekpuk Caribou Herd and its habitat to offset the project's impacts.[65] Its restrictions therefore further both surface resource protection and oil and gas development, consistent with the NPRPA's two objectives.

The Court therefore concludes that the ROW's conservation purpose does not establish that it was unlawful. The Secretary therefore erred as a matter of law when he misinterpreted the NPRPA by concluding that the ROW's conservation purpose is "secondary and subordinate to the primary [oil and gas leasing] purpose of the NPRPA" and that the ROW was therefore "inherently at odds with the text and purpose of the NPRPA."[66]

---

[63] ROW_02264.

[64] 42 U.S.C. § 6504(a).

[65] ROW_01461-62, ROW_02264-66.

[66] ROW_02704.

## B. The Scope of Rights-of-Way in the NPRPA

Federal Defendants contend that the ROW falls outside the meaning of "rights-of-way" under § 6502 for several reasons.[67] First, Federal Defendants assert that "right-of-way" is a common-law term that "has not historically encompassed negative easements . . . of the kind exemplified by the [ROW]."[68] As Federal Defendants note, "[r]ights-of-way are a species of easements."[69] The Supreme Court has defined an easement as "a 'nonpossessory right to enter and use land in the possession of another" that "obligates the possessor not to interfere with the uses authorized by the easement.'"[70]

Here, the ROW grants Plaintiff "the right to enter the Protected Property at reasonable times for the purpose of inspecting the Protected Property," as well as "the right to make surveys and plats, take photographs and prepare such other documents as may be necessary or desirable to administer the provisions of this Grant."[71] Those affirmative rights serve the ROW's stated purpose of providing "durable and long-term protection for the Herd" to offset Willow's impacts.[72] And,

---

[67] Docket 70 at 26-29.

[68] Docket 70 at 27.

[69] Docket 70 at 27 n.4 (quoting *Sierra Club v. Hodel*, 848 F.2d 1068, 1083 (10th Cir. 1988), *overruled in part on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992)).

[70] *Brandt Revocable Tr. v. United States*, 572 U.S. 93, 105 (2014) (quoting Restatement (Third) of Property: Servitudes § 1.2(1) (1998)).

[71] ROW_02267, §§ IV(D)-(E).

[72] ROW_02265, § I(A).

as Plaintiff highlights, Federal Defendants acknowledge that the Secretary may grant "rights-of-way to access subsistence resources, improve wildlife habitat, or conduct environmental monitoring."[73] The ROW also provides that "[t]he United States may not authorize or allow a third party to use the Protected Property in a manner inconsistent with the terms of this Grant."[74] Thus, the ROW combines affirmative rights to enter, inspect, and survey the Protected Property with enforceable restrictions on the use of the Protected Property by others. And as the Supreme Court explained in *Brandt*, an easement both authorizes entry and use and "obligates the possessor not to interfere with the uses authorized by the easement."[75]

Federal Defendants assert that "rights-of-way" in § 6502 must exclude negative easements because the neighboring terms "'licenses' and 'permits' connote government permissions to enter land and affirmatively make some use of it and its resources, not agreements to prohibit use of land like the [ROW] purports to do."[76] According to Federal Defendants, "'[r]ights-of-way' should be similarly construed."[77] Even accepting Federal Defendants' premise that each term in the statute denotes permission to enter and affirmatively use land, the

---

[73] Docket 70 at 29; Docket 74 at 19.

[74] ROW_02269, § VI(C).

[75] *Brandt*, 572 U.S. at 105.

[76] Docket 70 at 26 (emphasis omitted).

[77] Docket 70 at 26.

ROW expressly grants such permission. Section IV(D) of the ROW grants Plaintiff "the right to enter the Protected Property at reasonable times for the purpose of inspecting the Protected Property."[78] Section IV(E) additionally grants "the right to make surveys and plats, take photographs and prepare such other documents as may be necessary or desirable to administer the provisions of this Grant."[79] The ROW therefore conveys affirmative rights of entry and use of the kind Federal Defendants associate with licenses and permits. The neighboring statutory terms do not independently establish that the ROW's accompanying development restrictions render it unauthorized.

Federal Defendants also contend that "right-of-way" "has not historically encompassed . . . conservation servitudes of the kind exemplified by the [ROW]."[80] According to Federal Defendants, negative easements "were generally disfavored at common law and were limited to a closed set of categories," which did not encompass conservation easements.[81] Federal Defendants assert that statutes authorizing conservation easements "essentially save conservation easements from invalidity under the common law" and identify the Uniform Conservation Easement Act ("UCEA") as one such development.[82] However, Federal

---

[78] ROW_02267.

[79] ROW_02267.

[80] Docket 70 at 27.

[81] Docket 70 at 27.

[82] Docket 70 at 28 (internal quotation marks and citation omitted).

Defendants maintain that "the [ROW] cannot benefit from this historical change of course, because the UCEA was promulgated in 1981" subsequent to the NPRPA's enactment in 1976.[83] Federal Defendants also note that Alaska likewise did not adopt its conservation easement enabling statute until 1988, "twelve years after Congress enacted the NPRPA."[84] Federal Defendants therefore assert that neither the common law nor these subsequent statutory developments support construing § 6502 to authorize the ROW.

However, as Plaintiff notes, "Congress' earlier and contemporaneous recognition of conservation easements shows that it was aware of the instruments and could have excluded them from the NPRPA had it so wished."[85] The Wild and Scenic Rivers Act of 1968 expressly recognized a "scenic easement" as a "right to control the use of land" for the purpose of protecting a designated river area's natural qualities.[86] The Tax Reform Act of 1976, enacted later in the same year as the NPRPA, likewise expressly permitted charitable deductions for qualifying donations of easements granted exclusively for conservation purposes.[87] These enactments undermine Federal Defendants' assertion that construing § 6502 to

---

[83] Docket 70 at 28.

[84] Docket 70 at 28-29.

[85] Docket 74 at 17.

[86] Pub. L. No. 90-541, § 15(c), 82 Stat. 906, 918 (codified as 16 U.S.C. § 1286(c)).

[87] Pub. L. No. 94-455, § 2124(e)(1)(C), 90 Stat. 1520, 1919 (codified as 26 U.S.C. § 170); Docket 74 at 17.

encompass conservation easements would authorize "a property form that neither the states nor the federal government had attempted to codify at that time."[88] To the contrary, Congress had expressly recognized scenic easements before enacting the NPRPA and recognized qualifying conservation easement donations later that same year. Therefore, the later adoption of the UCEA and Alaska's enabling statute does not establish that conservation easements were outside Congress's consideration when enacting the NPRPA.

Federal Defendants further emphasize that the ROW covers "16 times more land than a maximum individual lease tract explicitly contemplated by the NPRPA" to support their contention that Congress did not authorize a right-of-way of this kind and magnitude under § 6502.[89] But Congress imposed that acreage limit on oil and gas leases, while authorizing rights-of-way under § 6502 without any acreage limit. The lease tract limitation therefore provides no basis for imposing the same acreage restriction on rights-of-way.

Although Congress presumptively incorporates the settled meaning of common-law terms, that presumption applies "absent other indication."[90] Here, the Court reads "rights-of-way" in light of § 6502's express connection to the Secretary's two statutory responsibilities, including mitigation of the surface impact

---

[88] Docket 70 at 29.

[89] Docket 70 at 30; *see also* ROW_02706; 42 U.S.C. § 6506a(h) ("The size of [oil and gas] lease tracts may be up to sixty thousand acres, as determined by the Secretary.").

[90] *Sekhar v. United States*, 570 U.S. 729, 732 (2013).

of oil and gas development through restrictions and prohibitions. Taken together, § 6502's language and statutory context support finding that the Secretary may grant rights-of-way combining affirmative use rights with enforceable conservation restrictions to fulfill the Secretary's responsibilities under the NPRPA. The ROW's entry, inspection, and monitoring rights and its development restrictions serve the purpose of protecting the Herd and its habitat to offset the surface impact of the Willow Project during that project's operation.[91]

The Court therefore concludes that the ROW does not fall outside the meaning of "rights-of-way" under § 6502. The Secretary therefore erred as a matter of law in the ROW Cancellation when he misinterpreted the NPRPA and concluded that § 6502 "must be understood to authorize rights-of-way related to oil and gas activities" and not to authorize the ROW at issue here.[92]

### C. Subsequent Legislation

Federal Defendants assert that cancellation of the ROW was necessary to comply with the OBBBA's directive to "expeditiously restore and resume oil and gas lease sales . . . in the areas designated for oil and gas leasing as described in" the 2020 IAP EIS and the 2020 IAP ROD.[93]

---

[91] ROW_02265, § I(A); ROW_02267, § IV.

[92] ROW_02702.

[93] Docket 70 at 30 (quoting OBBBA § 50105(a)-(b)).

The OBBBA requires the Secretary to conduct at least five sales over ten years, offering "not fewer than 4,000,000 acres in each lease sale."[94] Congress prescribed a minimum acreage for individual sales but did not expressly require every acre designated for leasing to be offered in each sale.[95] Indeed, the 2020 IAP incorporated into the OBBBA provided for a ten-year leasing deferral of acreage within the TLSA.[96] The 2025 IAP likewise identifies approximately 18.6 million acres as available for leasing while deferring leasing on approximately 132,000 acres for ten years.[97] And Interior's March 2026 sale offered approximately 5.5 million acres, rather than all of the acreage designated for leasing.[98] As Interior itself has demonstrated, the OBBBA's requirement to resume leasing "in the areas designated for oil and gas leasing as described in" the 2020 IAP does not require Interior to offer every acre designated in the 2020 IAP, including all acreage in the TLSA, in each lease sale.

---

[94] OBBBA § 50105(c).

[95] *See id.*

[96] ROW_00223 ("This Decision makes approximately 18,581,000 million acres of the approximately 22.8 million acres of subsurface managed by BLM in the NPR-A available for oil and gas leasing. . . . Of the 18,581,000 million acres, approximately 132,000 acres in the northeastern part of the Reserve would not be available for leasing until ten years after this ROD is signed, when a ten year deferral established by this Decision in the Teshekpuk Lake Special Area expires."); ROW_00231 ("A ten-year leasing deferral is established in this Decision for two caribou migration corridors near Teshekpuk Lake that are important for the Teshekpuk Caribou Herd."); ROW_00260.

[97] ROW_02718.

[98] *Supra* note 35.

Moreover, as Plaintiff notes, whether a statute operates retroactively depends on whether it would "attach[] new legal consequences to events completed before its enactment," including whether it would "impair rights a party possessed when he acted."[99] And "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."[100] Neither Federal Defendants nor the State identifies any language in the OBBBA directing that authorizations lawfully issued before the Act's enactment be treated as unlawful at inception. Plaintiff further notes that the 2020 IAP also designates lands underlying the Willow Project as open to leasing even though those lands are now encumbered by leases.[101] The OBBBA's direction to resume leasing in areas designated under the 2020 IAP therefore does not itself require Interior to extinguish existing property rights and offer the land for leasing anew.

Indeed, in the ROW Cancellation, Interior acknowledged that the ROW's asserted inconsistency with the OBBBA and Congress's subsequent disapproval of the 2022 IAP did "not amount to a pre-authorization defect because both were enacted after the issuance of the [ROW]."[102] Interior instead asserts that those enactments "support the Department's conclusion that the [ROW] is fundamentally

---

[99] *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269-70, 280 (1994); *see* Docket 56 at 28.

[100] *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

[101] Docket 56 at 28 (citing ROW_02793).

[102] ROW_02705.

inconsistent with the [NPRPA]'s text and purpose."[103] Although the OBBBA reinforces the NPRPA's oil and gas development objective, it leaves intact the Act's maximum protection and mitigation requirements. The OBBBA's direction to resume leasing therefore operates alongside those responsibilities, preserving the NPRPA's dual objectives of oil and gas development and surface resource protection.

The Court therefore concludes that the OBBBA does not support Interior's conclusion that the ROW is "fundamentally inconsistent" with the NPRPA. The Secretary therefore erred as a matter of law in the ROW Cancellation by concluding that the OBBBA and Congress's disapproval of the 2022 IAP "explicitly directed the Department to make available for leasing the approximately 1,012,040 acres that are currently subject to the ROW."[104]

Based on the foregoing, the Court concludes that neither Federal Defendants nor the State have established that the ROW was issued in violation of the NPRPA and the ROW Cancellation cannot be upheld on that basis.

**II. Subdelegation**

Interior's second ground for the ROW Cancellation was that "the sub-delegation doctrine bars the [ROW]'s sharing of the BLM's land management

[103] ROW_02705.

[104] ROW_02705.

duties with the NTI."[105] Federal Defendants contend that the ROW's waiver, enforcement, and notice provisions unlawfully subdelegate BLM's authority.[106] Plaintiff responds that the ROW conveys property rights rather than governmental authority: "property rights inherently limit conflicting uses, and those narrow, commonplace limitations do not usurp Interior's regulatory authority for any part of the Reserve."[107]

An agency generally may not subdelegate its statutory decision-making authority to an outside entity without congressional authorization.[108] But as Plaintiff notes, Congress exercises "the powers both of a proprietor and of a legislature over the public domain."[109] The Court therefore considers whether the challenged provisions of the ROW convey enforceable property rights to Plaintiff or transfer BLM's statutory decision-making authority to Plaintiff.

First, the waiver provision in the ROW permits Plaintiff to "waive its right to enforce the prohibition of uses" for a particular development proposal.[110] Plaintiff may waive enforcement only if it determines in writing that "the benefits associated with the proposal outweigh any impacts to the Herd" and that proceeding "is in the

---

[105] ROW_02705.

[106] Docket 70 at 35-39.

[107] Docket 74 at 9.

[108] *See U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004).

[109] Docket 74 at 9 (quoting *Kleppe v. New Mexico*, 426 U.S. 529, 540 (1976)).

[110] ROW_02267, § IV(C).

best interest of the community."[111] Interior asserts that this provision gives Plaintiff veto authority over development and impermissibly transfers BLM's mitigation responsibility to Plaintiff.[112]

However, as Plaintiff highlights, even if it waives enforcement for a proposed activity, that activity remains subject to the necessary federal leases, permits, and approvals.[113] Therefore, the responsible federal agencies retain their obligations under the National Environmental Policy Act, ANILCA § 810, and the Endangered Species Act, as applicable.[114] Plaintiff's assessment of community benefits and impacts on the Herd governs the exercise of its waiver, but the agencies tasked with authorizing oil and gas activities independently must determine compliance with federal law. Section VI(C) of the ROW reflects that distinction by permitting, but not requiring, the United States to authorize a use following Plaintiff's written waiver.[115] In other words, Plaintiff may waive the ROW's restrictions for a particular use, but only the responsible federal agencies may authorize that use.

Interior also notes that the ROW enables Plaintiff to block development that BLM otherwise would approve by refusing to waive the ROW's restrictions.[116] But

---

[111] ROW_02267, § IV(C).

[112] ROW_02705-06.

[113] *See* Docket 74 at 10-11.

[114] *See* 42 U.S.C. §§ 4332, 4336; 16 U.S.C. §§ 3120, 1536(a)(2).

[115] ROW_02269.

[116] ROW_02705-06.

the ability to prevent incompatible uses flows from the property interest BLM conveyed to Plaintiff, not from BLM's authority to administer the NPRPA. BLM selected the prohibited activities when it issued the ROW, and Plaintiff decides whether to waive the ROW's prohibition against them.[117]

Federal Defendants rely on *U.S. Telecom Association v. FCC* to assert that the waiver provision impermissibly transfers BLM's statutory decision-making authority, but that case involved a materially different delegation.[118] In *U.S. Telecom*, the FCC assigned state commissions "almost the entire determination of whether a specific statutory requirement—impairment—has been satisfied."[119] The state commissions had "virtually unlimited discretion" to define the relevant markets and apply the federal impairment standard with "FCC oversight neither timely nor assured."[120] Here, Plaintiff's waiver determines whether it will relinquish protection of surface resources under the ROW, while the responsible agencies must independently make the statutory determinations necessary for federal authorization. The ROW gives Plaintiff no authority to make binding determinations that a proposal satisfies federal statutory requirements. The agencies thus retain substantive responsibility for evaluating and authorizing any

[117] *See* Docket 56 at 26-27.

[118] Docket 70 at 32, 35-39.

[119] 359 F.3d at 567.

[120] *Id.* at 563-64, 567.

proposed development activity. The waiver provision therefore does not transfer BLM's statutory decision-making authority to Plaintiff.

The enforcement provision in the ROW authorizes Plaintiff "to take legal and any other lawful action" to prevent activities prohibited by or inconsistent with the ROW's purpose and "to require the restoration" of property damaged by such activities.[121] Federal Defendants argue that this enforcement provision permits Plaintiff to independently identify damage and pursue enforcement, including when BLM declines to act.[122] However, as Plaintiff explains, "a grantee's capacity to enforce its servitudes is a core and ancient provision of state law."[123] The ability to assert a violation and seek relief independently of BLM does not authorize Plaintiff to issue federal permits or adjudicate compliance with federal law. The ROW accordingly describes Plaintiff's right "to seek to enjoin" prohibited activities or obtain other appropriate relief through administrative or judicial proceedings.[124]

The notice provision in the ROW requires an opportunity for Plaintiff's input before BLM decides whether to authorize a proposed use at the Protected Property.[125] It directs the United States to consider that input and expressly permits it to proceed if Plaintiff neither responds nor requests additional time within

---

[121] ROW_02267, § IV(A).

[122] Docket 70 at 36-37 & n.7.

[123] Docket 74 at 9 (citing *Walls v. Pan Am. Petroleum Corp*, 384 U.S. 63, 68 (1966)).

[124] ROW_02267, § IV(A).

[125] ROW_02267, § IV(B).

the review period.[126] Federal Defendants take issue with the fact that the United States is "preclude[d] . . . from issuing a decision on a proposed use" until it satisfies those requirements.[127] But the provision requires BLM to consider Plaintiff's views, not to obtain its approval. Absent a timely response or extension request, BLM may evaluate a proposed use's consistency with the ROW "on its own merits."[128] The provision therefore establishes a notice and consultation process while preserving BLM's decision-making authority.

Federal Defendants rely on *National Park & Conservation Association v. Stanton* to assert that BLM must retain sufficient final reviewing authority over Plaintiff's actions to prevent a violation of the unlawful delegation doctrine.[129] In *Stanton*, the National Park Service assigned to a local council the responsibility for hiring staff, monitoring river resources, evaluating land-protection needs, providing law enforcement and emergency services, and maintaining roads, bridges, and access sites at a national scenic river.[130] Environmental groups sued, asserting that the National Park Service had unlawfully delegated its responsibility to manage the river to the local council.[131] The district court held that the

[126] ROW_02267, § IV(B).

[127] Docket 70 at 36.

[128] ROW_02267, § IV(B).

[129] Docket 70 at 33-34 (quoting 54 F. Supp. 2d 7, 19 (D.D.C. 1999)).

[130] 54 F. Supp. 2d at 19.

[131] *Id.* at 9, 17.

arrangement unlawfully subdelegated the agency's statutory responsibilities because the Park Service retained neither adequate oversight nor final reviewing authority over the council's actions; instead, its role had been reduced to "merely serving as liaison and providing technical support as needed."[132]

Here, the challenged provisions in the ROW do not assign Plaintiff responsibility for administering the federal leasing program or performing the agencies' statutory duties. Plaintiff may waive the ROW's protections, seek enforcement of the ROW, and provide input on proposed uses, but unlike in *Stanton*, the responsible federal agencies retain authority to evaluate proposals, determine compliance with federal law, and issue or deny federal authorizations. BLM's inability to override Plaintiff's exercise of its property rights therefore differs from the complete transfer of governmental functions to a local council found unlawful in *Stanton*.[133]

Based on the foregoing, the Court concludes that the challenged provisions allow Plaintiff to enforce or relinquish protections conveyed by the ROW and do not unlawfully transfer BLM's statutory decision-making authority to Plaintiff. The

---

[132] *Id.* at 19.

[133] Federal Defendants also contend that principles permitting certain delegations to sovereign entities do not apply here because Plaintiff "is not a tribe" and "lacks any independent authority to manage NPR-A public lands." Docket 70 at 33 (discussing *Assiniboine & Sioux Tribes of Fort Peck Indian Rsrv. v. Bd. of Oil & Gas Conservation*, 792 F.2d 782 (9th Cir. 1986), and *S. Pac. Transp. Co. v. Watt*, 700 F.2d 550 (9th Cir. 1983)). However, principles governing delegations to sovereign entities would apply only if the challenged provisions delegate governmental authority. Because the challenged provisions here do not delegate governmental authority, the Court does not reach this issue.

Secretary therefore erred as a matter of law in the ROW Cancellation in concluding that the ROW "constitutes an improper delegation."[134]

**III. Remedy**

Plaintiff requests vacatur of the ROW Cancellation.[135] Federal Defendants and the State contend that, if the Court identifies an error, it should remand without vacatur to avoid disrupting oil and gas development at the Protected Property.[136]

Vacatur is the presumptive remedy for unlawful agency action.[137] Courts remand without vacatur only in limited circumstances: when equity warrants leaving the challenged action in place while the agency addresses its errors.[138] In deciding whether vacatur is warranted, a court is to consider the seriousness of the agency's errors and the disruptive consequences of vacatur.[139]

First, in evaluating the seriousness of the error, the Court considers whether the agency could substantiate its ROW Cancellation decision through better reasoning or compliance with procedural requirements, or whether the decision

---

[134] ROW_02705.

[135] Docket 74 at 24-26.

[136] Docket 70 at 43-44; Docket 71 at 48-49.

[137] *350 Montana v. Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022).

[138] *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015).

[139] *Id.*; *see also Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). Federal Defendants contend that Plaintiff forfeited an argument for vacatur by failing to develop the remedial analysis in its opening brief. Docket 70 at 44 n.9. Plaintiff expressly requested vacatur in that brief and addressed Defendants' request for remand without vacatur in its opposition to the cross-motions. Docket 56 at 34; Docket 74 at 24-26. The requested remedy was therefore before the Court, and Defendants had an opportunity to present their arguments against it.

contains more fundamental flaws.[140] Here, Interior canceled the ROW because it maintained that the ROW had been unlawfully issued at inception. But, as discussed above, Interior's stated statutory and subdelegation bases for its finding of unlawfulness have been rejected as legally incorrect by this Court. These legal errors are fundamental flaws that form the predicate for the ROW Cancellation; they are not flaws that Interior could cure through a fuller explanation of its reasoning or through additional procedural steps.

As to disruptive consequences, Federal Defendants and the State emphasize the energy, national-security, and financial interests associated with oil and gas development in the NPR-A.[141] Here, vacatur of the ROW Cancellation would preserve the ROW protections already maintained by the Court's preliminary injunction in this one area of the NPR-A.[142] Unlike *California Communities Against Toxics v. EPA*, where vacatur threatened the completion of a power plant that was needed to avoid regional blackouts and associated pollution from the use of diesel generators, Defendants identify no comparable disruption that would occur if the ROW remains in place.[143] The Court's ruling in this case leaves leasing and development elsewhere in the NPR-A unaffected, and Defendants have not shown

[140] *Pollinator Stewardship Council*, 806 F.3d at 532.

[141] Docket 70 at 44; Docket 71 at 48-49.

[142] Docket 42 at 23-24, 26.

[143] *See* 688 F.3d at 993–94.

that the consequences of preserving the ROW outweigh the seriousness of Interior's errors.

Balancing both factors, the Court concludes that vacatur of the ROW Cancellation is warranted.

## CONCLUSION

In light of the foregoing, IT IS HEREBY ORDERED as follows:

1. Plaintiff's Motion for Summary Judgment at Docket 56 is **GRANTED**.
2. Federal Defendants' Cross-Motion for Summary Judgment at Docket 70 is **DENIED**.
3. The State of Alaska's Cross-Motion for Summary Judgment at Docket 71 is **DENIED**.
4. The ROW Cancellation is **VACATED**.
5. The Clerk of Court shall enter a Final Judgment accordingly.

DATED this 24th day of November 2026, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE